# EXHIBIT B

```
                                            Page 1
 1   UNITED STATES BANKRUPTCY COURT

 2   DISTRICT OF DELAWARE

 3

 4   In re:                    :

                               :      Chapter 11

 5   ENERGY FUTURE HOLDINGS     :

     CORP.,  et al.,            :    Case No. 14-10979(CSS)

 6                              :

               Debtors.        :    (Jointly Administered)

 7   _____:

 8

 9

10                                  United States Bankruptcy Court

11                                  824 North Market Street

12                                  Wilmington, Delaware

13                                  December 16, 2015

14                                  9:43 AM

15

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN
```

1    HEARING re Status Update: Executory Contract and Cure

2    Dispute Issues

3

4    HEARING re Stewart Claims Objections

5

6    HEARING re Debtors' Fourteenth Omnibus (Substantive)

7    Objection to Certain No Liability Claims.

8

9    HEARING re Debtors' Thirty-Third Omnibus (Substantive)

10   Objection to Substantive Duplicate and No Liability Claims

11

12   HEARING re: Motion for Application of Federal Rule of

13   Bankruptcy Procedure 7023 and to Certify A Class Pursuant to

14   Federal Rule of Civil Procedure 23.

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
                                           Page 3

 1    A P P E A R A N C E S :

 2

 3    MORRISON & FOERSTER

 4         Attorney for the TCEH Committee

 5

 6    BY:  TODD M. GOREN

 7

 8    MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

 9         Attorney for TCEH Debtors

10

11    BY:  DAVID P. PRIMACK

12

13    PACHULSKI STANG ZIEHL & JONES

14         Attorney for 2nd Lien Indenture Trustee

15

16    BY:  JOSEPH M. MULVIHILL

17

18    NIXON PEABODY

19         Attorney for the American Stock Transfer & Trust

20         Company, as EFH Indenture Trustee

21

22    BY:  RICHARD C. PEDONE

23

24

25
```

Page 4

```
 1   KIRKLAND & ELLIS

 2        Attorney for the Debtors

 3

 4   BY:  EMILY E. GEIER

 5        BRENTON ROGERS

 6        APARNA YENAMANDRA

 7        JONATHAN GENTRY

 8        CHAD J. HUSNICK

 9

10   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

11        Attorney for Ad Hoc Committee of TCEH First Lien

12        Creditors

13

14   BY:  JACOB A. ADLERSTEIN

15

16   YOUNG CONAWAY STARGATT & TAYLOR, LLP

17        Attorney for Ad Hoc Committee of TCEH First Lien

18        Creditors

19

20   BY:  PAULINE K. MORGAN

21

22   HOGAN MCDANIEL

23        Attorney for Punitive Class Claimants

24

25   BY:  DANIEL K. HOGAN
```

Page 5

```
 1   SULLIVAN & CROMWELL LLP

 2         Attorney E-side Committee

 3

 4   BY:  ALEXA J. KRANZLEY

 5

 6   MONTGOMERY MCCRACKER WALKER & RHOADS, LLP

 7         Attorney E-side Committee

 8

 9   BY:  MARK A. FINK

10

11   POTTER ANDERSON CORROON LLP

12         Attorney for Deutsche Bank New York

13

14   BY:  R. STEPHEN MCNEILL

15

16   SHEARMAN & STERLING LLP

17         Attorney for Deutsche Bank

18

19   BY:  (Indiscernible)

20

21   MORRIS JAMES LLP

22         Attorney for Law Debenture of New York,

23         Indenture Trustee

24

25   BY:  STEPHEN MILLER
```

Page 6

```
 1   RICHARDS LAYTON & FINGER

 2        Attorney for the Debtors

 3

 4   BY:  DANIEL J. DEFRANCESCHI

 5

 6   DRINKER BIDDLE & REATH LLP

 7        Attorney for Citibank, NA TCEH DIP Agent

 8

 9   BY:  HOWARD A. COHEN

10

11   POLSINELLI

12        Attorney for TCEH Creditor's Committee

13

14   BY:  JUSTIN K. EDELSON

15

16   VENABLE

17        Attorney for PIMCO

18

19   BY:  DANIEL O'BRIEN

20

21   BIELLI & KLAUDER, LLC

22        Attorney for EFH Corp.

23

24   BY:  DAVID KLAUDER

25
```

1   WHITE & CASE LLP

2          Attorney for Investor Consortium

3

4   BY:  CHRIS SHORE

5

6   GELLERT SCALIE BUSENKELL & BROWN

7          Attorney for Mr. Stewart

8

9   BY:  GARY F. SEITZ (TELEPHONICALLY)

10

11  MONTEMAYOR & MONTEMAYOR

12          Attorney for Mr. Stewart

13

14  BY:  CHARLES MONTEMAYOR

15

16  ALSO PRESENT TELEPHONICALLY:

17  SCOTT L. ALBERINO

18  ARLENE R. ALVES

19  ASHLEY F. BARTRAM

20  PEG A. BRICKLEY

21  MARK A. CODY

22  KENT COLLIER

23  MICHAEL L. DAVITT

24  STACY DORÉ

25  CATHERINE EISENHUT

Page 8

1    BENJAMIN D. FEDER

2    BARRY FELDER

3    SETH GOLDMAN

4    CHRISTOPHER HAHM

5    MARK F. HEBBELN

6    NATASHA HWANGPO

7    HAROLD KAPLAN

8    CHARLES KOSTER

9    STUART KOVENSKY

10   DANIEL A. LOWENTHAL

11   ROBERT K. MALONE

12   JONATHAN D. MARSHALL

13   BRIAN P. MORGAN

14   HAL F. MORRIS

15   MEREDITH PFISTER

16   ABID QURESHI

17   RACHAEL RINGER

18   MARC B. ROITMAN

19   ERIK SCHNEIDER

20   KENNETH STEWART

21   AMER TIWANA

22   MICHAEL TURKEL

23   MATTHEW UNDERWOOD

24   KEVIN M. VAN DAM

25   APARNA YENAMANDRA

1    FOTEINI TELONI

2

3

4

5

6                    P R O C E E D I N G S

7              CLERK:  All rise.

8              THE COURT:  Please be seated.  Excuse me.  Good

9    morning.

10             MR. HUSNICK:  Good morning, Your Honor.  Chad

11   Husnick from Kirkland & Ellis LLP appearing on behalf of the

12   Debtors.  Your Honor, I we have a fairly short agenda this

13   morning but a couple of things we would like to knock out.

14             Your Honor, first on the agenda is a -- relates to

15   an order that Your Honor has already entered and that is on

16   the 2016 insider compensation motion.  We did agree with the

17   TCEH first lien ad hoc group that we would read an agreed

18   statement into the record.  So if I may, I'm going to read

19   that statement into the record.

20             THE COURT:  Yes.

21             MR. HUSNICK:  Throughout this case, the various

22   boards have worked to operate the business and maximize

23   value while also making efforts to preserve optionality for

24   the future owners.  With the entry of the orders approving

25   the PSA, that is the Plan Support Agreement, the settlement

1  and the plan, we now know that the TCEH first liens will be

2  the future owners of TCEH regardless of whether the current

3  plan goes effective or we need to resort to an alternative

4  plan.

5          As a result, the TCEH first liens have requested

6  increased access to management at the operating levels of

7  TCEH during the gap period between confirmation and the

8  effective date so that the TCEH first liens can hit the

9  ground running once TCEH emerges from bankruptcy.

10          In response to that request, the TCEH board has

11  agreed to give the TCEH first liens increased access to

12  management at the operating levels in the business and has

13  committed and looked forward to working with the TCEH first

14  liens to positively position the business and its cost

15  structure to adapt to changing market conditions and its

16  emergence from restructuring.

17          The Debtors stipulate that nothing in the proposed

18  order that Your Honor entered yesterday will prevent the new

19  board of reorganized TCEH after emergence from bankruptcy

20  from enacting whatever compensation plans they deem

21  appropriate to meet their new business plans subject to

22  limitations in the plan, the settlement and confirmation

23  orders and the plan support agreement regarding current

24  compensation plans and employment agreements.  That

25  concludes the statement.

1          THE COURT:  Okay.

2          MR. HUSNICK:  Your Honor --

3          THE COURT:  Hang on, Mr. Husnick.

4          MR. HUSNICK:  Pardon me?

5          THE COURT:  Hang on.  Someone wants to be heard.

6          MR. HUSNICK:  Sure.

7          MR. ADLERSTEIN:  Thank you, Your Honor.  Jacob

8   Adlerstein, Paul Weiss Rifkind Wharton & Garrison on behalf

9   of the ad hoc committee of TCEH first lien creditors.  Just

10  following up on Mr. Husnick's remarks, I want to thank the

11  Debtors, their professionals and their management for

12  agreeing to work with our clients to finally reposition the

13  TCEH business during this trying time.

14          We very much look forward to working together with

15  the Debtors on this critical endeavor.  As you've heard many

16  times before, the TCEH Debtors are facing significant

17  headwinds which have had a substantial impact on their

18  financial performance.  Just by way of example, the TCEH

19  first lien debt has traded down by nearly $10 billion since

20  the petition date and natural gas prices are currently under

21  $3 dollars.

22          As the future owners of reorganized TCEH, the ad

23  hoc committee of TCEH first lien creditors is very focused

24  on acting swiftly and aggressively to meet these challenges.

25  We look forward to working correctively with the company to

1   identify and implement changes prior to emergence that will

2   maximize the company's value and we appreciate very much the

3   company's commitment to work with us in this regard.  Thank

4   you.

5            THE COURT:  Okay.  Thank you.

6            MR. HUSNICK:  Thank you, Your Honor.  So this

7   takes us to the agenda.  Just as a quick preview, Your

8   Honor, if it's okay with you, we had proposed to proceed in

9   the following way.  First we would hear a short up status

10  update for Your Honor on the executory contract and cure

11  dispute issues that we identified on the agenda.  The bulk

12  of it's been adjourned but we wanted to give Your Honor an

13  update of what we're doing to try to narrow those objections

14  because there's a lot on the docket related to that -- those

15  issues.

16            Then we'll turn to the Stewart claims objections

17  and then last we will have the motion of the unmanifested

18  asbestos plaintiffs for a -- to appoint a class

19  representative and authorize the filing of a class proof of

20  claim.  If that order works with Your Honor, that's what we

21  would proceed with.

22            THE COURT:  That's fine.

23            MR. HUSNICK:  Okay.  Thank you, Your Honor.  And I

24  turn the podium over to Ms. Emily Geier from Kirkland.

25            THE COURT:  Thank you.  Good morning, Ms. Geier.

1          MS. GEIER:  Good morning, Your Honor.  Emily Geier

2     from Kirkland & Ellis appearing on behalf of the Debtors.

3     I'm here this morning like probably Chad Husnick said to

4     give a brief update on the contract assumption and rejection

5     process and where it stands today.

6          Cumulatively through the process, the Debtors have

7     assumed nearly 7000 contracts and rejected approximately

8     100.  The Debtors have paid or plan to pay $55 million in

9     care costs but the overall effort has generated about $400

10    million in savings to the Debtors.  Specifically through the

11    plan supplement, the Debtors assumed approximately 2800

12    contracts and rejected approximately 75.  The Debtors will

13    pay the $44 million in cure costs related to those plan

14    contracts on the plan effective date.

15         The Debtors received 11 formal objections or

16    reservations of rights and approximately 45 informal

17    inquiries from creditors.  As reflected in Exhibit Z to the

18    amended agenda, the Debtors have resolved the vast majority

19    of those objections.  As of today, only four contract

20    objections remain outstanding and as Your Honor is aware,

21    the confirmation order provided that any outstanding

22    contract objections would be heard at today's hearing.

23         The Debtors and the four objecting parties have

24    agreed to further adjourn those objections to the January

25    Omnibus hearing.  We don't believe that there's any

1    substantive disagreement on the issues.  It's just

2    additional time to reconcile our records and the party's

3    records and confirm the cure amounts.  The Debtors expect to

4    have those objections resolved before the January 14th

5    hearing.

6             Additionally, two contracts remain on --

7             THE COURT:  I'm sorry.  I'm just interrupting you

8    briefly so that it's being continued to January 14th?

9             MS. GEIER:  Exactly, the January Fourteenth

10   Omnibus hearing.

11            THE COURT:  Just give me a moment.

12            MS. GEIER:  And I can give you the names of those

13   objections.

14            THE COURT:  That's okay.  I just want to double

15   check that everything's correct with regard to our records

16   on that being a hearing date.  Okay.  That's fine.  That's

17   listed as starting at 9:00, by the way.  We won't start at

18   9:00.  We'll start that hearing at 10:00.

19            MS. GEIER:  That sounds like good news.

20            THE COURT:  Yeah.  I don't know why it's on at

21   9:00.

22            MS. GEIER:  Okay.  And additionally two contracts

23   remain on the Debtor's amended conditional assumption list.

24   We removed the majority of those contracts.  They've either

25   been assumed or one was moved to the reject list.  The

1   parties and the Debtors are finalizing the terms of those

2   two amended agreements.

3           We've reached an agreement in principle on each of

4   them and hope to enter into those amended agreements before

5   the January 14th hearing.

6           So updates for those two conditional assumptions

7   and the resolution of the remaining cure objections will be

8   reflected in an amended plan supplement that we'll file

9   before that hearing or other filings as necessary with the

10  Court.  Your Honor, I'm happy to answer any questions you

11  may have, otherwise...

12          THE COURT:  No, I have no questions, thank you.

13          MS. GEIER:  Great.  Otherwise I will yield the

14  podium to my colleague, Aparna Yenamandra, to address the

15  next item on the agenda.

16          THE COURT:  Okay.

17          MS. GEIER:  Thank you.

18          MS. YENAMANDRA:  Good morning, Your Honor.  Aparna

19  Yenamandra from Kirkland & Ellis on behalf of the Debtors.

20  Your Honor, the next item on today's agenda is the Debtor's

21  Fourteenth Omnibus objection to claims as it relates to

22  proof of claim number 5739 for an unliquidated amount and

23  10003 for $1.8 billion and the Debtor's Thirty-Third Omnibus

24  objection to claims as it relates to proof of claim number

25  10982 for an unliquidated amount.

1           Your Honor, we understand that on the original

2    agenda that was filed for today's hearing, we listed the

3    first two proofs of claim as they relate to the Fourteenth

4    Omnibus objection but inadvertently failed to list the third

5    proof of claim as it relates to the Thirty-Third Omnibus

6    objection.  This was remedied on the amended agenda and just

7    so Your Honor's aware, Kirkland sent an email to the

8    claimant and her representatives and agents, which I'll

9    provide more color on in a moment, on Monday morning before

10   the first agenda was filed indicating that the claims for

11   the Fourteenth and Thirty-Third Omnibus objection would be

12   up today pending further word from them, which we did not

13   receive.  And additionally, the one claim on the Thirty-

14   Third objection relates to the same basis for liability as

15   the first two objections.  So we'd like to go forward on all

16   three.

17           THE COURT:  That's fine.

18           MS. YENAMANDRA:  All three of these proofs of

19   claim were filed by Ms. Kukja Stewart who received notice of

20   Your Honor's order establishing a customer claims bar date

21   in her capacity as a former customer at TSU Energy.  Your

22   Honor may have seen that Ms. Stewart's counsel of record Mr.

23   Seitz withdrew his notice of appearance recently, which I

24   can provide more color on.

25           This means that Ms. Stewart is pro se.  We do not

1    believe that she is here today.  We understand that her son,

2    Mr. Kenneth Stewart and his purported agent, Mr. Marco

3    Montemayor, are here today.  Your Honor, neither Mr. Stewart

4    or Mr. Marco Montemayor are attorneys.  Mr. Stewart has

5    never filed a proof of claim and we're a bit unclear on the

6    capacity in which they speak today but we understand they're

7    here and we're happy to give them their time subject to Your

8    Honor's allowance.

9              THE COURT:  Mm hmm.

10             MS. YENAMANDRA:  So what I would propose, Your

11   Honor, just to bring some order to this presentation, is for

12   the Debtors to first kind of provide a brief overview of the

13   claims, including the items that Mr. Stewart and Mr.

14   Montemayor filed on the docket and then, second, the process

15   the Debtors undertook before and after filing the claims

16   objection as information floated to, for lack of a better

17   term, quadruple check that.  They had no relationship to the

18   allegations or liability based on the proofs of claim.

19             At that point, the Debtors would yield the podium

20   to Mr. Stewart and/or Mr. Montemayor if they so desire and

21   we'll (indiscernible) with rebuttal if needed.

22             THE COURT:  All right.

23             MS. YENAMANDRA:  Your Honor, the Debtors filed the

24   Fourteenth Omnibus claims objection on April 2nd, 2015,

25   years are important in this case, at Docket number 4050 and

1    the Thirty-Third Omnibus claims objection on October 16th,

2    2015 at Docket number 6499.

3            Each claims objection was supported by a

4    declaration from Mr. Steven Kotarba.  Mr. Kotarba is in the

5    Courtroom today and serves as a managing director at Alvarez

6    & Marsal, the Debtor's restructuring advisor.  His

7    declarations were docketed at Docket numbers 4051 and 6501

8    respectively.  I have copies of Mr. Kotarba's declaration if

9    Your Honor would like to see them.

10           THE COURT:  No, I have them

11           MS. YENAMANDRA:  Additionally, the Debtors

12   conducted additional searches of their books and records

13   based on information received from Ms. Stewart, Mr. Stewart,

14   Mr. Marco Montemayor and Mr. Seitz prior to his withdrawal

15   as counsel.  If called to testify about these additional

16   searches, Mr. Kotarba, who is a senior member of the

17   Debtor's claims evaluation team would testify that, first,

18   Ms. Stewart's discovery request included specific references

19   to persons, entities and over 50 property records, almost

20   all of which covered the same parcel of land, which is 1800

21   Hunter Ferrell Road.

22           As a baseline matter, the only identifiable land

23   parcel in Ms. Stewart's discovery request, again, 1800

24   Hunter Ferrell Road, is in Irving, Texas.  Now, although TXU

25   leases office space in Irving, the land in question is 10

1  miles from the company's closest operations.  The property's

2  in the streets of Hunter Ferrell Road and TXU's operations

3  do not overlap or intersect at any point.

4       The Debtor's investigation led by the Debtor's

5  claims evaluation team related to the discovery request

6  built upon the earlier investigation and involved, among

7  other things, a review of multiple internal software systems

8  including the mining and counting system maintained by

9  Luminant Mining's Real Estate Group through which it is

10 possible to review all the co-leases to which any company

11 entity is a party as well as the company's residential

12 customer payment system which, again, Ms. Stewart received

13 notice of the party in her capacity as a former customer, so

14 she would have been included in that search.

15      Second, a review of hardcopy books and records

16 maintained by the Debtor's land department; third, a review

17 of Dallas County property records; and, finally, general

18 internet searches.

19      These results found no documents indicating that

20 EFH has any ownership or leasehold interest in the property

21 described in Ms. Stewart's discovery request, no indication

22 that EFH has any operations that touch the property, no

23 documents indicating any relationship between Ms. Stewart

24 and EFH and no other documents that were responsive to the

25 request in any way.

1          Your Honor, at this time, I'd like to move both

2     Mr. Kotarba's written declarations and his proffered

3     testimony into evidence.

4          THE COURT:  Any objections?  It's admitted.

5          MS. YENAMANDRA:  Thank you, Your Honor.

6          MR. STEWART:  I object.

7          THE COURT:  Sir, if you're going to participate in

8     the hearing, it would be helpful if you were at counsel

9     table, not in the back of the Courtroom.

10          MR. STEWART:  Well, I have a counsel with me.

11          THE COURT:  Well, then why don't you approach?

12          MS. YENAMANDRA:  Again, Your Honor, we're not

13     aware of Ms. Stewart having counsel, but we will yield the

14     podium as necessary.

15          MR. STEWART:  This is Charles -- I need to

16     clarify.  Marco Montemayor is not here today.  My counsel,

17     Charles Montemayor from Dallas is here today.

18          THE COURT:  All right.  And you're Mr. Stewart,

19     for the record.  Yes, sir.

20          MR. MONTEMAYOR:  With the Court's permission, Your

21     Honor, I'm here, Your Honor, because Mr. Stewart has asked

22     me to try to comply some part with the order of the Court in

23     view of the fact that counsel that was in this case has

24     withdrawn as of this week.  And we don't know whether or not

25     he has submitted all of the information that we had sent to

1   him to submit to the Court.  So I am new.  I haven't had an

2   opportunity to meet counsel on the opposing counsel and I

3   haven't had a chance to talk to Mr. Seitz who was on this

4   case.

5          And I have information primarily to the fact that

6   Mr. Stewart here wants to submit information to substantiate

7   the fact that the properties that have been testified as not

8   sufficient enough to prove the proof of claim that he has

9   submitted to the Court.  And that's the main thing that Mr.

10  Stewart now asks the Court for that opportunity, Your Honor.

11         THE COURT:  Okay.  Well, I'm certainly going to

12  allow Mr. Stewart to be heard either individually or through

13  you, but to put some focus on what we actually are dealing

14  with presently, the question specifically at this point was,

15  was there an objection to the admission of the declaration

16  of evidence and the proffer of evidence that was just made

17  to the Court and was there any objection to its admission

18  into evidence.

19         MR. MONTEMAYOR:  Yes, Your Honor.

20         THE COURT:  You certainly can cross examine the

21  witness.  That's not an issue.  Obviously you have a right

22  to cross examination, but we're dealing with the direct

23  evidence.

24         MR. MONTEMAYOR:  Yes.  Mr. Stewart has invited me

25  to say that he's objected to the presentation regarding

1    that.

2              THE COURT:  And do you know the basis?

3              MR. MONTEMAYOR:  He would have to explain it, Your

4    Honor.  Like I said, I haven't had an opportunity to talk to

5    Gary Seitz regarding the attorney in this case who just

6    withdrew the case.

7              THE COURT:  All right.  Mr. Stewart, what's your

8    evidentiary basis for objecting to the evidence?

9              MR. STEWART:  They haven't done their due

10   diligence.  I have the documentations that I actually

11   submitted in the proof claim at the very beginning and I

12   have a list of easements that go across our properties.

13             THE COURT:  All right.  Well, that's something

14   that you can address in cross examination of the witness.

15   That doesn't go to whether the actual evidence submitted is

16   admissible and obviously whatever you do in cross would --

17   might affect the weight or that the Court would give to the

18   evidence that's already been admitted, so I'll overrule the

19   objection to the admission of the evidence, so the

20   declarations and proffer are admitted into evidence.

21             I'd like to -- before I open up, Mr. Kotarba --

22   fair enough -- to cross examination, I'd like the Debtors to

23   finish their presentation.  So if you'd have a seat, sir,

24   and we'd yield the podium back to the Debtor's counsel and

25   she can finish her presentation and then if you wish to

1    cross examine the witness I'll make him available.

2              MR. MONTEMAYOR:  Thank you, Your Honor.

3              THE COURT:  You're welcome.

4              MS. YENAMANDRA:  Thank you, Your Honor.  With the

5    inclusion of Mr. Kotarba's proffered testimony and his

6    declarations, we've made the bulk of our direct case.  But

7    it's probably helpful to provide some context before we put

8    Mr. Kotarba on the stand.

9              THE COURT:  Okay.

10             MS. YENAMANDRA:  So starting from the beginning,

11   the -- Ms. Stewart filed three proofs of claim.  In some

12   instances, Mr. Stewart signed the proof of claim but in all

13   instances Ms. Stewart was listed as the claimant.  Again,

14   the first one was filed before the bar date for an

15   unliquidated amount.  The second one was filed after the bar

16   date purporting to amend the first proof of claim and was

17   for $1.8 billion.

18             The first proof of claim is the one that included

19   a cover note from Mr. Charles Montemayor, a Texas counsel,

20   and I'll note that that proof of claim was filed October

21   20th, 2014, so these are hardly new allegations that we're

22   discussing today.

23             Both proofs of claim were based on the same set of

24   alleged facts.  First, that the Debtors owned or controlled

25   certain land parcels; second, that certain mining activities

1   occurred on the land parcels which gave rise to mineral

2   rights that the Stewarts assert an interest in; and third,

3   that the Debtors, again, own or control some sort of

4   transmission mines or pipelines that Ms. Stewart asserts she

5   owns or asserts that she otherwise has an interest in.

6          Before filing the Fourteenth Omnibus claims

7   objection which relates to the first two of the three

8   claims, the Debtors conducted a search of their books and

9   records and found no connection between either the land

10  reference and the proofs of claim, the alleged operations on

11  the land or any connection to the transmission lines or

12  pipelines.

13         The Debtors separate and apart from their

14  investigation of their books and records also reviewed the

15  materials appended to their proofs of claim in great detail

16  and, again, found nothing to suggest the Debtors were

17  connected to the land, the operations, the transmission

18  lines or the pipelines.

19         To give Your Honor a flavor of the appended

20  materials, which we have a copy of if you'd like to see

21  them, they consisted of title insurance certificates,

22  descriptions of various properties, the zoning reports and a

23  timeline of events related to the sale and purchase of the

24  land parcels.

25         Nothing in the timeline evidences any kind of

Page 25

1   relationship between the land and the Debtors.  Nothing in

2   the land descriptions or the title certificates demonstrate

3   that the Debtors have ever had any kind of relationship to

4   the properties or the operations at issue.

5          Consequently, based on both their independent

6   review of their books and records and the materials

7   submitted by Ms. Stewart with her proofs of claim, the

8   Debtors filed the Fourteenth Omnibus objection objecting to

9   proofs of claim 5739 and 10003 on the basis of no liability.

10         Following that filing, a few things happened.  Ms.

11  Stewart retained the law firm of Geller Scali Busenkell &

12  Brown LLC to represent her interests.  Mr. Gary Seitz of

13  that firm registered a notice of appearance with this Court

14  in connection with that representation on April 30th, 2015

15  at Docket number 4361.

16         Second, Ms. Stewart filed a third proof of claim.

17  Mr. Stewart signed it but, again, the claimant was listed

18  as. Ms. Stewart alleging liability on the same basis as the

19  first two proofs of claim and adding new unfounded

20  allegations regarding fraud on certain of the Debtor's

21  prepetition equity holders.

22         Mr. Seitz, the counsel of record, did not sign the

23  proof of claim and neither he nor his firm appear anywhere

24  on the proof of claim.

25         Third, Mr. Stewart and what I'll refer to as his

1    agent, Mr. Marco Montemayor, filed a number of papers on the

2    docket at Docket number 5384, 5716, 6101 and 6934 and

3    submitted various materials to Kirkland.

4              THE COURT:  Can I interrupt for a moment.  Can you

5    give me the docket number again?  I'm sorry, for the notice

6    of appearance.

7              MS. YENAMANDRA:  Yes, 4361 was the original notice

8    of appearance and the withdrawal was at Docket number 7343.

9              THE COURT:  Okay.  I'd like to look at those, just

10   give me a minute, 7343?

11             MS. YENAMANDRA:  Yep.  Your Honor, I can provide

12   some context around the filing of the -- the timing of the

13   filing of the withdrawal.

14             THE COURT:  All right.  Just, before you get that,

15   I just wanted to look at it, so just give me a moment.

16   That's what I thought it was.  Is Mr. Seitz present or

17   anyone from Geller present in court?  All right.  I hear

18   nothing.  Give me just a moment.  All right.  Sorry to

19   interrupt.  You can proceed.

20             MS. YENAMANDRA:  Thank you, Your Honor.  So as I

21   noted, following the filing of the Fourteenth Omnibus

22   objection, Mr. Stewart and Mr. Marco Montemayor filed a

23   number of materials on the docket, submitted various

24   materials to Kirkland, again, kind of continuing on the

25   theme that we saw with the first two proofs of claim.

1      These materials continued to reference actions

2  taken by entities with no relationship to the Debtors, to

3  name a few AT&T, Verizon, Allstate Insurance, Edison

4  International, Gifco Properties and (indiscernible) as well

5  as claims related to land parcels with no relationship to

6  the Debtors, again, 1800 Hunter Ferrell Road, which is one

7  of the few identifiable land parcels mentioned, which again

8  sits roughly 10 miles from the closest company operations.

9      These submissions of materials that make various

10  allegations but do not show any liability on the part of the

11  Debtors continued up until this morning when Mr. Montemayor

12  filed a statement of facts identifying -- it's unclear

13  whether it's Ms. Stewart or Mr. Stewart as a major interest

14  holder in TXU and Edison International as it relates to the

15  solvency of Oncor.  This is at Docket 7369.

16      Your Honor, candidly, we don't know the basis of

17  these allegations.  We'll let Mr. Stewart speak for himself

18  but, again, it seems to ride the theme of the first two

19  proofs of claim where there's nothing showing any liability

20  on the part of the Debtors.

21      To date, neither Ms. Stewart, who is the only

22  actual claimant here who has filed a proof of claim, nor any

23  of her representatives or agents have actually filed a

24  response to the Debtor's claims objections and consequently

25  the Debtors did not file a formal reply.

```
 1              Instead, based on the materials we received,
 2    informal communications between the Stewarts, their agents,
 3    their representatives and the Debtors and cognoscente of the
 4    Court's time and resources, the Debtors agree to adjourn the
 5    claim's objections to, one, hopefully develop a consensual
 6    resolution and, two, again, quadruple check what we knew to
 7    be true from our first review of our books and records, that
 8    we had no relationship to any of the allegations in the
 9    proofs of claim.
10              Before I quickly touch upon the quadruple check
11    that we did, we wanted to make clear that Mr. Ken Stewart
12    has not filed any proofs of claim.  It has not been made
13    clear to the Debtors whether he believes he has any claims
14    separate and apart from the ones filed by his mother.
15              If he does, those claims have never been properly
16    asserted or filed with the Debtors or filed on the claims
17    register, excuse me, and we would seek to expunge those
18    claims on the same basis as the claims asserted by Ms.
19    Stewart.
20              So very quickly to run through what the Debtors
21    did to review the proofs of claim and appended materials, we
22    of course rechecked our books and records, confirmed
23    independently there was no relationship to the land, the
24    mining operations, the transmission lines or the pipelines.
25    Second, members of the Debtor's legal team both in-house and
```

Page 29

1   at Kirkland engaged in telephonic and in-person meetings

2   with Mr. Marco Montemayor, who professed to be the agent for

3   Mr. Stewart, to understand the asserted claims.  These did

4   not result in the production of any additional material from

5   any one purporting to act on behalf of the Stewarts

6   evidencing a relationship between their claims and the

7   Debtors.

8          Third, and this will provide some context around

9   the withdrawal, Mr. Seitz served certain discovery requests

10  on the Debtors asking the Debtors to produce any documents

11  that relate to leases, easements or agreements between the

12  Debtors and the Stewarts or between the Debtors and the

13  parcels of land identified in the proofs of claim.

14         We did another search of our books and records and

15  found no relationship.  We did also kind of going above and

16  beyond the call of duty, did an online search for a sample

17  of the document request and our results fall into three

18  buckets.  Some of the references yielded no results at all.

19  Some of them referenced -- some of them yielded results but

20  showed no relationship to EFH.  For example, we found a

21  mortgage to Stewart and Susan (indiscernible) who we have no

22  reason to believe had any connection to Mr. Kenneth and Ms.

23  Kukja Stewart.  Another result was a deed grant from Ms.

24  Stewart to a company that we understand the Stewart family

25  formed several years ago.

1          And then finally many of the results showed no

2     relationship between the land and the Stewart family.  For

3     example, there is a 1986 deed from Las Colinas Corporation

4     to Woodrow and Co. and an assessment of non-payment of

5     homeowner fees from a Mr. Robert (Indiscernible), again,

6     basically nothing showing a relationship to the Debtors or

7     in some instances even to the claimant.

8          After providing these results to Mr. Seitz, Mr.

9     Seitz withdrew as counsel and that notice of appearance as I

10    mentioned is at Docket 7343.

11         So in sum, Your Honor, Ms. Stewart and to the

12    extent he asserts any of his own claims based on the same

13    allegations, Mr. Stewart, have not alleged facts sufficient

14    to support legal liability and we commit that these proofs

15    of claim are invalid on their face.

16         The Debtors have undertaken an exhaustive search

17    to confirm they have no relationship to the Stewarts, the

18    land parcels at issue, the mining operations, the

19    transmission lines, the pipelines or any of the mine and

20    lease agreements that are referenced in the proofs of claim

21    and for this reason, Your Honor, we would ask that you

22    expunge the claims.

23         At this time, we'll turn the podium over and

24    reserve for rebuttal as necessary, unless Your Honor has any

25    questions.

1    THE COURT:  I don't have any questions.  I want to

2    take a very short recess, though.

3        (Recess)

4        CLERK:  All rise.

5        THE COURT:  Please be seated.  All right, well, we

6    have a problem in that Mr. Seitz has purported to withdraw

7    without notice to the Court, without motion and without a

8    court order.  And under our local Rule 9010-2(b), if you

9    have a matter pending before the Court, which he does, and

10   you are not substituting an attorney admitted before the

11   bar, which he has not, your representation continues until

12   the Court says it doesn't.

13       I've tried to contact Mr. Seitz directly and got

14   his voicemail.  As far as I'm concerned, he's in contempt of

15   court by not being here at a noticed hearing and I'm not

16   willing to proceed right now without counsel for Mr. Stewart

17   who knows something about what's going on in this case,

18   since the one he brought obviously doesn't, before the Court

19   so we can have a substantive discussion of the merits with

20   proper representation of Mr. Stewart.

21       So we're going to continue for the minute or the

22   time being this matter until I can hopefully reach Mr. Seitz

23   or someone can reach Mr. Seitz and get him in court where he

24   belongs and we can have this matter addressed on the merits.

25   And we will take the bar date motion or, excuse me, the

Page 32

```
 1    class group claim motion.

 2            Don't anybody go anywhere.  We're going to address

 3    this today one way or the other.  But hopefully we'll be

 4    able to contact Mr. Seitz and get him here.  I know he's

 5    generally not in the Delaware office.  He operates out of

 6    Philadelphia, so I'm not sure exactly how this will work,

 7    the nuts and bolts of it.

 8            So Mr. Stewart, we're going to hold off.  All your

 9    rights are reserved.  You'll get your opportunity to speak

10    hopefully through Mr. Seitz or at least I'll be able to

11    question Mr. Seitz about what exactly is going on and then

12    we'll figure out how to proceed.

13            So if you could have a seat back in the gallery

14    again, they will hold your matter for the time being and

15    we'll move on to the class proof of claim matter.

16            I think Mr. Hogan's here.  I see him in the

17    gallery.

18            MR. HUSNICK:  Your Honor, before we move on, Chad

19    Husnick from Kirkland & Ellis.  I had one counsel for the

20    EFH indentured trustee asked me -- they're in the Court

21    today and I believe they'd like to be excused.  There was an

22    order filed under certification of counsel last night.

23    Unless Your Honor had any questions and we didn't have a

24    formal presentation on that order.

25            THE COURT:  I thought we were going to -- I
```

Page 33

1    thought doing that was going to avoid him having to travel

2    was the whole point you asked for permission to file the

3    CNO.

4              MR. HUSNICK:  That's correct, Your Honor.  So

5    unfortunately we -- because it wasn't entered we had him

6    down here.

7              THE COURT:  Right.

8              MR. HUSNICK:  But I want to just follow up and

9    make sure.

10             THE COURT:  All right.  I've signed that order, so

11   Mr. Pedone, you can get back on a plane.

12             MR. HUSNICK:  Thank you, Your Honor.

13             MR. PEDONE:  Thank you, Your Honor.

14             THE COURT:  You're welcome.  So let's take the

15   next matter.

16             MAN:  Your Honor, may I be excused?

17             THE COURT:  Yes, Mr. (indiscernible).

18             MAN:  Oh, thank you.  Happy holidays.

19             THE COURT:  You, too, sir.  I'm going to get you

20   to shave that beard off, Mr. (indiscernible).

21             MAN:  (Indiscernible).  Thank you.

22             THE COURT:  You're welcome.  Mr. Hogan?

23             MR. HOGAN:  Good morning, Your Honor.

24             THE COURT:  Good morning.

25             MR. HOGAN:  Daniel Hogan of Hogan McDaniel on

1    behalf of the punitive class claimants, Your Honor.  Your

2    Honor, this is our motion for application of federal rule of

3    bankruptcy procedure 7023 and to certify a class pursuant to

4    federal rule of civil procedure 23.

5         The class claimants, Mr. Joe Aribe, Michael

6    Cunningham and Michelle Zieglbaum are unmanifested

7    claimants.  We move pursuant to Section 105 of Title 11

8    together with Rules 9014 and 7023 afore ordered asking you

9    to exercise your discretion to apply 7023 to the class

10   claimants class proof of claim which was filed on behalf of

11   unmanifested asbestos claims.

12        Jeanne Mirer is the attorney of Mirer Mazzocchi

13   Schalet & Julien PCCL or PLLC.  She's the class

14   representative.  She has been admitted in this case pro hoc

15   vice, Your Honor.  Her affidavit was attached to the amended

16   motion and, Your Honor, preliminarily I would ask how the

17   Court wishes to proceed.

18        We have, of course, attached affidavits to our

19   application.  Those affidavits are largely uncontested by

20   the Debtors.  The Debtors in their response attached a

21   number of web searches.

22        But aside from that, in an affidavit from the

23   noticing agent, there isn't largely a large amount of

24   evidence in this matter.  And so I don't know if the Court

25   wants to proceed to argue the merits of the motion or if you

1   would prefer to have schedule some sort of evidentiary

2   hearing and that preliminarily I wanted to ask the Court how

3   it wanted to proceed.

4            THE COURT:  Well, what's the Debtor's position on

5   that?

6            MR. ROGERS:  Your Honor, the affidavits are

7   obviously hearsay.  It is true that for purposes of this

8   hearing there's nothing in the affidavits that we believe

9   has any impact on the Court's determination of the motion.

10  Nevertheless, we don't agree that the affidavits are

11  admissible evidence and we don't think they should come into

12  evidence.

13           I don't think that there is an evidentiary issue

14  to be decided in the case, so I don't think it makes any

15  sense to have an evidentiary hearing.  But, you know, we do

16  not agree that the affidavits should come into evidence at

17  this time.

18           THE COURT:  All right.  Mr. Shore?

19           MR. SHORE:  Your Honor, Chris Shore from White &

20  Case on behalf of the investor consortium.

21           THE COURT:  You're fine.

22           MR. SHORE:  We filed a joinder.  We have no

23  objection to the declarations going into evidence provided

24  that -- and we could waive cross examination -- provided

25  that counsel stipulates on the record that each of the

1     affiants receive actual notice of the bar date order and

2     each of the affiants has filed a proof of claim in the

3     action.

4            THE COURT:  Mr. Hogan?

5            MR. HOGAN:  Your Honor, I know from firsthand

6     accounts that they in fact did not receive actual notice of

7     the bar date.  They became aware of the bar date but they

8     didn't become aware of the bar date by virtue of the notice

9     provided by the Debtor through their notice process pursuant

10    to the bar date order.  And so I can't attest to that issue.

11           THE COURT:  All right.  Give me a second.

12           MR. HOGAN:  Certainly.

13           THE COURT:  I assume your affiants aren't present

14    in court.

15           MR. HOGAN:  That's correct, Your Honor.  It wasn't

16    exactly clear, Your Honor, whether this was going to be an

17    argument on the motion or whether it would be for the

18    purposes of scheduling an evidentiary hearing since we do

19    have the preponderance of the evidence standard that we need

20    to meet with regard to our application and I presume that

21    there would be some objection to the entry of those

22    affidavits as evidence.

23           THE COURT:  I don't think that it's necessary at

24    least at this point to have an evidentiary hearing and I

25    don't think it's necessary to admit the affidavits.  I'd

1  like to hear discussion of the law and based on the record

2  that exists and depending on how that goes I'll determine

3  whether to rule on the merits or whether to put this over

4  for an evidentiary hearing.

5          MR. HOGAN:  That's fine, Your Honor.  Thank you.

6          THE COURT:  You're welcome.

7          MR. HOGAN:  Your Honor, as you're well aware, on

8  July 15th the Court set a bar date of Monday, December 14th,

9  2015 for claimants having unmanifested claims to file a

10  proof of claim.

11          Generally, Your Honor, you followed the case law

12  in In Re: Grossman from the Third Circuit and directed that

13  such persons who were employees and contractors who

14  encountered asbestos in the asbestos Debtors' facilities or

15  who were exposed by take-home exposure at a household to

16  file what was characterized as an unmanifested asbestos

17  claim.  In order to have it discharged in this case.  You

18  relied, of course, on the Jeld-Wen Van Brunt matter.

19          Accordingly, you set two proof of claim, discrete

20  proof of claims, one for manifested and one for

21  unmanifested.  You characterized the notice scheme such that

22  everyone presumably would be noticed.  The class claimants

23  are persons who are, in fact, they hold unmanifested claims

24  and who as I've said earlier did not receive notice of the

25  bar date.

1          This motion they filed on behalf of themselves and

2     others similarly situated individuals and in order to

3     preserve the rights as well as the right of their fellow

4     workers and loved ones who feared that they may be

5     unwittingly have their rights disposed of by the bar date.

6          I attached, as I indicated earlier, the affidavits

7     of Mr. Joe Aribe, an insulator with the Heat and Frost

8     Insulator and Allied Workers of Local 222 in Deer Park,

9     Texas who for over 20 years was employed by Vasco.  His

10    affidavit is replete with indications that he was exposed to

11    asbestos, asbestos containing dust from work as a tradesman

12    at the plant.

13         He was also exposed, Your Honor, during the yearly

14    shutdowns which contained apparently significant exposures

15    when carpenters and painters would sand down asbestos

16    containing joint compound and the asbestos would apparently

17    rain down on him.  They were provided, interestingly, no

18    uniforms, Your Honor, and therefore, had to take home their

19    clothes.  They would take these clothes home and presumably

20    other individuals in the family would then be exposed to the

21    asbestos by the take-home exposure.

22         Importantly, Your Honor, he's also in a position

23    as the director of field educational research at the AFL CIO

24    and would -- you would have expected that he would have

25    heard of the bar date.  He did not.

1          So despite his extensive exposure, he is not yet

2     manifested, so he is perfectly characterized as an

3     unmanifested claimant.

4          Mr. Cunningham also was not suffering from any

5     exposure to asbestos.  However, he was an insulator as well

6     in the same union as Mr. Aribe working specifically at the

7     WA Parish Power Plant.

8          Mr. Cunningham, likewise, did not receive any

9     notice from the Debtors were there notice program of the EFH

10    bar date, even though he's active in the union and even

11    though you would expect him to have received notice through

12    those channels.

13         Mr. Cunningham represents a class of people who

14    have been exposed in an asbestos plant owned by the Debtors

15    and who has not yet manifested and asbestos-related disease.

16         Michele Ziegelbaum is a family member of a former

17    contractor who performed work at the Beaver Generating

18    Station in Clatskanie, Oregon, listed as one of the power

19    and nuclear plants owned and operated by the asbestos

20    Debtors.

21         Her husband suffered from mesothelioma as a result

22    of his exposure.  However, Ms. Ziegelbaum has not manifested

23    any asbestos injuries to this point.  Interestingly, her

24    husband did not receive any notice of the unmanifested bar

25    date by either direct mailing which would have allowed her

Page 40

1    to file the proof of claim.

2            The claimants filed, in fact, did file their proof

3    of claim before the bar date on behalf of the nationwide

4    class of people who had been exposed either through work or

5    through take-home exposure.

6            In terms of asking the Court to exercise its

7    discretion, we believe that the courts in this district as

8    well as in the circuit have permitted the exercise of

9    discretion to allow the filing of a class proof of claim

10   relying largely on In Re: American Reserve Corp case and

11   also In Re: Zenith Labs, which is at 104 B.R. 659, that's a

12   bankruptcy from the District of Delaware -- or District of

13   New Jersey, excuse me.

14           The right to file a proof of claim is governed, as

15   you know, Your Honor, by 11 USC 501.  501's of course silent

16   on actually whether or not a class proof of claims may be

17   filed but other courts have looked to 901(4)(c) which allows

18   a court at any stage of a proceeding to direct that one or

19   more of the other rules of Part 7 shall apply.

20           Consistent with 904(1)(c) [SIC], the application

21   of federal rule of bankruptcy procedure 702(3) the proof of

22   claims is within the discretion of the Court.  That's In Re:

23   Tarragon Corp. and also In Re: American Reserve Corp.

24           The Third Circuit specifically has not considered

25   the question but, as I said, courts in the circuit have

Page 41

1   permitted the class proof of claims to be filed at your

2   discretion.

3           The Court at In Re: American Reserve articulated

4   compelling arguments in support of interpretation of the

5   bankruptcy rules that permits class proof claims as being

6   consistent with the legislative intent of the drafters of

7   the rules.  In Re: Zenith Labs holding that the policies

8   underline class action in congress explicit provision for

9   the application of federal rule of -- or federal rule of

10  civil procedure 23.  The bankruptcy proceeding supports the

11  view in the latter cases In Re: American Reserve set forth

12  as the better rule.

13          The discretionary factors within the scope of the

14  Court's review weigh strongly in favor of permitting claims

15  (indiscernible) to proceed with the class proof of claim.

16  In Re: Tarragon Corp. in that case the court ordered

17  delineated factors the court should consider when

18  determining whether to exercise its discretion to allow

19  class proof of claim.

20          Those factors included prejudice to the Debtor and

21  to other creditors, prejudice to the punitive class members,

22  efficient estate administration, the conduct to the

23  bankruptcy case -- conduct in the bankruptcy case of the

24  punitive class representatives in the status of the

25  proceedings of other courts.

Page 42

1          Class claims motion here, Your Honor, is

2     presumptively timely.  The motion was filed before the bar

3     date.  The class proof of claims were both filed before the

4     bar date.

5          In deciding whether a claim is prejudicial to the

6     Debtor and to the efficiency of the administration of this

7     estate, courts look for the timeliness of the motion and the

8     filing of the underlying proof of claim.  As I stated, we

9     filed before the deadline.

10          District courts have held that 702(3) is properly

11     considered when a class proof of claim or a motion for class

12     certification is filed contemporaneous with a submission of

13     the class proof of claim.  It is right and appropriately

14     considered at the time of the filing of the motion for class

15     certification when timely filed with a proof of claim.

16          There's been no delay here, Your Honor.  As

17     argued, the class claimants have conducted themselves

18     diligently and consistent with the efficient administration

19     of this estate.  This is their first appearance in the case,

20     Your Honor.  It's not as if they've waited.

21          The lack of delay as to the Debtor applies with

22     equal force to the other creditors.  They're not injured in

23     any way by this motion.

24          Second, failure to exercise the discretion to

25     permit a class proof of claim would result in severe

Page 43

1   prejudice to persons similarly situated to the class

2   claimants.  The strongest single factor warning the exercise

3   of discretion to permit a class proof of claim is far and

4   away prejudiced to the punitive class members.

5          Well, our -- well, claimants Aribe and Cunningham

6   as contractors were presumptively entitled to perceive

7   direct mail pursuant to the notice procedures previously

8   addressed by this Court.  They received no such notice.

9   Similarly, claimant Ziegelbaum is married to a person who

10  suffered from meso and her status as a family member of such

11  should have made her readily identifible for the purpose of

12  mailing requirements in the notice scheme.  Class claimants

13  can hardly be said to be unknown unknowns as their names

14  resultively appear in the business records.

15         In the absence of class certification, such

16  persons with unmanifested injuries dealing claims under

17  Grossman would be subject to discharge.  Prejudice then to

18  those persons would be great.  They would effectively be

19  brought to due process which the Court has explicitly found

20  in its July 15th, 2015 order that they were due.

21         Critically, the availability of relief pursuant to

22  Grossman should not weigh against the Court exercising its

23  discretion with respect to Rule 23 in granting this motion.

24  As this Court has held, the bar date was required as to all

25  claims by the plain language of the statute and on such

Page 44

```
 1    basis the that the Court determine a priority the scope of

 2    due process protections which each type of unmanifested

 3    claimant is entitled.

 4          Should this motion not be granted, such similarly

 5    situated class claimants would not file individual proof of

 6    claims and may nonetheless be entitled to a pro hoc, post

 7    pro hoc, post hoc case-by-case evaluation of other due

 8    process rights per Grossman.

 9          Rather, by extending Rule 23 to the proof of

10    claims process, this Court may satisfy the requirements in

11    order in terms of protecting the bar date.

12          Finally, Your Honor, the case-by-case analysis

13    under Grossman also obviates the concern of an opt-out class

14    will provide an end around to the bar date.  Any end around

15    made by the punitive class members opting out pales in

16    comparison to the end run made by a flood of potential

17    claimants seeking an individualized review of their due

18    process rights per Grossman.  Thus, the efficient

19    administration of the estate is enhanced by the Court's

20    exercise by applying Rule 7023.

21          In applying 7023, Your Honor, the Court should

22    grant the motion to proceed the class, the requisite showing

23    under 7023 having been made to secure the class.  Generally,

24    Your Honor, what we're looking for is a general class with

25    two sub classes, one class for those individuals who were
```

1    exposed at work and yet are unmanifested and then a second

2    class for those who were exposed by take-home and who are,

3    again, yet unmanifested.

4            Rule 23 standard requires, obviously, a couple

5    things, Your Honor, a number of things.  With regard to

6    23(a), we obviously have to demonstrate numerosity,

7    commonality, typicality and adequacy of representation.

8    These are threshold issues that we have to demonstrate,

9    hence my comments earlier about the preponderance of the

10   evidence standard and whether we needed and evidentiary

11   hearing.

12           Once we prove 23(a), we then move to 23(b) and

13   we'll do that, Your Honor, but first let me address the

14   23(a) requirements.  First, Your Honor, (indiscernible),

15   (indiscernible) requires a finding of the class

16   representative be appointed only if the joinder of all class

17   members would be impractical.

18           We've seen from the response of the Debtors

19   there's a number of claims that have been filed in excess in

20   the thousand, Your Honor.  It'd be impractical for the Court

21   to join all those individuals in a single action.

22           Given the scope of the facilities operated by the

23   asbestos Debtors, likewise, lends itself to the fact that

24   joinder would be inappropriate.  Class claimants bring this

25   motion on behalf of thousands of similarly situated persons

1     whose occupational -- who are occupationally exposed to

2     asbestos in the asbestos Debtor's facilities who have not

3     yet manifested claims.

4              As the district court in the Third Circuit has

5     found, the numerosity requirement may be met by less than

6     1000 class members and that's in Beck v. Maximus Inc., 457

7     F. 3d at 294, finding a proposed class of 776 claimants

8     satisfied the numerosity requirement.

9              With regard to the next element under 23(a), Your

10    Honor, commonality, a punitive class satisfied 23(a)'s

11    commonality requirement if the main plaintiff shared at

12    least one question of fact or law with grievances of the

13    proposed class.

14             Here, Your Honor, the bar is not high.  Courts

15    have acknowledged a commonality be present even when all

16    members of the plaintiff class have not suffered an injury.

17    That's Baby Neal v. Casey 43 F. 3d 48, where class members

18    don't have identical claims In Re: Credential Insurance 148

19    F. 3d at 311 and most dramatically where some member claims

20    were arguably not even viable, Sullivan v. DB Investments,

21    Inc., 667 F. 3d at 273.

22             The focus on commonality, Your Honor, the part in

23    query is not on the strength of each class member's claim

24    but instead on whether the defendant's conduct was common to

25    all the class members, the focus being on the defendant's

Page 47

1    conduct.  Here we have class-wide answers.  The defendant's

2    conduct was common to all the class members and common

3    questions lead to common answers such as these alleged

4    misconduct and harm it caused whether it would be common to

5    all the class members.

6           Here the common questions relate to the health

7    hazards of asbestos, the Debtor knew about those hazards,

8    their failure to warn and the ineffectiveness of the safety

9    products that they utilized for their employees.  All class

10   claimants share the above class-wide answers to these

11   questions with the similarly situated class of the persons

12   who they seek to represent.

13          Finally, Your Honor, a single common question

14   regarding Debtor's behavior is sufficient to meet the

15   commonality requirement, thus a class may be certified even

16   in the presence of individualized determinations which may

17   be necessary to completely resolve the claims of each

18   punitive class member in the case.  That's In Re: Community

19   Bank of North Virginia versus Mortgage Lending Practices

20   litigation PNC Bank NA 795 F. 3d at 399.

21          Next, Your Honor --

22          THE COURT:  Mr. Hogan, I do apologize.  I have Mr.

23   Seitz on the phone, so I'm going to take a recess and talk

24   to him.

25          MR. HOGAN:  Certainly, Your Honor.

Page 48

1          (Recess)

2               CLERK:  All rise.

3               THE COURT:  Please be seated. Just very quickly

4      before we continue with Mr. Hogan, and I do apologize.  I

5      spoke with Mr. Seitz and he is in court in Philadelphia, but

6      he is available to participate by telephone, so we will

7      obviously deal with Mr. Hogan's matter at -- depending on

8      when we're done there.  We'll take a recess and we'll

9      reconvene the Stewart issue at 1:00 PM, and Mr. Seitz will

10     participate by court call to the extent there are any

11     issues.

12              MR. HUSNICK:  Your Honor, my understanding is that

13     Mr. Kotarba has a deposition in New York scheduled for 2:00

14     o'clock.  You've -- I'm sorry?

15              MAN:  I already moved it from 1:00 to 2:00.  I

16     can't --

17              MR. HUSNICK:  It's in the --

18              THE COURT:  But he's a witness.  I had a hearing

19     booked all day today.

20              MR. HUSNICK:  Understood.  Can we try and move it

21     again?

22              MAN:  I'll ask.  I apologize, it's my deposition.

23     Is there a possibility that we could do it earlier than

24     1:00?

25              THE COURT:  No.  He's in court.

1    MR. HUSNICK:  While we're doing the asbestos

2    argument, we'll step out into the hall and I'll call his

3    counsel.

4    THE COURT:  Yeah, see what you can do.  I mean,

5    Mr. Stewart traveled from Texas.

6    MR. HUSNICK:  Understood.

7    THE COURT:  This was the time for the hearing.  I

8    know it's inconvenient and I know everybody expected it

9    would actually be done this morning, but circumstances have

10   evolved in such a manner that we're, you know, in a tough

11   spot.

12   There may be factual questions, if nothing else, I

13   need to ask Mr. Seitz about what was done, what was said, et

14   cetera.  He -- I -- based on our preliminary conversation, I

15   don't think I'll ask him to abdicate on behalf of Mr.

16   Stewart, but it'll be helpful to have him on the phone.

17   MR. HUSNICK:  Understood, Your Honor.  I'll step

18   out and try and resolve this action.

19   THE COURT:  Okay, thank you.

20   MR. HUSNICK:  Thank you.

21   THE COURT:  Let me know.  Okay, Mr. Hogan.  Again,

22   I apologize.

23   MR. HOGAN:  Thank you.

24   THE COURT:  Again, I apologize.

25   MR. HOGAN:  No, Your Honor, not a problem.  Just

Page 50

1    don't hold me in contempt, Your Honor.

2              THE COURT:  I won't, you're here.

3              MR. HOGAN:  Your Honor, returning to my argument,

4    I believe I left off with regard to 23(a) with regard to the

5    typicality requirement, that being the typicality

6    requirements of 23(a) where a class rep can satisfy those

7    requirements where they possess the same interest and same -

8    - and suffer the same injuries as the other class members.

9              To avoid a typicality for the purposes of class

10   certification, courts often ask are the class claimants

11   claims typical in the common sense of the class, suggesting

12   that the incentives of the plaintiffs are aligned with those

13   of the class.

14             Factual differences will not render a claim

15   atypical if the claim arise from the same event or practices

16   or course of conduct that give rise to the claim of the

17   class members.  Here -- and further, Your Honor, even where

18   there's the presence of unique defense, that alone will not

19   render a class claim as atypical.

20             Here, Aribe and Cunningham are members of the

21   class occupationally exposed in plants designed my asbestos

22   debtors, and Ziegelbaum is a family member who was

23   occupationally exposed or a family of someone who was

24   occupationally exposure, and thus, the risk of asbestos-

25   related disease by take-home exposure.  As such, all class

1    claimants may then fill out proof of claim forms and are

2    members of the punitive class.

3            Further, the claims raised by the class claimants

4    that the asbestos debtors negligently, and with knowledge of

5    the health hazards posed by asbestos, exposed them to

6    asbestos and its attendant harm is a typical legal theory

7    common in every state in which it could be pled.

8            Further, class claimants stand in the same

9    relation to a legal injury as every other similarly-

10   situation person within the class; that is, each holding a

11   claim as accrued under Grossman, though they have not yet

12   manifested a physical injury.  In Re: School Asbestos

13   Litigation, 789 F. 2d at 1000.  The typicality requirement

14   was satisfied because the plaintiffs theories of liability

15   were harmonious and the named plaintiff stood in the

16   position similar to the other class members.

17           Next, Your Honor, the final issue under 23(a)

18   relates to whether the class representative and their

19   attorneys can fairly and adequately represent the interests

20   of their clients.  Rule 23 requires that the class rep and

21   class counsel fairly and adequately protect the interest of

22   the class and not the class rep.  By the way, Your Honor,

23   just FYI, obviously Jeanne Meyer is the class action

24   attorney in this.  To the extent that you were to grant this

25   motion, she's the one who would prosecute the class proof of

1    claim, Your Honor.

2            The adequacy of representation examines two

3    matters, the interest and incentives of the class

4    representatives and the experience and performance of the

5    class counsel.  By that inquiry, Rule 23(a) adequacy

6    requirement is designed to uncover conflicts of interest

7    between the name parties and the class they seek to

8    represent.  As to class counsel, the adequacy requirement

9    assures that the counsel possess adequate experience and

10   will vigorously prosecute the claim, and will act at an

11   arm's length from the defendant.  As attested to in the

12   Meyer affirmation, which is attached to our motion, class

13   counsel is an experienced attorney well versed in bringing

14   class actions in Federal Court and is, therefore, able to

15   provide vigorous prosecution to such claims against the

16   Debtor.  There is no conflict here as between the classes

17   because as to both sub-classes, they are individuals who,

18   depending on whether they were exposed at work or by take-

19   home, they still are unmanifested asbestos claimants and

20   they're agnostic to one another, Your Honor.

21            So, Your Honor, what we have here is an alignment

22   of interest and incentives between the class representatives

23   and the rest of the class.  So long as the class members are

24   united in asserting a common right, such as achieving the

25   maximum possible recovery for the class, the class interests

1    are not agnostic for representation purposes.  Thus, there

2    is no fundamental inner class conflict that prevents class

3    certification.

4         The class claimants in the claim they seek to

5    represent all proceed on the same theories and suffer the

6    same legal harm claims cognizable under Grossman and, yet,

7    unmanifested.  Class claimants seek to protect all those

8    with unmanifested claims like them who, for reasons of

9    notice or disability or for other reasons, would not file

10    their claim by the bar date of December 14, 2015.

11         Class claimants are in no actual conflict with the

12    punitive class members, nor can they have any speculative

13    conflict be adopted by the Debtors to defeat the adequacy

14    requirement.

15         That brings us to 23(b), Your Honor.  Assuming

16    that we can satisfy the requirements of 23(a), we still have

17    to meet one of the requirements of 23(b).  In this instance,

18    we focus on 23(b)(3), Your Honor, which states that the

19    claimants have to satisfy or establish predominance and

20    superiority sufficient to satisfy 23(b)(3).

21         First, Your Honor, the class members are

22    ascertainable.  An essential prerequisite of a class action,

23    at least with respect to actions under 23(b)(3), is that the

24    class must be currently and readily ascertainable based on

25    objective criteria.  Marcus vs. BMW of North America LLC,

1  687 F. 3d 583.  Thus, the movant must show, again, by the

2  preponderance of the evidence, that the class is

3  ascertainable.

4         Specifically, ascertainability inquiry is a two-

5  fold inquiry requiring first, that the class be defined

6  reference to an objective criteria, and two, that there is a

7  reliable and administratively-feasible mechanism for

8  determining whether punitive class members fall within the

9  class definition.

10         The class claimants bring this action to protect

11  the rights of similarly-situated persons who may not have

12  knowledge of the bar date, but who were entitled to file

13  individual class unmanifested proof of claims.  Here, the

14  class is defined by the objective of criteria set forth in

15  the proof of claim form, and that the class claimants and

16  the persons similarly situation are present or former

17  employees and contractors who worked for the asbestos

18  debtors in one of the enumerated numbers of facilities

19  and/or family members thereof.

20         In protecting the due process rights of persons

21  within the scope of the class form -- or the claim form --

22  this Court, in its July 15, 2015 Order, devised a method of

23  direct notice and notice via targeted media outlets.

24         Implicit in both methods of notice is that the

25  punitive class claimants are readily identifiable and may be

1   readily identified by such methods.  Specifically, the Court

2   ordered the debtors to make reasonable search of their

3   business records for the names and address of employees and

4   contractors of the asbestos debtors.

5          Recently, the Third Circuit found that a class --

6   found a class ascertainable where the debtor possessed all

7   of the relevant records needed to identify the punitive

8   class members.  That's In Re: Community Bank of North

9   Virginia, 795 F. 3d at 397.

10          Further, while such method may entail some

11   individual review, such method is not -- such review is not

12   fatal to a finding of ascertainability.  Notice of the class

13   could be improved by requiring a further individualized

14   search of the records in mailing such to the specific

15   skilled trade unions in the states where EFH plants existed

16   among other things.

17          This method would ensure sufficient notice to

18   protect these claimants' due process rights without changing

19   the verdict.  Second, Your Honor, we must show that the

20   class claimants' common questions predominate over questions

21   that are individual to them.

22          Plaintiffs must further establish this for the

23   purpose of satisfying 23(b)(3).  Before certifying a

24   23(b)(3) class, the District Court must evaluate, or a Court

25   must evaluate, whether (indiscernible) questions or fact

1    that the class members predominate over questions affecting

2    only individual members.

3            The focus, Your Honor, is on task to see whether

4    the proposed classes are sufficiently cohesive as to warrant

5    adjudication by representation.  The focus on predominance

6    inquiry is whether defendant's conduct was common to all the

7    class members, and whether the class members were harmed by

8    the defendant's conduct.  That's Sullivan vs. DB Investment,

9    Inc., 667 F. 3d 273.

10           The predominance inquiry, Your Honor, begins, of

11   course, with the elements of the underlying cause of

12   actions.  Predominance requirements focus on the essential

13   elements of the class claims to be proven at trial with

14   common, as opposed to individualized, evidence.  Commonality

15   and predominance together are the focus because where an

16   action is to proceed under 23(b)(3), the commonality

17   requirement is subsumed by the predominance requirement.

18   Class claimants identify the common issues, as I've stated

19   earlier.

20           In this case, class claimants seek to represent a

21   class of similarly-situated individuals who've been exposed

22   to asbestos by the asbestos debtors, and to put them at risk

23   of developing asbestos-related diseases, but who have not

24   yet become sick and, thus, have the unmanifested claims.

25   These are questions of defendant's conduct which

Page 57

1    predominate.

2           The ability to satisfy the predominance standard

3    is unimpeded by the existence of different state law

4    standards with regard to the various states -- the various

5    laws of the individual states.  The In Re: Sullivan case

6    that I mentioned earlier is specific to that, Your Honor.

7    So the predominance or the primacy of the injuries by these

8    individuals satisfies or overcomes the requirement

9    necessitating the predominance.

10          As they say in Sullivan, Your Honor, this

11   determination is not a mechanical, single-issue test, but is

12   a determination by looking at the claims, and it is usually

13   sufficient to establish predominance.  They really look to

14   the defendant's conduct, Your Honor.

15          Finally, with regard to the superiority

16   requirement, the class proof of claim is superior method of

17   proceeding in this instance, Your Honor.  23(b)(3) requires

18   that a class claim be superior to other available methods

19   for the fairly and efficiently adjudicating the controversy,

20   and provides a non-exhaustive list of factors to be

21   considered in determining superiority, including the class

22   members interest and individually controlling the

23   prosecution of the separate actions, the extent and nature

24   of similarly-litigated issues already commenced by class

25   members, which are none in this instance, the desirability

Page 58

```
1    of concentrating the litigation in a particular forum, and

2    the difficulties likely to be encountered in the management

3    of a class action.

4           The superiority requirement asks a Court to

5    balance the terms of fairness and efficiency the merits of a

6    class action versus those of the alternatives available

7    forms of adjudication.  Here, it's our position, Your Honor,

8    that a class action is vastly superior to claimants

9    proceeding individually.

10          A class claim would ensure the broadest due

11   process of those claims that may be disposed by the bar

12   date.

13          It also comports with the Court's Order by

14   remedying the infirmed implementation of the notice scheme,

15   as demonstrated by these class claimant affidavits.

16          Not only are class proof of claims superior to

17   individual proof of claims with respect to the due process

18   and the Court's Order as established above, but the common

19   questions in fact and law are best addressed as a class,

20   thus expediting these proceedings and resulting in a

21   significant judicial efficiencies.

22          With respect to the class members' interest and

23   individually controlling the prosecution of their separate

24   actions, here, as the claims are brought by persons with

25   unmanifested injuries, no person has a significant interest
```

Page 59

1    in controlling in the individual control of a separate

2    action at this stage.  Rather, a class mechanism removes

3    what would be burdensome to individual claimants, exerting

4    the effort to protect their rights, even while injuries have

5    not yet manifested.

6           As to similar litigation, while the number of

7    individual claims filed by the asbestos debtor is not known,

8    class claimants know of no other class proof of claims being

9    brought, nor of any other prior class actions being brought

10   against the asbestos debtors.

11          With respect to the desirability of concentrating

12   the litigation in this particular forum, just as this Court

13   found it desirable to consolidate the proceedings in this

14   instant forum, by the same logic, the concentration of class

15   proof of claims is not detrimental to the claimants, and is

16   further desirable as permitting and expediting in streamline

17   process.

18          Finally, Your Honor, the class proof of claims

19   present no insurmountable challenge to the management of a

20   class action.  While state law of distinctions may implicate

21   manageability concerns, they do not pose an obstacle to the

22   certification of a settlement class.

23          Furthermore, persons who are part of this class

24   who develop asbestos-related diseases -- that is, they

25   manifest -- would simply be moved from the persons with

1    unmanifested claims to those with manifested claims.  And

2    like anyone else who filed an individual proof of claim for

3    unmanifested claim prior to the bar date, would be able to

4    pursue their manifested claim against the bankruptcy estate.

5    You'll recall, Your Honor, the plan, of course, provides

6    that asbestos claims are reinstated in pass-through.

7            Furthermore, 23(d) vests in the Court's

8    substantial discretion to enter orders subsequent to the

9    orders certifying the class to manage the class.  This goes

10   a long way to managing any issues that may arise.

11           In closing, Your Honor, it's our position that the

12   class claim is permissible, that we've satisfied all the

13   requirements necessitated by 23(a), as well as 23(b)(3), and

14   we would offer the affidavits of Mr. Aribe, Mr. Cunningham,

15   and Miss Ziegelbaum into the record, together with the

16   affidavit of Jeanne Meyer.  Thank you, Your Honor.

17           THE COURT:  Thank you, Mr. Hogan.  Counselor?

18           MR. ROGERS:  Your Honor, Brent Rogers from

19   Kirkland & Ellis LLP on behalf of the Debtors.  I think Mr.

20   Hogan's argument is the same argument that he presented in

21   his briefs.  We've responded to those arguments in our

22   briefs, and I would try not to repeat myself here.

23           What I didn't hear from Mr. Hogan was any reply to

24   our response.  I want to be mindful of the Court's desire to

25   hear about the law and less about the facts.  I don't think

Page 61

1   we need to hear about the affidavits that were filed along

2   with this motion.  I think there's ample evidence in the

3   record for the Court to apply the law that exists and deny

4   this motion.

5           There's a threshold issue, Your Honor, and that's

6   should the Court apply its discretion to apply Rule 23 to a

7   class proof of claim here.  And I want to emphasize the

8   unprecedented nature of that ask in this case.  This is not

9   a case where a class has been certified in another action in

10  state court or in federal court, and now the class is coming

11  to this Court and asking to file a proof of claim on behalf

12  of that class.  That's the -- as In Re: Sacred Heart pointed

13  out, that's the, you know, quintessential case that's

14  appropriate for a class proof of claim.  This is not that

15  case.

16          This is also not a case where the class that the

17  claimants seek to certify will go on to prosecute a cause of

18  action.  The class itself has no cause of action.  Because,

19  you know, there's a lot of fuzziness around the definition

20  of the class in this case, but the one thing that is clear

21  is that it is made up of unmanifested claimants. They have

22  no injury yet.

23          And as Mr. Hogan just pointed out and as they

24  pointed out in Paragraph 77 of their brief, the moment

25  someone in this class manifests an injury, they leave the

Page 62

1    class and they become a manifested claimant, they go on to

2    prosecute their own claim.  So what that means is that this

3    class, if certified, would really have one purpose only, and

4    that is to file a class proof of claim.

5           In none of the cases cited on either side has a

6    Court endorsed the application of Rule 23 to a class solely

7    for the purpose of filing a class proof of claim.  And,

8    frankly, there's good reason for that, Your Honor.  It

9    really makes no sense.

10          It doesn't serve the purpose of Rule 23.  It

11   undermines the purpose of the bankruptcy rules and the bar

12   date order and the notice procedures orders that Your Honor

13   entered.  So in this case, I think it's very clear that the

14   discretionary call that Your Honor has to make cuts in favor

15   of denying this motion and refusing to apply Rule 23 to a

16   class proof of claim.

17          And just to back up, Your Honor, Rule 7023 applies

18   to adversary proceedings.  This is not one.  To get to the

19   application of Rule 23 to a class proof of claim, you have

20   to go through Rule 9014, which is entirely discretionary.

21   In the Court's that have undertaken that analysis have been

22   very clear that applying Rule 23 to a contested matter, and

23   specifically applying it to a class proof of claim, there's

24   a heightened standard, and it's less likely to be a good

25   idea to apply Rule 23 in these circumstances than in others

1    in adversary proceedings, for instance.

2              Mr. Hogan never really grapples with the issue of

3    the Court's discretion and whether it should apply Rule 23

4    in this case.  He does talk about, you know, the prior, I

5    would say, consensus in the law that it's not even

6    appropriate to apply Rule 23, or it's not even possible to

7    apply Rule 23 to a proof of claim because Rule 501 only

8    allows individuals to file proofs of claim.  I'm not going

9    to make that argument here.  I think it has some merit, but

10   I don't think that it's dispositive.  I think there's plenty

11   of other reasons to deny in this case.

12             I do think that that prior body of law is

13   indicative of the skepticism that courts have applied when

14   they look at a class proof of claim.  And I think that,

15   although that body of law has largely been moved away from

16   since the American Reserve case, I think that that

17   skepticism endures.

18             So the question is, is this the kind of case, is

19   this the right case, is this the right circumstance in the

20   case to go through the long journey from 9014 to 7023 to

21   apply Rule 23 in the first instance.  And the answer there,

22   I think, is clearly no.  That's setting aside whether the

23   class claimants in this case can even meet the requirements

24   of Rule 23, which I'll get to later, but I want to focus on

25   this discretionary call.

1          One thing that Mr. Hogan, again, did not respond

2    to at all is what is the impact that this class proof of

3    claim would have on this Court's prior orders.  And I think

4    it's very clear that the impact is that it dramatically

5    undermines and, in fact, it renders moot Your Honor's Orders

6    in January on the application of the bar date to

7    unmanifested asbestos claims, and in July, when you entered

8    the noticing order and applied the -- or set the bar date.

9          In the W.R. Grace case at 389 B.R. 737, that's out

10   of the Bankruptcy District of Delaware in 2008, the Court

11   observed that when you're looking at an issue like this,

12   whether to certify a class on a class proof of claim, you

13   can't do it in a vacuum.  You have to consider the impact of

14   the bar date.  And you've got to consider, in this case, the

15   impact of the bar date that Your Honor set for unmanifested

16   asbestos claims.

17         Put simply, if this class is certified and the

18   class proofs of claim are allowed, we can say good-bye to

19   the bar date for unmanifested asbestos claims.  That's

20   because any litigant or any potential claimant would then

21   later be able to come in, whether or not they filed their

22   own individual proof of claim by the bar date, they'd be

23   able to come in and leverage the class proof of claim to say

24   I'm a claimant, my rights were reserved by the class proof

25   of claim, notwithstanding the fact that I did not file a

1    proof of claim of my own.

2            And, you know, I don't think I need to remind the

3    Court, but the bar date Order that Your Honor entered in

4    January was the culmination of a long -- months' long --

5    process of multiple rounds of briefing, multiple hearings.

6    And I think the Court's Order was quite clear that not only

7    is it within the Court's discretion to apply the bar date to

8    unmanifested claims, but it's required.  It's required by

9    the rules, and the Grossman construct that the Court apply

10   the bar date to unmanifested claimants.  This class proof of

11   claim that the class claimants purpose to be seeking would

12   completely that context or that construct.

13           The other thing that this class proof of claim

14   would do is wipe out, you know, not just the long effort and

15   judicial party resources that went into getting the bar date

16   to apply to unmanifested asbestos claims, but after that

17   happened, as Your Honor knows, the Debtors and the EFH

18   Committee worked long and hard to construct a notice program

19   to, as best as possible, get notice out to all potential

20   unmanifested asbestos claimants.

21           That order was heavily negotiated.  It was

22   consensual.  And it led to the issuance of, I think,

23   somewhere around 70,000 direct notices, not to mention all

24   the indirect notice or the constructive notice through

25   publications and newspapers on websites, et cetera.  All

1   those forms of notice were designed to get the word out.

2          And what Mr. Hogan says about these class

3   claimants not having notice doesn't make sense to me.  They

4   filed their proof of claims.  They're in Court today arguing

5   about the bar date.  They clearly know about the bar date.

6          Now, did they get that notice directly from the

7   Debtors?  I, frankly, don't know.  There's no evidence on

8   that, and we don't really need evidence.  What we do know is

9   that they have notice.  And what that shows, I think, Your

10  Honor, is that the notice program that's been constructed

11  has been effective.

12         It's not a program that is only effective if

13  everyone gets notice from the Debtors.  It is a program

14  that's designed to get the word out through whatever

15  channels are available, whether it's through someone's

16  counsel at the union or through someone's spouse or through

17  a friend.  All of those are signs, signals of effective

18  notice, and I think that's what's been done here.

19         So this proof of claim, or this class proof of

20  claim request, is -- you know, one of the things it's going

21  to do if granted is it's going to require the Debtors to

22  undertake that whole notice program again.  Rule 23 requires

23  notice to potential class members of their potential status

24  as a class member.  And I think Mr. Hogan has said, and they

25  said in their brief, that the notice that they would propose

1   that we give to potential class members start at least with

2   the -- at the base line of the same notice that we gave the

3   first time around.  S

4            o we're now talking about duplicating what I

5   believe is somewhere around $2.5 million worth of effort to

6   get the word out.  That, to me, seems like a tremendous

7   waste of resources of the debtors.

8            Your Honor, this Court has already shot down two

9   attempts at least to mount a collateral attack

10  inappropriately on the January Order -- or the January

11  Memorandum Opinion and the Order on the bar date and the

12  notice.

13           The first of those was when asbestos plaintiffs'

14  firms came in and asked for the appointment of a class

15  representative for unmanifested claims and future claims.

16  Then Your Honor said the time to -- the time to appeal the

17  bar date Order has passed.  The time to appeal the notice of

18  procedures has passed.  I'm not going to hear that today.

19           You did the same thing in connection with the

20  confirmation hearing when asbestos plaintiffs came in and

21  said that the Order -- that the reorganization could not be

22  confirmed because of due process concerns to unmanifested

23  claimants.

24           Again, you emphasized the protective nature of the

25  notice program that was entered, the fact that there was no

Page 68

```
 1    appeal of that, and denied that relief as an inappropriate

 2    collateral attack.  And so, Your Honor, the Debtors submit

 3    that you should deny, as well, this as an inappropriate

 4    collateral attack on those two rulings by the Court.

 5              Now let's look at the other side of the ledger.

 6    We've talked about the -- you know, the bad aspects of this

 7    request for proof of claim on behalf of the class.  What do

 8    we get as a benefit?

 9              Well, Mr. Hogan has focused both in his briefing

10    and his argument today on prejudice to class members.  Let's

11    start with the class members who are similarly situated to

12    the three who purport to be representatives of the class.

13    There's no prejudice to them if this order is denied.  They

14    have filed proofs of claim in advance of the bar date.

15              What I think Mr. Hogan's really getting at is the

16    other class members who are different from the ones who

17    appear in court today, the class members who may not have

18    received notice through any channel.  The Court has already

19    addressed the issue of due process and prejudice to

20    unmanifested claimants multiple times in the context of the

21    orders that I just discussed.

22              In lieu of that, the notice program that we have

23    and that we implemented was reasonably calculated to reach

24    as many of the potential claimants as possible.  So that's

25    sort of a due process protection on the front end.
```

1          Then as Mr. Hogan acknowledges, there's a due

2    process protection on the back end as well.  And that is if

3    a claimant, notwithstanding our efforts to get the word out,

4    comes into court and says, "I didn't hear this.  I didn't

5    know about it.  I now have an asbestos claim because I have

6    an injury.  I should be relieved from the bar date," then

7    the Court has the ability under the rules to -- you know,

8    for cause shown, to grant relief from that bar date.  So

9    there's a due process protection on the back end.

10          And Mr. Hogan sort of acknowledges that, but then

11   tries to shift the discussion from prejudice and due process

12   to this concern about efficiency, which is yeah, we have

13   this protection on the back end, but if you don't grant this

14   motion and allow the class proof of claim, what that means

15   is that you're going to get what they call an avalanche of

16   post bar date proofs of claim and injuries coming into court

17   and that there's going to have to be a case-by-case

18   determination on those claims.

19          Well, that is the construct that Grossman sets up

20   and that we think the Court should apply, but I think this

21   concern about efficiency and the avalanche of claims is

22   really misstated and has no support.

23          We have received, I believe, 10,000 unmanifested

24   claims so far as of today.  There's no indication in the

25   record or in the experience of the Debtors that after the

1    bar date there's going to be a sudden flood of manifested

2    claims that are going to come into court and allege that

3    their due process rights were violated because the notice

4    never reached them.

5            What's really going on here, I think, Your Honor,

6    is that Mr. Hogan is trying to flip the burden of showing a

7    due process violation and to take that burden off of the

8    plaintiffs where it would sit with -- under the Grossman

9    standard, and put that on the defendants.  In fact -- I'm

10   sorry, the Debtors, and in fact, it would be a preclusive

11   burden because we would not have an opportunity to show that

12   their due process rights weren't violated.  They'd be able

13   to come in regardless of whether they receive notice or not

14   and file a claim after the bar date because they would say

15   they were protected by the class proof of claim.

16           So this efficiency concern doesn't hold water.

17   Not only that, but when you think about the tremendous

18   duplication of efforts that would obtain if we had to go

19   through the notice process again.  That's the opposite of

20   efficiency.  That is a massive inefficiency in the process.

21           So the two aspects or the two arguments that the

22   class claimants make in favor of applying Rule 23 just don't

23   hold up.  And the traditional, more traditional reasons to

24   apply Rule 23 in the bankruptcy context also don't hold up.

25   So as the Court observed in American Reserve, you know,

1    efficiency in terms of consolidation of claims in a single

2    forum isn't really an argument in favor of a class treatment

3    in bankruptcy because the claims are already consolidated in

4    a single forum.

5            So what the courts really look to is, is it

6    serving the function of Rule 23 in that it's bringing claims

7    that otherwise would not be filed into court and getting

8    them filed?  And I think from experience we know that that's

9    not the case here.

10           The burden of filing claims in this Court, the

11   proofs of claim, is minimal, and we've already seen, as I

12   said -- I believe the numbers are 10,000 and 12,000

13   claimants file unmanifested proofs of claim.  So there

14   appears to be no impediments to unmanifested claimants

15   getting into court.  And with the notice program being as

16   robust as it is, there's also no impediment to getting the

17   word out.

18           For instance in American Reserve, the Court, when

19   it articulated this rule, said that the bankruptcy court in

20   that case could achieve all of the benefits of class

21   treatment in the bankruptcy context simply by making sure

22   that appropriate notice got out to the claimants.  That's

23   exactly what's happened here.

24           So that all goes to the question of whether the

25   Court should apply its discretion and apply Rule 23 in the

1    first place.  And we think it's quite clear that the Court

2    should decline to do so.  Nevertheless even if the Court

3    were to apply its discretion to apply Rule 23 through 9014

4    and 7023, we don't think that the class claimants have come

5    in with -- that the class claimants have put forward a

6    viable Rule 23 class.  And I don't think you need to look to

7    the affidavits to make that determination.

8            I think you can simply look at the class that

9    they're trying to -- the class that they're trying to

10   certify and ask as a matter of first principles whether that

11   satisfies Rule 23.  It does not.

12           One thing I would like to highlight is -- and I

13   spent a little more time with their briefs over the last

14   week -- there's a real lack of clarity as to what is the

15   class they want to certify.  Does it include folks who

16   received direct notice?  Does it include folks who were in

17   the area of constructive notice in a publication?  Does it

18   include people like the claimants?  Apparently it includes

19   folks who received notice through channels other than direct

20   notice.

21           Is it limited to people who did not receive direct

22   notice or were not targets of constructive notice?  Is it

23   limited to people who have not filed a proof of claim?  Or

24   does it include the 10,000 folks who have already taken the

25   initiative to do so?  Does it include only people who are in

1    trade unions as is suggested in one of the affidavits?  Or

2    is it a larger class that includes all unmanifested

3    claimants?

4           If you look at particular paragraphs of their

5    brief, you could interpret them in any of these ways.  And I

6    think that shows a lack of clarity around the class that's

7    going to be satisfied, but it also, as you're going through

8    the factors for Rule 23, it's important because it has an

9    impact on the way you analyze those factors.

10          But let's walk through quickly those factors and

11   how they would play out according to different definitions

12   of the class.  So if you look at Rule 23(a), the numerosity

13   standard, well, here it really matters how we're defining

14   the class in a sense because if we're defining the class

15   only as those folks who have received zero notice of the bar

16   date and the bankruptcy, then presumably, that's going to be

17   a very small class given the robust nature of the notice

18   program.  And we certainly haven't seen any indication that

19   there's a large group of people who have received no notice

20   whatsoever.

21          Regardless, even if it includes the entire class

22   of unmanifested claimants, the entire group, I don't the

23   requirement of numerosity is met here because numerosity

24   doesn't just mean let's count the heads.  It means how

25   difficult is it to join those parties into an action?

1            And that concept, the concept of joinder, really

2    has no meaning in this context.  There's no joinder of

3    parties that would be necessary absent a class proof of

4    claim here.  If there's no class proof of claim, there are

5    individual proofs of claim.  That's just the status quo.

6    And as I mentioned, there's no going forward use for this

7    class, so there's no need to join these people into a class

8    for purposes of prosecuting a claim.  So I think the

9    numerosity standard, however you look at the class and

10   however it's defined, is not met here.

11           Next, commonality.  And so here again, it really

12   reflects the mistaken view that this class is somehow a

13   class of people with a cause of action.  When I say it

14   reflects, I mean Mr. Hogan's argument and the brief reflect

15   that because all of their arguments about commonality are

16   about issues including the conduct of the s, the risk of

17   asbestos exposure, etc., those are not issues that are

18   before the Court on a proof of claim.

19           Those are issues that will be before the Court if

20   there is an asbestos litigant who comes to Court and has an

21   injury, but that's not the question that's before the Court

22   today.

23           So as to what's before the Court today, the filing

24   of the proofs of claim and whether a late filing would be

25   appropriate, there's little commonality among the purported

1    class members, especially if you're looking at the entire

2    class of unmanifested claimants.  Some received a notice;

3    some didn't.  Some filed proofs of claim; some didn't and

4    some are in a situation where they are direct exposures, and

5    some are take home exposures.  So there's no one question

6    across the class that really is a question that Your Honor

7    has to answer at this stage of the litigation.

8            Then typicality; do these particular purported

9    class representatives -- are they typical of the entire

10   class?  Again, it probably depends on how you define a

11   class.

12           But if you're defining the class to include all

13   unmanifested claimants, the answer is no, these are not

14   typical because they are folks who got notice in a very

15   particular way, and to the extent that they are purporting

16   to be representing people who got no notice, they are not

17   even a member of that class.

18           So these -- this group of potential claimants

19   cannot represent adequately the interests of the folks that

20   they say are really the target of this class protection,

21   which is the group that did not receive any notice.

22           On that predominance question, which is

23   commonality plus, again, because there's no commonality of

24   questions across this class, there can be no for dominance.

25   Extent of litigation already filed is another factor.  Here

1   we have 10,000 or more individually filed proofs of claim

2   that cut strongly against having a class because we've seen

3   from experience that folks are filing these claims on their

4   own.

5          Concentration in a particular forum is one of the

6   factors under Rule 23.  I think I've already addressed that,

7   that we have a concentration in the bankruptcy court

8   already.  We don't need a class mechanism to do that.

9          And then finally, superiority.  I think for all of

10  the reasons that I've articulated today and in our brief,

11  the idea that a class proof of claim a superior to the

12  Grossman construct that's already in place, it falls flat.

13  It falls short.

14         And for that reason, the Debtors respectfully

15  submit that the order should be denied.  The Court should

16  decline to apply its discretion and apply Rule 23.  And even

17  if the Court does apply Rule 23, it should find that those -

18  - the factors under Rule 23 have not been met.  Thank you,

19  Your Honor.

20         THE COURT:  Thank you, Mr. Rogers.  Mr. Shore?

21         MR. SHORE:  Good morning, Your Honor.  Chris Shore

22  from White & Case on behalf of the investor consortium.

23  I'll be brief.

24         Let me give you two updates first on the deal

25  which is proceeding apace.  The Court may have seen that

1   there was some legislation that had been proposed that would

2   bar tax-free spinoffs into REITs.  The bill that came out I

3   think last night has a grandfather in for transactions that

4   are subject to a pending PLR.  So we kind of dealt with that

5   problem.

6           There's been PUCT testimony filed.  It's all kind

7   of what we expected, and that's moving forward to those

8   January dates still.  So from our perspective, the

9   transaction is moving as it should be, and by the end of the

10  first quarter, beginning of the second quarter, we

11  anticipate being the owners of EFH.  As such, we're keenly

12  interested in addressing the asbestos problem at EFH.

13          To that end, while the deal was going forward and,

14  and during the plan negotiations, we worked very hard with

15  Kirkland to understand the problem and to understand the bar

16  date, why that was put in place, and proceed with that

17  rather than card out everybody is part of a planned

18  settlement.

19          In other words, we let that objection press so

20  that we could keep the deal as structured and would provide

21  a cordoning off of the liability so that we can know what

22  we're investing into.

23          To that end, obviously a great deal of money was

24  spent noticing and performing pursuant to the two prior

25  court orders -- that's money that came out of the new

1   equity's pocket from our perspective -- all to satisfy the

2   due process concerns of unmanifested claimants.  So we would

3   reiterate that the Court exercise its discretion not to

4   certify a class which essentially wastes all that money that

5   was spent.

6           I'm only going to add one point, and it's really

7   an emphasis on the legal side of it.  You know, there's one

8   key development that isn't really focused on by either side

9   so far since the filing of the papers.  The bar date has

10  come and gone.

11          In the eyes of the law right now, the three

12  declarants have claims against the s.  Everybody else has no

13  claims against the Debtors that they can prosecute absent

14  relief from the bar date order.

15          The -- so this whole case is far as I'm concerned

16  hinges on the Court's application of Rule 3001(b), which is

17  who's an authorized representative?  A class proof of claim

18  was purported to have been filed on behalf of all those

19  parties.  There was no authority to file that proof of claim

20  at the time oddly enough.  It's the second kink of the day

21  where we have an issue with respect to who's authorized to

22  act on whose behalf and when.

23          So what they're really asking for is retroactive

24  authorization to file a proof of claim on behalf of these

25  parties.  Their only mechanism for doing so is Rule 23, and

1   that's why I think you have to look at the class for the

2   purposes of today's motion as parties who did not receive

3   notice and did not file proofs of claim, because that's the

4   only class for which they can have authority to do anything

5   right now.

6          And when you look at the proposed class

7   representatives, they have nothing to do with that class

8   because they did receive notice, actual notice, and they did

9   actually file proofs of claim.  So I don't think using the

10  Rule 23 mechanism in this case to give them retroactive

11  authorization to file a proof of claim as appropriate here.

12  And for those reasons, we'd ask you to deny the motion.

13          THE COURT:  Thank you, Mr. Shore.  Mr. Hogan?

14          MR. HOGAN:  Thank you, Your Honor.  I'll be brief.

15  Your Honor, Debtors' counsel raised at its essence really

16  what this controversy relates to, and that is, is the action

17  between the class or individuals, who have no cause of

18  action currently because they're unmanifested, versus

19  individuals, those same individuals, who, while not having a

20  cause of action, have a claim pursuant to the construct in

21  Grossman.  And so there's a void in that.  They don't have a

22  cause of action, but yet they have a claim.

23          The cause of action won't arise until they

24  manifest.  And as such, there needs to be protection for

25  those individuals until such time as they manifest.  The

1    purpose of the request for the class proof of claim isn't

2    necessarily to prosecute those claims as they manifest, but

3    instead to preserve the status quo until they manifest.

4    Class actions for the purpose of injunctive relief are not

5    unheard of, Your Honor, and that's effectively what this

6    class purports to do.

7            As it relates to the argument that we haven't met

8    our burden with regard to 9014, the burden remains a

9    preponderance of the evidence.  Other than argument, Your

10   Honor, there, there is no evidence as to whether or not we

11   satisfied our burden.  Our class purports to represent

12   unmanifested asbestos claimants either exposed at work or

13   through take-home exposure.

14           The impact of the Court's prior rulings really has

15   no impact, Your Honor.  Our argument isn't inconsistent with

16   what you ruled in the -- with regard to the bar date and

17   your reliance on Grossman.  I was involved in the Grossman

18   case unfortunately, Your Honor.  I represented the Van

19   Brunts as local counsel.  I know all about that case.  That

20   case was an -- that case really largely stems on an

21   application of lookback to try and resolve a one-off

22   exposure by a claimant.  It wasn't constructed with this

23   application in mind.

24           Your bar date order contains no admonition or

25   prohibition against filing a class proof of claim.  It says

1   unmanifested claimants have to file a proof of claim.  It

2   doesn't say no class proof of claims shall be filed.  We

3   don't see it as an inappropriate collateral attack.

4          Throughout the Debtor's response to my motion

5   they've mischaracterized my involvement, and I just raise it

6   as an issue, Your Honor, just so the Court and the record

7   are clear.

8          Hogan McDaniel doesn't have an "S" at the end of

9   McDaniel.  No big deal.  Misspelled repeatedly throughout

10  the response.  Not a big deal.  Bigger, though, Your Honor,

11  is the fact that I'm not a PI law firm.  My firm's not a PI

12  law firm.  It's represented throughout their response that

13  where a PI law firm.  Do I have co-counsel that are PI law

14  firms?  Absolutely.  But I just wanted the record to be

15  clear on that, Your Honor.

16         Your Honor, the prejudice to the unmanifested

17  claimants is real.  If the class proof of claim is not

18  allowed, you'll be left with the one-off Grossman analysis

19  with regard to every individual who comes in and says they

20  didn't get notice.  The purpose of the class is to short-

21  circuit that inquiry without short-circuiting the bar date.

22  The bar date exists.  We understand that.  It's passed.

23         The purpose of this is to coalesce those

24  individuals so that their claims can continue on in light of

25  the bar date, and so that they -- when they manifest, won't

1    be prejudiced by what has already occurred.  Their claim

2    will manifest as the Debtors have said.  They don't have

3    cause of action, but they have a claimant.

4            That just doesn't make sense, Your Honor.  I mean,

5    I know it does within the context of the law, but from the

6    unmanifested claimant's point of view, 10 years from now,

7    when all of a sudden somebody shows up with mesothelioma and

8    they have no idea of the bar date and they try to assert a

9    claim, and the analysis is going to be not on whether

10   they're sick or not but on whether or not they got notice of

11   the bar date.  And inherently that just seems unfair, Your

12   Honor.

13           Finally, Your Honor, with regard to the burden of

14   the proof of claim being minimum, there is no impediment,

15   Your Honor.  We filed the claims.  They're after -- they

16   were filed before the bar date.  It's a viable claim.  It

17   includes all unmanifested claimants, and that's our

18   position, Your Honor.  Thank you.

19           THE COURT:  You're welcome.  All right, thank you

20   very much.  I am going to deny the motion for a number of

21   reasons.  First of all, as a preliminary matter, it's a

22   question of the Court's discretion whether to apply Rule

23   7023 to a situation where we're talking about the filing of

24   a proof of claim on behalf of the class.

25           The -- as counsel pointed out and in my experience

Page 83

1    as well doing independent research, to allow a class proof

2    of claim under the facts and circumstances of this case

3    would be unprecedented.  We don't have an existing class

4    action.  We often see this where we have and existing WARN

5    Act class, for example, that's been certified by this Court.

6    And though a proof of claim is filed on behalf of that

7    class, it's a completely different situation here.  We don't

8    have this pending asbestos manifested or unmanifested injury

9    claim lawsuit pending somewhere, where a class has been

10   certified.

11           We're talking about certifying a class solely for

12   purposes of filing a proof of claim.  And I think that is

13   where -- to allow that would be in effect a collateral

14   attack on what this Court has already done, which is set a

15   bar date as required by the bankruptcy rules, requiring

16   filing by unmanifested claimants as contemplated by

17   Grossman's, and establishing and approving an elaborate

18   noticing procedure that cost several million dollars

19   designed to provide a notice as adequately as possible to as

20   many possible claimants as possible.  None of those matters

21   have been appealed, and they are final orders.

22           Really Mr. Hogan made at the end an impassioned

23   and interesting and perhaps in some ways weighty argument,

24   which was a collateral attack not on this Court, but on the

25   Third Circuit's opinion on Grossman's, drawing the

Page 84

1    distinction between a claim and a cause of action.  That is

2    the law, and the fact that you have a claim at the time of

3    exposure, but not a cause of action until injury, is a

4    distinction the Third Circuit has made and that I have to

5    apply in the context of what my job is.

6             To apply or to allow the filing of a class proof

7    of claim here and fit that into the bar date mechanism

8    that's under the rules really is to try to fit a square peg

9    into a round hole.  It just doesn't make any sense.  If I

10   were to certify however I were to draw the lines, which are

11   unclear to me, I agree with the Debtors from the motion

12   exactly how that class would be technically certified.

13            But if I were to allow a class to file this class

14   proof of claim on behalf of unmanifested claimants, the

15   whole point of the bar date goes away because everybody's

16   covered.  What's the point of the bar date?  And the reality

17   is bar dates are how you operate bankruptcy cases, and

18   they're required by the rules, and they have legal

19   significance, both for reorganizing the estate and for

20   dealing with the claims vs. assets distribution of value.

21            The fact that the claims here are being reinstated

22   as opposed to being distributed, a subset of consideration

23   under a plan, I don't think makes a difference here.  The

24   same principle applies.  So I will not exercise my

25   discretion to apply Rule 7023 at all to the filing of a

1    class proof of claim here.

2            In addition, were I to do that, I will assume

3    solely for purposes of this ruling that Rule 23 is met here.

4    And that would be without a prejudice on remand if I am

5    remanded and appealed to actually make a factual finding.

6    But we didn't have an evidentiary hearing, and I'll take the

7    affidavits for these purposes on their face value and find

8    that 23(a) is a satisfied, but I don't think 23(b)(3) is

9    satisfied in this situation because 23(b) says -- (b)(3)

10   says that the Court finds -- this is the order to satisfy,

11   23(b)(3) -- "The Court finds that the questions of law or

12   fact common to class members predominate over any questions

13   affecting only individual matters, and that a class action

14   is superior to other available methods for fairly and

15   efficiently adjudicating the controversy."  I don't believe

16   that in this situation the class action is superior to other

17   available methods.

18           The superior method here is a method that's

19   already occurred, the establishment of a bar date and the

20   establishment of an elaborate notice procedure, which has

21   worked frankly.  It's one way or the other in that we have,

22   at least on the face of the affidavits, three persons who

23   did not receive a mailing from the noticing agent that

24   nonetheless got sufficient notice that they -- prior to the

25   bar date that they were put in a situation where they could

1    file a proof of claim.

2            So I find that (b)(3) would not be satisfied in

3    this situation.  So for those reasons, I will also talk

4    about due process.  I spoke at length at confirmation in

5    overruling the objection to confirmation reiterating my

6    findings as to the issues of due process.  And I would

7    incorporate those, rather than going through this whole

8    process again, into today's ruling.  And just to be clear

9    again, perspective due process is preserved, or, excuse me,

10   is met.  Perspective due process is met by the bar date

11   notice being provided.

12           The issue of whether that due process as applied

13   is sufficient to individual claimants is fully preserved.

14   And that's what Grossman's is about.  So if there are

15   unmanifested claimants, who don't file a proof of claim, who

16   manifest an injury in the future, and who attempt to file

17   some sort of claim and prosecute a cause of action against

18   the reorganized , their ability to argue under Grossman's

19   that the due process I previously approved was insufficient

20   and that their claim should survive, their cause of action

21   should survive, that's fully preserved, and that we'll be

22   decided on a fact-by-fact and a case-by-case basis in the

23   future by whatever judge has to decide those issues.

24           I think that that is sufficient and superior to

25   requiring or allowing the issuance of a class cause of -- or

1    class proof of claim in this instance.  So I will again deny

2    the motion on the merits.  And do you have a form of order?

3              MR. ROGERS:  We do, Your Honor.  I -- as you want

4    to point out one provision in the order that I didn't

5    mention in my argument, and that is we have in Paragraph 3

6    that the class proofs of claim that have already been filed,

7    and we have three proofs of claim that have been filed that

8    purport to be on behalf of the class, we would have those

9    expunged from the claims register to the extent that they

10   purport to be filed on behalf of anyone other than the named

11   claimant.

12             THE COURT:  All right.

13             MR. ROGERS:  So we'd put that in the order.

14             THE COURT:  Thank you.

15             MR. ROGERS:  May I approach, Your Honor?

16             THE COURT:  Yes.  Thank you.  I'm going to

17   interlineate under Paragraph 1, where it says, "The motion

18   is denied as set forth herein," I'm going to add, "and for

19   the reasons set forth on the record at the hearing."

20             All right.  With that change, I've signed the

21   order.  We'll take a -- Mr. Husnick, how are we on our

22   witness?

23             MR. HUSNICK:  We're good, Your Honor.

24             THE COURT:  Okay.

25             MR. HUSNICK:  The witness will be available to

1    testify.

2         THE COURT:  All right.  Thank you.  We'll

3    reconvene.  We'll take a recess and reconvene at 1:00 and

4    take up the Stewart matter.

5        (Recess)

6         CLERK:  All rise.

7         THE COURT:  Please be seated.  All right.  We're

8    going to continue with the Stewart matter.  And we have Mr.

9    Seitz available on the telephone now.

10        And I don't know if there -- is there any

11   additional thing you want to say before we turn it over to

12   Mr. -- well I'm going to ask Mr. Seitz some questions and

13   then turn it over to Mr. Stewart.

14        MS. YENAMANDRA:  Sure.  Your Honor, again, Aparna

15   Yenamandra from K&E on behalf of the Debtors.

16        We just wanted to say on our behalf Mr. Kotarba is

17   here.  We're happy to do a short direct of him as well.  It

18   will mirror what was in his declarations and his proffered

19   testimony, but defer to Your Honor on whether that would be

20   helpful, given that the scope of the cross should be limited

21   to what was provided on direct.

22        THE COURT:  Okay.  Mr. Seitz, if you -- if you're

23   available to answer just a couple questions and then what

24   we'll do is we'll offer up the witness for cross

25   examination, if anyone wishes to cross examine him.  If you

1    want to make an additional direct, that's fine.

2           THE COURT:  Though if you could help the Court

3    with just a recitation of the -- you know, what happened,

4    what was done, you know, what the chronology is from your

5    involvement in April to -- I believe it was April 2015 till

6    your -- till today.  And I understand there was some

7    discovery that may have occurred, so I'm just trying to

8    clarify, for the record, for my own understanding and for

9    Mr. Stewart's understanding, exactly sort of what happened

10   and what you did in your role as counsel.

11          MR. SEITZ:  Certainly, Your Honor.  First of all,

12   when we were retained, the proofs of claim had already been

13   filed and were of record.  They're voluminous documents so

14   the first thing we did after our retention was to review all

15   those records and try to address some of the issues that

16   with had, with our client, about the connections between the

17   records and the various parties in the case.

18          After considerable back and forth with the client

19   on those points, we made the recommendation that discovery

20   be propounded of the Debtors to try to elicit any

21   information or documentation they may have, because the --

22   in the circumstances of the Debtors, there was a lack of

23   access to various documents that the Debtors may have had in

24   their possession.

25          So we did, in consultation with the client,

1    propound those.  The Debtors provided responses to that

2    discovery.  We -- I consulted with the clients about that

3    discovery and the effect of those responses and made

4    recommendations to the client as a result of a combination

5    of the review of all the discovery in the case and the

6    various claims that had been filed and the amendments to

7    claims that had been filed and the records that the client

8    had provided.

9            As of December 4th, we made certain

10   recommendations to the client that I really can't go into

11   because of the attorney/client relationship, but the client

12   was not happy with our recommendations and we allowed

13   additional time for the Debtor to provide -- the client to

14   provide additional information to us.  That was not

15   satisfactory, so on December 8th we provided a written

16   notice to the client that, you know, we were no longer a --

17   we had an impasse in our views as to how the case and

18   prosecution of these claims should be handled and we were

19   disengaging as counsel.

20           And we encouraged the client to get replacement

21   counsel on our behalf.  And we reminded the client that

22   there was an evidentiary hearing scheduled, by the Debtors,

23   for December 16th, and that they should have an attorney for

24   that conference -- or for that hearing.

25           The client provided us with additional information

1   that didn't change our mind as to the representation of

2   them.  We communicated that to them, again, reminded them

3   that the hearing was going forward and that they should have

4   counsel and that they should have their counsel contact us

5   so that we could do a substitution.  When that was not

6   forthcoming, we filed a notice of withdrawal of our entry of

7   appearance in the case.

8            THE COURT:  All right.  There was some amended

9   claims filed or another claim filed, I think in -- later,

10  after the representation occurred.  You were not involved in

11  that.  Is that correct?

12           MR. SEITZ:  That's correct.

13           THE COURT:  Okay.  Let's do this.  Why don't you

14  put on your witness for your supplemental direct, and then

15  I'll make him available for cross examination.

16           Mr. Seitz, if you could stay on, I'd appreciate

17  it.

18           MR. SEITZ:  I will, Your Honor.

19           THE COURT:  Please take the stand and remain

20  standing.

21           CLERK:  Please raise your right hand.  Do you

22  affirm you're willing to tell the truth, the whole truth,

23  and nothing but the truth, to the best of your knowledge and

24  ability?

25           MR. KOTARBA:  I do.

1        CLERK:  Please state and spell your name for the

2    record.

3        MR. KOTARBA:  Sure.  Steve Kotarba.  K-O-T-A-R-B-

4    A.

5        CLERK:  Thank you.

6        THE COURT:  Thank you, Mr. Kotarba.

7        MR. KOTARBA:  Thank you.

8        THE COURT:  Sorry about the delay.

9        MR. KOTARBA:  Not a problem.

10        MR. GANTER:  Your Honor, Jonathan Ganter of

11    Kirkland & Ellis on behalf of the Debtors.  We prepared a

12    binder of just materials from the docket.  Permission to

13    approach and provide it to you?

14        THE COURT:  Yes.  Thank you.  Did you give Mr.

15    Stewart a copy?

16        MR. GANTER:  Mr. Stewart, you have a copy from

17    beforehand?

18        MR. STEWART:  Yes.  Yes.  Yes, sir.

19        THE COURT:  Okay.

20                    DIRECT EXAMINATION

21    BY MR. GANTER:

22    Q    Mr. Kotarba, could you please introduce yourself for

23    the Court.

24    A    Sure.  Steve Kotarba.  I'm a managing director with

25    Alvarez & Marsal.

 1   Q     And what exactly does Alvarez & Marsal do?

 2   A     Sure.  We provide financial advisory services, we're

 3   serving that role with respect to the Debtors in these

 4   cases.

 5   Q     So, can you elaborate a little bit more on A&M.  Is it

 6   okay if we refer to Alvarez & Marsal as A&M --

 7   A     Sure.

 8   Q     -- you understand that?  You -- or expound a little bit

 9   on what A&M's role is with regard to this matter in

10   particular?

11   A     Sure.  With respect to the incident matter, we're

12   serving to lead the process to reconcile the various claims

13   that have been filed in these cases.  So for example, as the

14   claims come in, we're leading the process to -- to -- to

15   undertake to look at those claims, review them and take

16   positions as to their validity.

17   Q     And you're a senior member of the claims evaluation

18   team, correct?

19   A     That's correct.

20   Q     Are you familiar with the proofs of claim filed by Ms.

21   Stewart that are the subject of today's hearing?

22   A     I am.

23   Q     And just to be clear, those proofs of claim are numbers

24   5739, Number 10003 and Number 10982?

25   A     That's correct.

Page 94

1    Q    Mr. Kotarba, your declaration in support of the 14th --

2    the Debtors' Fourteenth Omnibus Objection is already --

3              MR. GANTER:  -- was moved into evidence this

4    morning, I believe, Your Honor?

5              THE COURT:  Yes.

6              MR. GANTER:  Is that accurate?

7              THE COURT:  Yes.

8              MR. GANTER:  We didn't apply a number to it, but

9    it will be -- that will be Defendant -- Debtors' Exhibit 1

10   in your binder.

11             THE COURT:  Okay.

12   Q    Could you please turn to Tab 1 in your binder, sir.

13   A    I'm there.

14   Q    What was the purpose of A&M and the claims evaluations

15   team of reviewing the proofs of claim as described in your

16   Debtors' Exhibit 1?

17   A    Sure.  We undertake a process to review all of the

18   claims that are filed in the case, as I said earlier, to

19   review them for their validity.  With respect to the

20   Fourteenth Omnibus Objection, as we go through the series of

21   claims, they'll fall into certain categories.  One of the

22   categories that's pertinent here are claims where we think

23   there's no basis, based on the company's books and records,

24   or what we call a no-liability claim.  So one of the bases

25   for the objection, Omnibus 14, was to object to claims for

Page 95

```
1    which we thought the estates had no liability.

2    Q    And with regard to Omnibus 14, you reviewed -- the

3    claims investigation team reviewed two of Ms. Stewart's

4    claims.  Is that right?

5    A    That's correct.

6    Q    I'd ask you to please turn to Tab 5 in your binder.

7    A    Okay.  I'm there.

8    Q    Do you recognize what Debtors' Exhibit 5 is?

9    A    I do.

10   Q    And what is it?

11   A    It's Proof of Claim Number 5739.

12   Q    And this -- was this one of the proofs of claim -- Ms.

13   Stewart's proofs of claim that was reviewed related to

14   Omnibus Objection -- the Fourteenth Omnibus Objections?

15   A    It is.

16   Q    And then if you could turn to the next tab, which is

17   Debtors' Exhibit 6.  Let me know when you're there.

18   A    I'm there.

19   Q    Could -- do you recognize this?

20   A    I do.

21   Q    And what is this, sir?

22   A    This is Claim 10003.

23   Q    This is one of Ms. Stewart's proofs of claim that was

24   investigated in relation to your Fourteenth Omnibus

25   Objections?
```

1    A    It is.

2    Q    Okay.  At a high level, Mr. Kotarba, could you please

3    describe the inquiry that was performed with regard to

4    Debtors' Exhibits 5 and 6, the Proofs of Claim 5739 and

5    10003?

6    A    Sure.  So as the claims come in, we receive, "we" being

7    the A&M claims team, receives those claims.  We'll do our

8    own investigation and review of those claims in an attempt

9    to ascertain the validity of those claims, their ties to the

10   company's books and records, the statements and schedules

11   that have been filed in these cases.  Where we're unable to

12   take a position as to here or need further support to

13   reconcile that claim, we'll reach out to the company, which

14   we did in these cases.

15          So we'll conduct a review, then we'll reach out to

16   the company, give them sort of the results, preliminary

17   thoughts on our review and then elicit their additional

18   support and research to further attempt to reconcile the

19   claim.

20   Q    So before we get to the results of that review,

21   Debtors' Exhibits 5 and 6, can you tell us, as parts of that

22   inquiry, did that involve review of the proofs of claim

23   themselves?

24   A    It did.

25   Q    And did it also involve review of the materials

1   appended to the proofs of claim, so attached to them?

2   A    It did.

3   Q    Mr. Kotarba, what did the inquiry regarding Debtors'

4   Exhibits 5 and 6 reveal?

5   A    We were unable to make any sort of connection between

6   the claims asserted and -- either claim, and the Debtors or

7   their estates.  Essentially we determined that the estates

8   had no liability for these claims, because we couldn't

9   determine any sort of connection or nexus between the claims

10  and the Debtors.

11  Q    On that point, you said that the claims had no

12  liability.

13  A    That's correct.

14  Q    Could -- direct you, sir, to Paragraph 5 of Debtors'

15  Exhibit 1, which is, again, your declaration in support of

16  the Debtors' Fourteenth Omnibus Objections.  Let me know

17  when you're there.

18  A    All right.  I'm there.

19  Q    Okay.  If you see at the beginning of Paragraph 5 your

20  declaration states that, "Upon review of the proofs of claim

21  filed against the Debtors in these Chapter 11 cases, the

22  Debtors have identified 61 no-liability claims listed on

23  Exhibit 2 to Exhibit A."  Do you see that?

24  A    I do.

25  Q    Sir, now if you could turn to Tab 3 in your binder.

1    And as you're turning there, I'll represent that this is

2    Exhibit A to the Debtors' Fourteenth Omnibus Objections,

3    which is on the docket at 405-2.  Okay?

4    A    I'm there.

5    Q    And then when you're there, if you could turn to -- so

6    do you recognize this, sir?

7    A    I do.

8    Q    Could you please turn to Page 27 of 33, using the

9    numbers at the top?

10   A    I'm there.

11   Q    Or actually, I'm sorry, before we go to 27 of 33, can

12   you please turn to 18 of 33.

13   A    Okay.  I'm there.

14   Q    And explain what this shows.

15   A    Sure.  This is just the cover page of Exhibit 2 to

16   Exhibit A.  So in -- in the context of how we file our

17   objections, we file an Omnibus objection, which would have

18   the narrative that describes the basis for the objection,

19   generally and then we attach exhibits that would list the

20   specific claims that are subject to each type of objection.

21   Q    And is this the same Exhibit 2 to Exhibit A that was --

22   we just looked at in Paragraph 5 of your declaration at the

23   Debtors' Exhibit 1?

24   A    That's correct.

25   Q    All right.  Now, if you could go to 27 of 33.

1    A    Um hmm.

2    Q    And I'll direct you to Entries 56 and 57.

3    A    I see those.

4    Q    Okay.  Explain what these show.

5    A    What these do is they simply list out, for the benefit

6    of the claimant and others reviewing the objection, the

7    claimant's name, the case number where the claim was

8    originally filed, and then other particulars with respect to

9    the claim and then there's a column, the last column, which

10   states our reason for disallowance.  And we give the reason

11   why we're disallowing the claim, which ties back to the

12   narrative in the Omnibus objection.

13   Q    And just to be clear, for the record, Entries 56 and 57

14   are they Ms. Stewart's claims, which we looked at as

15   Debtors' Exhibits 5 and 6?

16   A    They are.  Yes.

17   Q    And so the determination was those were no-liability

18   claims?

19   A    That's correct.

20   Q    Sir, now you also -- we also -- in evidence already, if

21   you could turn to Debtors' Exhibit 2.  And what you'll see

22   here is that this is the -- your declaration, in support of

23   the Debtors' Thirty-Third Omnibus Objections.  Do you see

24   that?

25   A    I do.

1    Q    Can you please compare the work -- A&M's work and the

2    claims investigations team's work related to the subject

3    matter covered in this declaration with that in Debtors'

4    Exhibit 1?

5    A    Sure.  I mean the review -- the process from the review

6    of the claims, to the vetting of the claims, to placing them

7    on the Omnibus objection and how the objection worked with

8    corresponding exhibits would have been identical in Omnibus

9    33 as it was for Omnibus 14.

10   Q    And Debtors' Exhibit 2, your second declaration here,

11   also uses the phrase "no-liability proofs of claim."  Does

12   that have the same meaning as in Exhibit 1?

13   A    It does.

14   Q    And Mr. Kotarba, you reviewed one -- or the claims

15   investigation team, A&M and the claims evaluation team

16   reviewed one of Ms. Stewart's proofs of claim in connection

17   with the Thirty-Third Omnibus Objections.

18   A    That's correct.

19   Q    If you could turn to Tab 7 in your binder, sir.  It's a

20   heavy lift there.

21   A    It is.  Okay.  I'm there.

22   Q    All right.  Do you recognize this?

23   A    Yeah, I do.

24   Q    And what is it?

25   A    It's Plan Number 5739.

1    Q    Actually if -- I'd direct you back up to the top, above

2    that, the stamped number under the barcode.

3    A    Oh, I apologize.  Yeah, Claim Number 10982.  It's the

4    third claim that was filed.

5    Q    And so this is Ms. Stewart's claim, Debtors' Exhibit 7,

6    that was reviewed in connection with Debtors' Thirty-Third

7    Omnibus Objections, right?

8    A    That's right.

9    Q    And at a high level, can you describe the inquiry that

10   was performed with regard to Debtor's Exhibit 7?

11   A    Sure.  It would have been the same as we did with

12   respect to the other claims, in that we would take the

13   claim, review the claim, attempt to identify anything in the

14   claim that would tie to existing records that we have, to

15   assess the validity of the claim.  We would then go back and

16   work with the company to elicit their further assistance to

17   evaluate the claim.  Upon those efforts, once we realized

18   that there was no liability, we would then place it on the

19   appropriate objection.

20   Q    All right.  And that review of this particular claim,

21   would that have involved review of the proof of claim

22   itself?

23   A    That's correct.

24   Q    As well as any materials that had been attached to it?

25   I don't know if there --

```
                                                    Page 102
 1    A     That -- I don't think there was for this one.  But
 2    that's correct.
 3    Q     Okay.
 4    A     (Indiscernible).
 5           THE COURT:  That is small print.
 6    Q     Okay.  What did the inquiry regarding Debtors' Exhibit
 7    7 reveal?
 8    A     Similar to the other claims, we were unable to
 9    ascertain any liability on behalf of the Debtors for this
10    claim.
11    Q     I'd ask you now to turn to Debtor -- to Tab 4.  And
12    just let me know when you're there.  Actually, I apologize.
13    Before we get to Tab 4, go back to Debtors' Exhibit 2, we go
14    to Paragraph 5.
15    A     Okay.  I'm at Exhibit 2.
16    Q     Okay.  In Exhibit 2, Paragraph 5, do you see, similar
17    to your first declaration, it starts -- it indicates that,
18    in the second line, "The Debtors have identified 81 no-
19    liability claims listed on Exhibit 2 to Exhibit A."  Do you
20    see that?
21    A     Yes.
22    Q     Okay.  Now if you'll turn to Tab 4.  And I'll represent
23    that this is -- on the docket at 6499-2 and it's Exhibit A
24    to the Debtor's Thirty-Third Omnibus Objection.  Are you
25    there, sir?
```

Page 103

1    A    Yes.

2    Q    If you could turn to Page 11 of 27, along the top.

3    A    Okay.  I'm there.

4    Q    All right.  And then -- and could you explain what this

5    shows?

6    A    Sure.  This is Exhibit 2 to the same Exhibit A, just

7    identified, to the Thirty-Third Omnibus Objection.

8    Q    Okay.  That was referenced in Paragraph 5 of your

9    Thirty-Third Omnibus Objection?

10   A    That's correct.

11   Q    Now if you can go to Page 25 of 27.

12   A    I'm there.

13   Q    Okay.  And then turn -- look -- direct your attention

14   to Entry 69.  Can you explain what this shows?

15   A    Sure.  Similar to the other claims, this indicates that

16   there is a no -- pending no-liability objection on the

17   Thirty-Third Omnibus Objection to the Stewart Claim 10982

18   and similar to the other claims we give the reason for

19   disallowance as no-liability.

20   Q    Mr. Kotarba, thank you.  Besides -- stepping back,

21   besides what you've already discussed with regard to the

22   Debtors' 14th and Thirty-Third Omnibus Objections and Ms.

23   Stewart's claims, are you aware of any other investigation

24   related to Ms. Stewart's proofs of claim that are reflected

25   at Debtors' Exhibits 5, 6 and 7?

1    A    There was one further investigation.  Ms. Stewart's

2    counsel had reached out to us and propounded discovery to

3    which we prepared responses.

4    Q    Could you please turn to Tab 8 now, sir.

5    A    I'm there.

6    Q    And do you recognize this?

7    A    I do.

8    Q    What is it?

9    A    These are the discover -- the list of discovery

10   requests that we received from Ms. Stewart's counsel.

11   Q    And this -- so these were the subject of that

12   additional investigation that you mentioned?

13   A    That's correct.

14   Q    How many requests are there, total, in here?  Do you

15   know?

16   A    I'm checking.  I believe -- I believe there was 15.

17   Q    Okay.  I want to direct you, just briefly, to a couple

18   of them in particular.  First, if you please look to Request

19   for Production Number 3, which appears on Page 4 of the

20   document.

21   A    Okay.  I'm there.

22   Q    At a high level, can you please explain what this

23   particular request is about and is asking for?

24   A    Sure.  Really Requests 3 and 4 sort of work together.

25   And Request 3, the discovery essentially asking for us to

 1   investigate and opine on any connections between certain

 2   individuals and the Debtors.  And then Question 4 lays out

 3   and asked a very similar question but attempts to find ties

 4   between certain parcels of land and any of the Debtors.

 5   Q    Thank you.  Mr. Kotarba, you're a -- as you mentioned

 6   earlier, you're a senior member of the Debtors' claims

 7   evaluation team, right?

 8   A    That's correct.

 9   Q    And can you tell us whether any members of the claims

10   evaluation team conducted any investigation in connection

11   with Debtors' Exhibit 8?

12   A    Yeah, there was extensive additional research into

13   compiling responses to this discovery.

14   Q    Okay.  What can you tell us, in more detail, about that

15   search that was done?

16   A    Sure.  We -- we were able to go back, in conjunction

17   with the company and their resources, essentially went back

18   and looked at any company systems where this information may

19   be recorded, any -- had conversation with any individuals

20   that may have knowledge of either these persons or these

21   parcels.  And then additional research was done into third

22   party external sites, again, to try and -- to determine any

23   sort of connection between either these persons or these

24   parcels.

25   Q    And when you mention third party external sites, that

1    includes public records?

2    A    That's correct.

3    Q    How about -- what -- are you -- have anything more you

4    can tell us about the software systems that were examined?

5    A    Sure.  There -- there was -- I know there was -- it was

6    an accounting software system maintained by the Land

7    Department and then there were also certain databases that

8    -- that related to current and former customers of the

9    Debtors, and Ms. Stewart had appeared as a former customer,

10   so we checked those databases as well.

11   Q    Mr. Kotarba, what, if anything, can you tell us about

12   the results of the investigation you just described, in

13   response to Debtors' Exhibit 8?

14   A    After those results, again, we were unable to find any

15   connection between any of the parties identified, or parcels

16   identified and the Debtors.

17   Q    Does that include -- was -- did you find any connection

18   between the Debtors and the -- any of the property or

19   parcels of land described?

20   A    We did not.

21   Q    How about -- did the searches reveal anything with

22   regard to Debtors' operations that were -- purportedly

23   touched the property?

24   A    We -- we didn't find any identify -- any instances of

25   that.

1   Q    And so did the investigation, in response to Debtors'

2   Exhibit 8, return any requests that were responsive to the

3   documents in any way?

4   A    They did not.

5            MR. GANTER:  Your Honor, at this time the Debtors

6   have no further questions for Mr. Kotarba right now but

7   would ask to move the following exhibits used during the

8   direct examine into evidence, those being DX-1, DX-2 --

9   well, which are already in evidence, my apologies.  So it

10  would be -- right now we would move in Debtors' Exhibit 3,

11  Debtors' Exhibit 4, Debtors' Exhibit 5, Debtor's Exhibit 6,

12  Debtor's Exhibit 7 and Debtors' Exhibit 8.

13           THE COURT:  Any objection to the admission of

14  these documents into evidence?

15           MR. STEWART:  I would object to --

16           MR. SEITZ:  Your Honor, just -- Your Honor, just

17  as a point of clarification, Gary Seitz here.  Is Debtors'

18  Exhibit 8 the request and the responses?

19           THE COURT:  I believe it is just the request.

20           MR. GANTER:  That's correct, Your Honor, it's just

21  the request.  That were used --

22           MR. SEITZ:  I think it would be fair -- it would

23  be fair if it was both the request and the responses.

24           MR. GANTER:  That's not a problem for us, Mr.

25  Seitz.  We can add those as an additional exhibit.

```
 1              THE COURT:  All right.  We'll add those as Exhibit
 2    9 then.  You can have time to put that together, obviously.
 3              MR. GANTER:  Okay.
 4              THE COURT:  Mr. Stewart, you were going to say
 5    something?
 6              MR. STEWART:  DX -- I believe it's going to be DX-
 7    7, you want -- they want to say this is a claim for Mrs.
 8    Stewart.  That's incorrect.  On the backside of it it says
 9    Kenneth Stewart, Pro Se.  That was my claim.  Or
10    (indiscernible) --
11              THE COURT:  All right.  Well, the exhibit sort of
12    speaks for itself.  It says what it says.  And I'll take it
13    based on what it says and we can discuss what it means
14    later.  But as a matter of evidence, it says what it says.
15              MR. STEWART:  So what kind of search engine did
16    you use to --
17              THE COURT:  All right.  Wait.  Hang on, we're not
18    there yet.
19              MR. STEWART:  Okay.
20              THE COURT:  All right.  So I'm going to admit
21    Documents 1 through 8 into evidence, pending 9 which will be
22    the responses.
23              MR. GANTER:  Um hmm.
24              THE COURT:  So admitting 8 and subject to
25    admitting 9.
```

 1            And at this point, unless you have any further

 2      questions, I'll turn the witness over for cross?

 3            MR. GANTER:  No further questions.  But we also

 4      wanted to add, with regard to some of the filings on the

 5      docket, that for purposes of completing the record, with

 6      respect to the Stewarts' proof of claim, that we also

 7      request that the Court just take notice of four other

 8      filings that were on the docket related to this, just for

 9      completeness of the record.

10            THE COURT:  All right.

11            MR. GANTER:  And those would be, they're docketed

12      at Number 5384, Number 5716, Number 6101 and Number 6934.

13            THE COURT:  And what are they?

14            MR. GANTER:  They are -- Number 5384 is a letter

15      -- and these are -- I believe I have the exact description

16      from the docket, it's a letter and statement of facts and

17      that includes one exhibit.  And this was I believe docketed

18      by Mr. Stewart.

19            THE COURT:  Okay.

20            MR. GANTER:  5716 is a statement of facts

21      amendment to the statement, with additional information,

22      dated 8/25/15, again, Mr. Stewart.

23            There is a -- Entry 6101 is a letter regarding

24      time to hire an attorney to file an adversary dated 9/18/15,

25      Mr. Stewart, and then 6934 is an additional letter filed by

1   Mr. Stewart along with the exhibits.  That's just for

2   completeness of the record, Your Honor.

3            THE COURT:  Okay.  Thank you.

4            MR. STEWART:  May -- can I say something?

5            THE COURT:  Yes, why don't you take the podium, if

6   you don't mind.

7            MR. GANTER:  I'll just get out of your way.

8            MR. STEWART:  On 8/18/2015 you appointed Mr.

9   Sassower to discuss with me the questions that I was asking

10  for.  He did not give me any of the information that I asked

11  for.  I had my family lawyer counsel ask for the same

12  information and nothing was given to him.  And it was

13  appointed -- it was appointed that day that he was supposed

14  to disclose information to me, and it wasn't disclosed at

15  all.

16           THE COURT:  Okay.  Do you have questions for this

17  witness?  Let's take this one step at a time.

18           MR. STEWART:  In my -- in my -- in my paperwork

19  I'm -- I'm ready, but I just got this book at 12:00 o'clock,

20  and it's going to take me a second to pull up the easements.

21           THE COURT:  Okay.

22           MR. STEWART:  The easements have already been

23  entered in as a record.

24           THE COURT:  They're part of what has been entered

25  into admission?

```
 1            MR. STEWART:  Yes, and thus my question is, if

 2   they've already been entered in as a record, he should have

 3   been able to find those easements and tracked it back.

 4            THE COURT:  All right, well you can examine him on

 5   that.

 6            MR. STEWART:  And as a record, I went to the PUC,

 7   and for some reason, they have the arm of KSU, the attorney

 8   general has that information, and I put a Freedom of Request

 9   in for that information, because I have the nuclear energy

10   policy for the nuclear power plant in the state of Texas.

11            THE COURT:  All right, do you have any questions

12   for the witness?

13            MR. STEWART:  Yes.  It's going to be --

14            THE COURT:  Which exhibit number?

15            MR. STEWART:  It's going to be Exhibit DX-6, Page

16   2 of 15.  But it's really not labelled.  It's going to be

17   where -- the pages are not numbered.

18            THE COURT:  Did you say you had these documents

19   sort of separate already?

20            MR. STEWART:  Yes.

21            THE COURT:  We can work off that, if that's

22   easier.

23            MR. STEWART:  Oh, well it's going to be -- okay.

24            THE COURT:  If not, that's fine.  We'll figure it

25   out.
```

1          MR. STEWART:  It's going to say Gifco Properties,

2   it's going to be --

3          THE COURT:  About how far in are we?

4          MR. STEWART:  Three quarters of the way in.

5          THE COURT:  Okay.  Can you approach it, give your

6   copy to the witness?  Would that be acceptable?  Maybe I can

7   -- actually, can you let me see it real quick, and I'll see

8   if I can find it in my own binder.

9          MR. STEWART:  It's going to be 3 of 15, it's going

10  to be on the bottom side.

11         THE COURT:  Got it.  I'm there.  Thank you,

12  counsel.

13         MR. STEWART:  It's going to be the Texas Electric

14  Service Company.

15         MR. KOTARBA:  What page are you looking at?

16         MR. STEWART:  3 of 15.

17         MR. KOTARBA:  Okay.

18         MR. STEWART:  It's going to be the Texas Electric

19  Service, TU, Texas Utilities, probably.

20         THE COURT:  All right, which one?

21         MR. KOTARBA:  It's going to be 3 of 15, it's going

22  to be your 6572, it's going to be the Gifco property.

23         THE COURT:  Okay, what's the question?

24  Q    I'm asking, does he recall researching the Texas

25  Utility Service Company?

Page 113

1   A    I don't have independent recollection of researching

2   this particular line, but we did research the claim, and all

3   the supreme documentation, and were unable to determine a

4   tie between the Debtors and your claims.

5   Q    It's going to be TXU Electric.

6   A    I'm not sure that that is --

7   Q    So these are all easements that are on our property.

8   A    Okay.

9   Q    From Trinity River, to Montague County.

10  A    Where's the reference to Trinity River?

11  Q    (Indiscernible), if you researched it, you would admit

12  it's right by the Trinity River, right here.

13  A    Okay.

14  Q    So I --

15  A    I don't know what you're asking.

16  Q    Did you personally research this information yourself?

17  A    I did not personally research it, no.

18  Q    On the next page, it's going to be Gifco Properties,

19  with the resolution.  It's going to be resolution trust.

20          THE COURT:  Which page?  415?

21          MR. STEWART:  That's going to be 415.  It's about

22  three quarters of the way down the page.  You can see

23  resolution, it's going to be resolution trust.  Do you see

24  that?

25          MR. KOTARBA:  I don't.

1            MR. STEWART:  It's going to be on Page 415.

2            MR. KOTARBA:  Okay.

3            THE COURT:  Dated February 16th, 1973, is that

4    correct?

5            MR. STEWART:  Yes.

6            THE COURT:  I don't see trust, but it does say

7    resolution.

8            MR. STEWART:  It's resolution trust, because it's

9    how we acquired the prop -- or we had to save it.

10           THE COURT:  DO you see it, sir?

11           MR. KOTARBA:  I don't.  I wonder if I have the

12   same page.

13           THE COURT:  Page 415.

14           MR. KOTARBA:  Yep.

15           THE COURT:  About two-thirds down, you'll see the

16   dates on the left.  It's dated February 16th, 1973, the

17   grantee is Gifco Prop, and then it says Doc Type Legacy

18   Number, the word Resolution.

19           MR. KOTARBA:  Oh, got it, got it, I do.

20           THE COURT:  All right, and the question then.

21   Q    Do you recall going over this particular document,

22   because it's going to be all of the set track?

23           THE COURT:  Do you recall going over this

24   document?

25   A    I don't.  Others reviewed it, and they reported back to

Page 115

1    me.  I didn't review this individually.

2    Q    So have you ever went over this information?  So you

3    physically went over the information that I submitted to

4    Court?

5    A    We went through your documentation, and then others at

6    my direction went through that review.  I don't recall

7    individually doing this page, no.

8    Q    I actually submit, when I realized that people weren't

9    looking at the -- it's a lot of information to take in -- I

10   actually submitted just bits and pieces, to make it easier

11   on you, so you'd know what to actually look at, and you'd

12   see it.  Did you ever get those papers that I faxed in, to

13   THUMG, it was about five, four pages of this specific

14   document?

15   A    I'm not sure which fax you're referring to.  I mean, I

16   will say that we received the information that you submitted

17   extensively, and I was unable to find a connection.

18   Q    Do you see a connection now, of easements, of the

19   legible easements?

20   A    I would have to take time to review this independently.

21   I can't make a determination from the stand.

22   Q    Okay.  I thought that was part of the discovery.

23           THE COURT:  Part of what was the discovery?

24           MR. STEWART:  Mr. Seitz --

25           THE COURT:  I don't understand what you're asking.

1          MR. STEWART:  Didn't Mr. Seitz ask for this in

2    discovery?

3          THE COURT:  Mr. Seitz found in discovery -- who

4    did the work at A&M in response to the discovery?

5          MR. KOTARBA:  We actually work with persons at the

6    Debtors.

7          THE COURT:  Individuals at the Debtors themselves?

8          MR. KOTARBA:  That's correct.

9          THE COURT:  Where, in Irving, or?

10         MR. KOTARBA:  Out at headquarters, at company

11   headquarters.

12         THE COURT:  At headquarters.

13         MR. STEWART:  On Page 5 of 15, do you see Texas

14   Power and Light?

15         THE COURT:  Where?

16         MR. STEWART:  It's going to be 5 of 15, it's on

17   the next page, it's Texas Power and Light Company, it's

18   another easement.

19         THE COURT:  You mean at the very top there?

20         MR. STEWART:  Yes, sir.

21   A    That's correct.  It's Texas P&L Co.

22   Q    Texas Power and Light Company.

23   A    Well, I can't be certain that that's the same.

24   Q    Okay.  Well, if you researched, it, you would know what

25   it stands for, wouldn't you think?

1    A    I can't tell you from the stand what Texas A&L Co

2    stands for.

3              MR. STEWART:  I don't think there's been discovery

4    done.

5              THE COURT:  What do you mean?

6              MR. STEWART:  I don't think that anybody's

7    actually went over and physically looked at my documents

8    that I've submitted.

9              THE COURT:  Why would you say that?

10             MR. STEWART:  Because they don't even know if --

11             THE COURT:  The man just testified that he did.

12   That he didn't personally do it, but people under his

13   direction did, in consultation with the Debtor.

14             MR. STEWART:  Page 7 of 15.  The Debtor can't

15   object to the information, based on discovery.

16             THE COURT:  No one's objecting to the information,

17   I don't know what you're saying.

18             MR. MONTEMAYOR:  The Debtor has objected to it

19   based on information that was submitted earlier, to these

20   matters, that there is no connection at all with reference

21   to what was demanded from them in the discovery, Your Honor.

22   And they said there's no connection, and there is connection

23   based on these matters here.  I mean, with --

24             THE COURT:  Help me out.  What am I looking at?

25   I'm looking at a spreadsheet, what is this?

```
 1              MR. STEWART:  This is going to be the property --

 2              THE COURT:  Property search?

 3              MR. STEWART:  No, it's going to be Gifco

 4    Properties.

 5              THE COURT:  But what is the document?

 6              MR. STEWART:  It is transactions and easements for

 7    Dallas County.

 8              THE COURT:  All right, so this is a public

 9    document that you --

10              MR. STEWART:  It's a public, because I did my

11    research on our property.  In 1968, my father gave to the

12    Dallas County/Irving land, let them subdivide.  He retained

13    all rights to the easements, and it was going to be his

14    company that did work on the easements, and I submitted that

15    document into Court today, and I am the beneficiary to that

16    680046, Page 14.

17              THE COURT:  Is -- a couple questions for counsel

18    to the extent you know, is Texas P&L Company, is that a

19    Debtor, a predecessor to a Debtor?

20              MR. GANTZ:  Your Honor, we'd have to go back and

21    check.  I'm not even clear, from Mr. Stewart, whether this

22    is actually something he prepared, or a public filing.  It's

23    just a question.

24              MR. STEWART:  It's my research that I did on, Your

25    Honor.
```

1          THE COURT:  It's a print out a computer search,

2     right?  You put in the word --

3          MR. STEWART:  No, I went to the County Records,

4     and the 680046, Page 14, that I submitted into the docket

5     today, if you do research, they have it blacked out.  I had

6     to go to microfiche, and get it off the computer and I had

7     it certified.

8          THE COURT:  Well, I didn't look at anything that

9     you filed today.  I don't know what you're talking about.

10         MR. STEWART:  Okay.  But some of the documents

11    that are needed, that you have to get, you'll have to go to

12    the County for it, and search off microfiche.  A lot of

13    documents that relate to the easements --

14         THE COURT:  So your claim is, what are these --

15    this is one large tract of land?

16         MR. STEWART:  There's going to be seven tracks of

17    land throughout the State of Texas from Montague County to

18    East Texas.

19         THE COURT:  Okay, and you -- who owns that land?

20         MR. STEWART:  And in Montgomery.  My father and my

21    mother own that land.  Now my mother owns the Montague and

22    East Texas.

23         THE COURT:  She owns the land.

24         MR. STEWART:  She owns what wasn't given away,

25    yes.  But he retained the rights to the easements, and --

```
                                              Page 120
```

1           THE COURT:  What do you mean he retained the

2     rights to the easements?  The right to get paid for the

3     easements?

4           MR. STEWART:  No, but he says, "I'm going to give

5     you the land.  I'm going to let you subdivide --" To

6     dedicate to the public use, the benefit (indiscernible)

7     streets.  I mean, like I said, I had to pull it off

8     microfiche, it's -- "the streets, the alleys, thereon, for

9     all public use in purposes including, but not limited to,

10    all the streets and the rights of the City of Irving, and

11    assigns to the alleys and install and operate and replace

12    his drainage storm sewers, lines, gas lines, telephone

13    poles, and electrical poles.  Says the easements shown on

14    the pact here above grant, dedicate, and reserve for mutual

15    --

16          THE COURT:  Is this from what you filed this

17    morning?

18          MR. STEWART:  Yes, but we here do bind ourselves

19    to the easements, the electrical lines, anything that's on

20    the easements is going to be done by Stewart Company, and

21    it's been documented in 1968, because that's when we're

22    giving the land.

23          THE COURT:  All right.  So I'm just trying to

24    figure out your argument.  So your father --

25          MR. STEWART:  Yes, Kenneth James Stewart.

1          THE COURT:  Granted, or gave, or sold a bunch of

2   land to the City of Irving, Texas.

3          MR. STEWART:  Dallas County.

4          THE COURT:  Dallas County, all right.

5          MR. STEWART:  It goes all the way up to

6   Montgomery.

7          THE COURT:  And the consideration was that he

8   would do all the construction work.

9          MR. STEWART:  Yes, so it would be his companies

10  that do the sewer, the power --

11         THE COURT:  And did that happen?  Did his

12  companies actually do that work?

13         MR. STEWART:  In my investigation, it sure does

14  like TXU, and Oncor, and Edison International, we have

15  claims, a large amount of claims to it.

16         THE COURT:  Well, and the claim is that they

17  double-crossed you, I guess?

18         MR. STEWART:  Yes, with my -- not this, my family

19  lawyer, Charlie B. Mitchell, which he's going to be with

20  some wind energy, with -- my father was one of the providers

21  on that specific document.  Charlie B. Mitchell, I think was

22  with Moody Electric.  I believe they're in debt.  And

23  Douglas J. Brooks, with associates.  And I am the associate.

24         THE COURT:  Okay, all right.  Do you have any

25  other questions for the witness?

Page 122

1          MR. STEWART:  No.  No, not right now.

2          THE COURT:  Okay, redirect.

3          MR. GANTZ:  Hold on one moment, Your Honor.

4          THE COURT:  Mr. Stewart?

5          MR. STEWART:  Yes?

6          THE COURT:  What's your middle -- who are you?

7    Are you Kenneth R. Stewart, are you Kenneth S. Stewart?

8          MR. STEWART:  In 1994, my father put it in a red

9    folder, did not throw away, and it was my TRW from 1994, and

10   he just went back to Edison in 1995 as the ethical counsel,

11   and he was the counsel for the registrant and that -- TRW

12   states that I am Kenneth S. Stewart, AKA Robert, and TRW,

13   just for your information, is owned by Allstate.

14          Allstate, in 2007 went into an agreement with the

15   attorney general, with KKR, and I think that's where my

16   shares have been lost, or what have you.  I went to the Bank

17   of the Mellons, it was 8/25/2015, after I left court.

18          I went to Syracuse, and talked to Bank of the

19   Mellons, I gave them the exact information, my TRW, gave

20   them my driver's license.  I had an Oklahoma ID at the time,

21   and they said, "Well, we need something else to prove about

22   this address," which is my mother's address.  So I went and

23   got my registration out of my truck.  And they said, "We're

24   going to run the check, and we'll get back," and I submitted

25   that document as one of the proofs.  They came back and

1    said, "Kenneth S. Stewart, that --"

2            THE COURT:  That's what I'm confused about.  I'm

3    trying to figure out what your name is.  What's your name?

4    Your name, yeah.

5            MR. STEWART:  I go by Kenneth Robert Stewart.  My

6    father put it as Kenneth S., I'm not sure why.  I think it

7    has something to do with England.  I'm not sure, it's a code

8    of some sort.

9            THE COURT:  All right.  But the social security

10   numbers, I did look at that from Bank of NY Mellon.  They

11   said the social security numbers didn't match, is that

12   right?

13           MR. STEWART:  My social security?

14           THE COURT:  I thought that's what I read.

15           MR. STEWART:  I know, it said the -- I turned in

16   the Edison bond for Kenneth S. Stewart.  They said it came

17   back -- I am Kenneth S. Stewart, but it came back that the

18   bond didn't match what was on the paper.  Instead it went to

19   C, and then to the DTCC, and the DTCC gave it to KKR.

20           THE COURT:  All right.

21           MR. STEWART:  So that's where the mistake has

22   been.

23           THE COURT:  Okay.  Any question?

24           MR. GANTZ:  No further questions, Your Honor.

25           THE COURT:  All right.  Thank you, sir, you may

Page 124

1    step down.  You may be excused, if you wish.

2            MR. KOTARBA:  Thank you, Your Honor.

3            THE COURT:  To go have your deposition taken.  Mr.

4    Stewart, do you have anything else you want to put in front

5    of the Court?

6            MR. STEWART:  My personal opinion, I don't think

7    they have actually done the research telling them that the

8    easements that I've submitted, or as evidence to support my

9    proof of claim.

10           THE COURT:  All right.  Can you flesh that out a

11   little bit, and respond to that -- this argument is, I

12   think, that the plaintiff's prima facie valid, it's your

13   burden to rebut that presumption of validity through

14   evidence.

15           Obviously you've submitted testimony today, as

16   well as representations to the Court, documents, et cetera,

17   and the argument back is, "Look, there's documents here that

18   purport to show easements in favor of Gifco," if I got it

19   right, "Property Company against what might be Debtors, or

20   predecessors to the Debtors, which might give rise to a

21   proof of claim, and how you -- what's your response to how

22   you've rebutted that presumption of validity?"  If that

23   makes any sense.

24           MS. YENAMANDRA:  Your Honor, once again, Aparna

25   Yenamandra, from K&E, on behalf of the Debtors.  Just to

Page 125

1    level-set, a little bit, we did, as I noted, search for

2    books and records before and after filing the objections.

3    We went through the thousands of pages of appended

4    materials, had many of the same conversations that Your

5    Honor had today, in an attempt to figure some of this out.

6    What might be some helpful context is that TXU and Oncor

7    were originally a consolidated entity.

8            Post deregulation, the entity split, and the

9    transmission lines, which seem to be at the heart of a

10   number of the proofs of claim, went with the Oncor entity.

11   That might help provide, shed some light on the confusion

12   here as to the Debtor's relationship to the allegations, and

13   the proofs of claim.

14           The other thing we wanted to clarify while we were

15   up here is with respect to the directive that Your Honor

16   gave in response to the email Mr. Stewart sent to Mr.

17   Sassower, from Kirkland, we understood the directive to be

18   that Mr. Sassower, or his designee, should meet with Mr.

19   Stewart.  Mr. Husnick, who is also here, did in fact meet

20   with Mr. Stewart, just outside, the halls.

21           We continued to correspond.  At that time, they

22   asked for informal discovery on all of the Debtor's

23   corporate records, going back ad infinitum.  We then

24   understood that they retained counsel, so we started to

25   conduct our conversations through Mr. Seitz, who then served

1   the formal discovery, which we responded to, and which Your

2   Honor has been made familiar with today.

3           In addition, Your Honor, Oncor's counsel has

4   informed us that we can represent today that they did their

5   own diligence as well, searched their books and records, and

6   found no relationship to the land parcels, the mining

7   operations, the transmission line allegations, the pipeline

8   allegations in their books and records, so we believe that

9   the fact that they did their search, we did our search

10  appropriately addresses the potential confusion associated

11  with TXU and Oncor originally being a consolidated entity.

12          THE COURT:  All right, thank you.  Mr. Stewart?

13          MR. STEWART:  Who is TXU, who is Oncor?

14          THE COURT:  TXU is --

15          MR. STEWART:  Who's registered owner, who's --

16          THE COURT:  Well, Oncor's owned by two entities.

17  Well, three entities.  80 percent owned by EFIH, which is a

18  Debtor, 20 percent is a minority holder, company called

19  Texas Transmission.  Oncor's not a Debtor of this Court.

20  TXU is the business that is in the retail business of buying

21  -- of providing -- what's the word I'm looking for?  It's a

22  retail servicer, or a retail provider of electrical services

23  to customers in Texas, there we go.

24          MR. STEWART:  And Oncor takes care of the

25  transmission?

1           THE COURT:  Yes, and they're a non-Debtor.

2           MR. STEWART:  But they're fixing to sell the

3      asset.

4           THE COURT:  The plan that the Court confirmed

5      sells this control of Oncor -- well, reorganizes the control

6      of Oncor through the EFH entities, and there are new owners,

7      if you will, that are putting new money into the company

8      that will actually own that business, but it's being

9      reorganized.

10          MR. STEWART:  Yes, but I have nuclear energy

11     insurance on a nuclear power plant in the State of Texas,

12     and I want this to be --

13          THE COURT:  That would be, probably Luminant owns

14     that.  Luminant is one of the Debtors.

15          MR. STEWART:  PUC told me that that's TXU.

16          THE COURT:  Well, it used to be called TXU.  It's

17     an alphabet soup.  The whole company, all together, used to

18     be called TXU, and it was divided up into a bunch of

19     different business units and entities, and everybody changed

20     their names.

21          MR. STEWART:  But really, they're owned by the

22     same entity.  I mean, basically it's like take it out of

23     this pocket, put it in the other pocket.  Yeah.

24          But I have a policy on that, and Allstate knows

25     why I have that policy on that, and they know what the

Page 128

1   attorney general, state of Texas, and KKR, when they worked

2   a deal out in 2007 to sell off my asset or dilute my stake.

3           THE COURT:  All right.  Well I have to say, I'm

4   going to rule.  I'm going to grant the objection.  I'm going

5   to disallow all the claims. The claims are prima facie valid

6   under the law.  It's the burden of the Debtors to rebut that

7   presumption.  They've done that through the submission of

8   evidence today that indicates that there is no connection

9   between the Debtors and any of the allegations you have

10  made.

11          I find that evidence to be credible and complete.

12  It would then shift to you to try to convince me otherwise,

13  and I've looked at your documents, I've read what you've

14  submitted to the Court, both previously, and in preparation

15  for today.  So I took my binders home last night, and read

16  everything to prepared for today --

17          MR. STEWART:  What about what I -- oh, go ahead.

18          THE COURT:  Well, you're going to submit papers to

19  the Court at 9:00 before a 9:30 hearing, they're not going

20  to be read.

21          MR. STEWART:  I asked Mr. Seitz to submit them

22  last week, and he resigned.

23          THE COURT:  That's a question between you and Mr.

24  Seitz.  And Mr. Seitz, as your agent, didn't do what he was

25  supposed to do, then you may or may not have claims against

Page 129

1   him.  I'm not saying you do, but the Court can't be held

2   responsible for any miscommunication between a client and

3   counsel.  So I'm going to sustain the claim objection, and

4   disallow your claims. Can I have a court order?

5             MS. YENAMANDRA:  Yes, Your Honor.  May I approach?

6             THE COURT:  Yes.  Anything further today?

7             MS. YENAMANDRA:  Nothing from the Debtors, Your

8   Honor, thank you.

9             THE COURT:  Thank you, we're adjourned.

10            MR. STEWART:  Sir, I have to say one thing.

11            THE COURT:  Yes.

12            MR. STEWART:  I typed in my last four digits of my

13   social security number in your search, 5438.  TXU Energy

14   came up.

15            THE COURT:  Okay.  I don't -- all right.  Thank

16   you for that statement.  We're adjourned.

17

18                          * * * * *

19

20

21

22

23

24

25

Page 130

1                          I N D E X

2

3                           RULINGS

4     DESCRIPTION                              PAGE        LINE

5     Motion for Application of Federal Rule     82          19

6     of Bankruptcy Procedure 7023 and to

7     Certify a Class Pursuant to Federal Rule

8     of Civil Procedure 23.

9

10    HEARING re Debtors' Fourteenth Omnibus     128          4

11    (Substantive) Objection to Certain No

12    Liability Claims.

13

14    HEARING re Debtors' Thirty-Third           128          4

15    Omnibus (Substantive) Objection to

16    Substantive Duplicate and No Liability Claims

17

18

19

20

21

22

23

24

25

Page 131

1           C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya Ledanski Hyde        Digitally signed by Sonya
                                Ledanski Hyde
                                DN: cn=Sonya Ledanski Hyde,
                                o=Veritext, ou,
                                email=digital@veritext.com,
                                c=US
7    _____     Date: 2015.12.17 15:43:41 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 17, 2015

# UNITED STATES BANKRUPTCY COURT
## District of Delaware
## 824 Market Street, 3rd Floor
## Wilmington, DE 19801

**In Re:**
Energy Future Holdings Corp.
Energy Plaza
1601 Bryan Street                            **Chapter:** 11
Dallas, TX 75201
 **EIN:** 46–2488810
TXU Corp.
TXU Corp
Texas Utilities

*Case No.*: 14–10979–CSS

### *NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*

A transcript of the proceeding held on 12/16/2015 was filed on 12/18/2015 . The following deadlines apply:

The parties have  7 days to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *request for redaction* is 1/8/2016 .

If a request for redaction is filed, the redacted transcript is due 1/19/2016 .

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is 3/17/2016 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (see docket for Transcriber's information) or you may view the document at the clerk's office public terminal.


_David D. Bird_
David D. Bird, Clerk of Court

Date: 12/18/15


(ntc)

# Notice Recipients

District/Off: 0311−1          User: Brandon          Date Created: 12/18/2015
Case: 14−10979−CSS           Form ID: ntcBK         Total: 60

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| ust | United States Trustee | USTPREGION03.WL.ECF@USDOJ.GOV |
| aty | Andrea Beth Schwartz | andrea.b.schwartz@usdoj.gov |
| aty | Brian Schartz | bschartz@kirkland.com |
| aty | Chad J. Husnick | chusnick@kirkland.com |
| aty | Daniel J. DeFranceschi | defranceschi@rlf.com |
| aty | David M. Klauder | dklauder@bk−legal.com |
| aty | Edward O. Sassower | esassower@kirkland.com |
| aty | Jason M. Madron | madron@rlf.com |
| aty | Jason M. Madron | madron@rlf.com |
| aty | Jason M. Madron | madron@rlf.com |
| aty | Jason M. Madron | madron@rlf.com |
| aty | Joseph Charles Barsalona II | barsalona@rlf.com |
| aty | Mark D. Collins | collins@rlf.com |
| aty | Michael A. Rosenthal | mrosenthal@gibsondunn.com |
| aty | Peter Jonathon Young | pyoung@proskauer.com |
| aty | Richard L. Schepacarter | richard.schepacarter@usdoj.gov |
| aty | Thomas F. Driscoll, III | tdriscoll@bifferato.com |
| aty | Tyler D. Semmelman | semmelman@rlf.com |
| aty | Tyler D. Semmelman | semmelman@rlf.com |
| aty | Tyler D. Semmelman | semmelman@rlf.com |
| aty | William A. Romanowicz | rbgroup@rlf.com |

TOTAL: 21

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | |
|---|---|---|
| db | Energy Future Holdings Corp.    Energy Plaza    1601 Bryan Street    Dallas, TX 75201 | |
| aty | Andrew McGaan    Kirkland & Ellis LLP    300 North LaSalle    Chicago, IL 60654 | |
| aty | Anna Terteryan    Kirkland & Ellis LLP    555 California Street    San Francisco, CA 94104 | |
| aty | Anthony V. Sexton    Kirkland & Ellis LLP    300 North LaSalle    Chicago, IL 60654 | |
| aty | Aparna Yenamandra    Kirkland & Ellis LLP    601 Lexington Avenue    New York, NY 10022 | |
| aty | Brenton Rogers    Kirkland & Ellis LLP    300 North LaSalle    Chicago, IL 60654 | |
| aty | Bridget K. O'Connor    Kirkland & Ellis LLP    655 Fifteenth Street, N.W.    Washington, DC 20005 | |
| aty | Bryan M. Stephany    Kirkland & Ellis LLP    655 Fifteenth Street, N.W.    Washington, DC 20005 | |
| aty | Christopher W. Keegan    Kirkland & Ellis LLP    555 California Street    San Francisco, CA 94104 | |
| aty | Cormac T. Connor    Kirkland & Ellis LLP    655 Fifteenth Street, N.W.    Washington, DC 20005 | |
| aty | Emily E. Geier    Kirkland & Ellis LLP    300 N. LaSalle    Chicago, IL 60654 | |
| aty | Iskender H. Catto    McDermott Will & Emery LLP    340 Madison Avenue    New York, NY 10173 | |
| aty | James H.M. Sprayregen    Kirkland & Ellis LLP    601 Lexington Avenue    New York, NY 10022 | |
| aty | Jeff J. Marwil    Proskauer Rose LLP    Three First National Plaza    70 W. Madison Street    Suite 3800    Chicago, IL 60602 | |
| aty | Jeremy L. Graves    GIBSON DUNN & CRUTCHER LLP    1801 California Street    Suite 4200    Denver, CO 80202−2642 | |
| aty | Jeremy L. Retherford    Balch & Bingham LLP    1901 Sixth Avenue North    Suite 1500    Birmingham, AL 35203−4602 | |
| aty | Jonathan F. Ganter    Kirkland & Ellis LLP    655 Fifteenth Street, N.W.    Washington, DC 20005 | |
| aty | Justin Sowa    Kirkland & Ellis LLP    555 California Street    San Francisco, CA 94104 | |
| aty | Kevin Chang    Kirkland & Ellis LLP    555 California Street    San Francisco, CA 94104 | |
| aty | Lary Alan Rappaport    Proskauer Rose LLP    2049 Century Park East    Los Angeles, CA 90067−3206 | |
| aty | Marc Kieselstein    Kirkland & Ellis LLP    300 North LaSalle    Chicago, IL 60654 | |
| aty | Mark E. McKane, Esq.    Kirkland & Ellis LLP    555 California Street    San Francisco, CA 94104 | |
| aty | Mark K. Thomas    Proskauer Rose LLP    Three First National Plaza    70 W. Madison Street    Suite 3800    Chicago, IL 60602 | |
| aty | Matthew E. Papez    Kirkland & Ellis LLP    655 Fifteenth Street, N.W.    Washington, DC 20005 | |
| aty | Michael A. Firestein    Proskauer Rose LLP    2049 Century Park East    Los Angeles, CA 90067−3206 | |
| aty | Michael A. Petrino    Kirkland & Ellis LLP    655 Fifteenth Street, N.W.    Washington, DC 20005 | |
| aty | Michael B. Slade    Kirkland & Ellis LLP    300 North LaSalle    Chicago, IL 60654 | |
| aty | Michael L. Raiff    Gibson Dunn & Crutcher LLP    2100 McKinney Avenue    Dallas, TX 75201 | |
| aty | Michael P. Esser    Kirkland & Ellis LP    555 California Street    San Francisco, CA 94104 | |
| aty | Natalie Hoyer Keller    Kirkland & Ellis LLP    300 North LaSalle    Chicago, IL 60654 | |
| aty | P. Stephen Gidiere, III    Balch & Bingham LLP    1901 Sixth Avenue North    Suite 1500    Birmingham, AL 35203−4642 | |
| aty | Richard M. Cieri    Kirkland & Ellis LLP    601 Lexington Avenue    New York, NY 10022−4611 | |
| aty | Richard U.S. Howell    Kirkland & Ellis LLP    300 North LaSalle    Chicago, IL 60654 | |
| aty | Stephen E. Hessler    Kirkland & Ellis LLP    601 Lexington Avenue    New York, NY 10022 | |
| aty | Steven N. Serajeddini    Kirkland & Ellis LLP    300 North LaSalle    Chicago, IL 60654 | |
| aty | Todd F. Maynes    Kirkland & Ellis LLP    300 North LaSalle    Chicago, IL 60654 | |
| aty | W. Clark Watson    Balch & Bingham LLP    1901 Sixth Avenue North    Suite 1500    Birmingham, AL 35203−4642 | |

| aty | William Guerrieri | Kirkland & Ellis LLP | 300 North LaSalle | Chicago, IL 60654 |
| aty | William T. Pruitt | Kirkland & Ellis LLP | 300 North LaSalle | Chicago, IL 60654 |

TOTAL: 39