## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re

**YELLOW CORPORATION, *et al¹*.**

          **Debtors.**

**Chapter 11**
**Case No. 23-11069 (CTG)**
**(Jointly Administered**

---------------------------------------------------------------x

**JEFF MOORE, et al.,**

            **Plaintiffs,**

        v.

**YELLOW CORPORATION, et al.**

           **Defendants**.

**Adversary Proceeding No. 23-50457 (CTG)**

-------------------------------------------------------------------

## DEBTORS/DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT

---

¹ A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 511500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

# TABLE OF CONTENTS

**Page**

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING** ......................... 1

**SUMMARY OF ARGUMENT** ................................................................................ 1

**STATEMENT OF FACTS** ...................................................................................... 6

    **A.**    **The Importance Of One Yellow To The Company** ............................................ 6

    **B.**    **Despite Yellow's Best Efforts, Negotiations With The IBT Ultimately Failed.** ................................................................................................ 7

    **C.**    **Yellow's Communications With Plaintiffs And Other Employees Regarding The Unions Negotiations And Disastrous Results If They Failed.** ................................................................................................ 10

**ARGUMENT** ...................................................................................................... 12

**I.**    **As a Matter of Third Circuit Law, After-The-Fact Notice Can Satisfy the Warn Act.** ................................................................................................ 15

**II.**    **Yellow's Notice Provided Sufficient Detail, Especially in the Context of Yellow's Abundant Prior Communications.** .................................................... 17

**III.**    **Plaintiffs Fail to Present any Argument or Evidence of Prejudice Resulting from the Supposed Notice Deficiencies.** .......................................................... 19

**IV.**    **Under Third Circuit Precedent, a Company Need Not File for Bankruptcy to Cease Being an "Employer" under Warn Acts.** .............................................. 22

**V.**    **Yellow Was Not an "Employer" Under Either the New Jersey or California Warn Acts.** ................................................................................................ 25

**VI.**    **The Vast Majority of Putative Class Members' Claims are Barred by Releases They Voluntarily Signed.** .............................................................. 27

**CONCLUSION** .................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*,
  340 U.S. 593 (1951)..........................................................................................23

*Alston v. Forsyth*,
  379 F. App'x 126 (3d Cir. 2010) .....................................................................20

*Aman v. Cort Furniture Rental Corp.*,
  85 F.3d 1074 (3d Cir. 1996)............................................................................14

*Bland v. Lewis*,
  2016 WL 3762707 (E.D. Pa. July 13, 2016)...................................................20

*Bratton v. Hershey Co.*,
  2018 WL 934899 (W.D. Mo. Feb. 16, 2018) ..................................................21

*Butler v. Fluor Corp.*,
  511 F. Supp. 3d 688 (D.S.C. 2021)..................................................15, 16, 20

*Chauffeurs, Sales Drivers, Warehousemen Helpers Union Local 572 v. Weslock Corp.*,
  66 F.3d 241 (9th Cir. 1995) .............................................................................23

*Cruson v. Jackson Nat'l Life Ins. Co.*,
  954 F.3d 240 (5th Cir. 2020) ...........................................................................19

*DeRosa v. Accredited Home Lenders, Inc.*,
  22 A.3d 27 (N.J. Super. Ct. App. Div. 2011)...................................................26

*Drake v. U.S. Enrichment Corp.*,
  63 F. Supp. 3d 721 (W.D. Ky. 2014) ...............................................................27

*Ellis v. DHL Exp. Inc. (USA)*,
  633 F.3d 522 (7th Cir. 2011) ...........................................................................27

*Heinz v. Dubell Lumber Co.*,
  2020 WL 6938351 (D.N.J. Nov. 25, 2020) .....................................................26

*Hotel Emps. & Rest. Empls. Int'l Union Local 54 v. Elsinore Shore Assocs.*,
  173 F.3d 175 (3d Cir. 1998)......................................................................1, 13

*In re AE Liquidation, Inc.*,
  556 B.R. 609 (D. Del. 2016) .................................................................. *passim*

*In re AE Liquidation, Inc.*,
  866 F.3d 515 (3d Cir. 2017)....................................................3, 13, 15, 16

*In re Century City Doctors Hosp., LLC*,
  2010 WL 6452903 (B.A.P. 9th Cir. Oct. 29, 2010)...........................................23

*In re Flexible Flyer*,
  511 F. App'x 369 (5th Cir. 2013) ....................................................................14

*In re Initial Pub. Offering Secs. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ............................................................................... 19

*In re Jamesway Corp.*,
  235 B.R. 329, 337 (Bankr. S.D.N.Y. 1999) ....................................................... 25

*In re Jevic Holding Corp.*,
  496 B.R. 151 (Bankr. D. Del. 2013) ................................................................... 13

*In re MF Glob. Holdings Ltd.*,
  481 B.R. 268 (Bankr. S.D.N.Y. 2012) ................................................................ 23

*In re United Healthcare Sys.*,
  200 F.3d 170 (3d Cir. 1999) ...................................................................... *passim*

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana*
  *de Aviacion, S.A. de C.V.*,
  199 F.3d 796 (5th Cir. 2000) ............................................................................. 27

*Int'l Bhd. of Boilermakers v. NASSCO Holdings, Inc.*,
  226 Cal. Rptr. 3d 206 (Cal. Ct. App. 2017) ...................................................... 26

*Kalwaytis v. Preferred Meal Sys., Inc.*,
  78 F.3d 117 (3d Cir. 1996) ............................................................. 3, 17, 18, 19

*Law v. American Capital Strategies, Ltd.*,
  2007 WL 221671 (M.D. Tenn. Jan. 26, 2007) ................................................... 25

*Lipton v. Chattem, Inc.*,
  289 F.R.D. 456 (N.D. Ill. 2013) ......................................................................... 21

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) ........................................................................ 19, 21

*Marotto v. Kellogg Co.*,
  415 F. Supp. 3d 476 (S.D.N.Y. 2019) ................................................................ 21

*Marques v. Telles Ranch, Inc.*,
  867 F. Supp. 1438 (N.D. Cal. 1994), *aff'd*, 1997 WL 811889 (9th Cir. 1997) ....... 20

*Nagel v. Sykes Enters., Inc.*,
  383 F. Supp. 2d 1180 (D.N.D. 2005) ................................................................. 20

*Oscar v. BMW of N. Am., LLC*,
  2012 WL 2359964 (S.D.N.Y June 19, 2012) ..................................................... 21

*Owen v. Gen. Motors Corp.*,
  2007 WL 1655760 (W.D. Mo. June 5, 2007), *aff'd*, 533 F.3d 913 (8th Cir.
  2008) .................................................................................................................. 21

*Ramcharan v. A.F.L. Quality, Inc.*,
  2014 WL 4388579 (D.N.J. Sept. 5, 2014) .......................................................... 26

*Schmelzer v. Office of Compliance*,
  155 F.3d 1364 (Fed. Cir. 1998) ................................................................ 4, 20, 21

*Thorn v. Jefferson-Pilot Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) ...................................................................................19

*Williams v. Phillips Petroleum Co.*,
   23 F.3d 930 (5th Cir. 1994) .....................................................................................27

*Wis. Cent. Ltd. v. United States*,
   585 U.S. 274 (2018) ................................................................................................23

*Yellow Corp., v. Int'l Brotherhood of Teamsters, et. al.*,
   No. 23- CV-1131-JAR (D. Kan. July 21, 2023) ..................................................1, 8

**Statutes**

29 U.S.C. § 2101(a)(1)..............................................................................4, 12, 22, 23

29 U.S.C. § 2102(a) ..........................................................................................12, 22

29 U.S.C. § 2102(b)(1) ............................................................................................13

29 U.S.C. § 2102(b)(2)(A).......................................................................................13

29 U.S.C. § 2102(b)(3) ........................................................................................3, 17

29 U.S.C. § 2104(a) .................................................................................................12

29 U.S.C. § 2104(a)(4)..............................................................................................13

Cal. Lab. Code § 1401(a)..........................................................................................25

N.J. Stat. Ann. § 34:21-2..........................................................................................25

**Rules**

Federal Rule of Civil Procedure 56(d) ....................................................................21

**Other Authorities**

20 C.F.R. § 639.7(d) ...........................................................................................17, 20

20 C.F.R. § 639.9 ...............................................................................................3, 15

54 Fed. Reg. 16,042, 16,065 (1989) § 639.3(a)(1)(ii) .............................................22

54 Fed. Reg. 16,045 .................................................................................................22

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiffs filed this adversary proceeding asserting claims under federal, California, and New Jersey Worker Adjustment and Retraining Notification ("WARN") Acts, which can require some employers to provide employees with a period of notice before a mass layoff or plant closing. Debtors have answered the complaint.  The Court held a hearing on April 11, 2024.  The parties to this case, a related adversary proceeding, and a related objection to approximately 1,300 proofs of claim, continue to negotiate a scheduling order.

## SUMMARY OF ARGUMENT

Yellow Corporation ("Yellow" or the "Company"), prior to ceasing its business operations, exercised reasonable business judgment in attempting to preserve its business and avoid laying off its entire work force.  Throughout the first half of 2023, Yellow undertook a series of initiatives meant to position the Company for long-term success and preserve the jobs of its 30,000 employees, roughly 22,000 of which were unionized.  Chief among these was the final completion of One Yellow, a vital multi-year strategic initiative launched in 2019, that ultimately would unify the different entities under the Yellow corporate umbrella, optimize its operational network, enable it to better compete with the non-union carriers who dominate its market, and save the Company hundreds of millions annually.

Throughout 2023, Yellow constantly sought to negotiate with the Company's largest union, the International Brotherhood of Teamsters ("IBT" or "Union") to implement One Yellow, only to be met with an escalating series of demands.  Yellow, understanding this to be part of the regular give and take of union-employer negotiations, conceded to these demands in the expectation that the IBT would then agree for One Yellow to proceed.

The IBT's intransigence culminated on July 17, 2023, when, without any warning, the IBT issued a highly publicized threat to strike.  That strike threat (over issues that could have been

easily resolved) scared off Yellow's customers, leading to the sudden, unexpected collapse of Yellow in a matter of days. Yellow went from picking up over 40,000 shipments daily on July 17 to under 10,000 on July 21, to nearly zero on July 26.

Yellow was shocked at the rapidity of its knife-edge transition from an operating business to an entity existing only to liquidate its assets for the benefit of its stakeholders. The Company had no time to plan, much less provide WARN notice for, what became mass layoffs on July 28 and July 30, 2023. And under these facts (which do not appear to be seriously disputed), if Yellow does not fall within the exceptions and exemptions from the WARN Act, then no company ever would. There simply is no WARN exposure here.

Given these facts, there should be no surprise that Plaintiffs' partial summary judgment motion avoids discussing the substance of the WARN exemptions and exceptions. Instead, Plaintiffs largely complain about particular allegations regarding notice, without providing any explanations of how, even if Plaintiffs' allegations were true (they are not), changing the details of the notice would have made one iota of difference to any of the employees (let alone all of them) whose jobs were lost as a result of the IBT's actions. All of Plaintiff's arguments fail, and they offer zero basis for judgment as a matter of law in their favor. To the contrary, the Debtors will ultimately be entitled to summary judgment here because the facts and law show that either the WARN Acts do not apply and that, even if they did, Yellow fully complied with all WARN Act requirements. For now, and at a minimum, the evidence shows disputed issues of fact, such that summary judgment on Plaintiffs' behalf is inappropriate:

1.    Plaintiffs' assert that Yellow violated the WARN Acts by not giving advance or contemporaneous notice, Pls. Memo. 7-8, but the Third Circuit and Department of Labor ("DOL") regulations expressly hold or state that after-the-fact notice can satisfy WARN requirements. *E.g.*,

*In re AE Liquidation, Inc.*, 866 F.3d 515, 524-25 (3d Cir. 2017) ("*AE Liquidation II*") (holding

that WARN notices sent five days after layoffs occurred satisfied WARN notices requirements);

20 C.F.R. § 639.9 (DOL regulations acknowledging that "the employer must give as much notice

as is practicable … and this may, in some circumstances, be notice after the fact"). Thus, Plaintiffs'

primary argument simply fails as a matter of settled law.

2.      Plaintiffs argue that Yellow's WARN notice did not provide sufficient explanation

of why notice could not be given earlier, Pls. Memo. at 8-13, but the statute expressly states that

an entity "shall give a ***brief*** statement of the basis for reducing the notification period." 29 U.S.C.

§ 2102(b)(3) (emphasis added). Moreover, Third Circuit precedent holds that the sufficiency of

the notice should be considered in light of other communications made to employees. *E.g.*,

*Kalwaytis v. Preferred Meal Sys., Inc.*, 78 F.3d 117, 119-22 (3d Cir. 1996) (considering multiple

letters regarding company's buyers would provide jobs to employees in determining whether

notice was sufficient); *In re AE Liquidation, Inc.*, 556 B.R. 609, 626 (D. Del. 2016) ("*AE

Liquidation I*") (holding that "the Third Circuit has allowed that multiple communications to

employees, read together, may satisfy the statute"); *see also id.* at 618 (holding that the "Court

may also consider whether multiple communications to employees, read together, satisfy the

statute"). In the weeks leading up to the end of July, Yellow sent numerous communications to its

employees explaining its efforts to negotiate with the IBT, that Yellow had been operating at a

loss, and that lenders and other stakeholders needed a path to advance One Yellow, Yellow had

been attempting to negotiate with the IBT over One Yellow, and all jobs would be lost if One

Yellow did not proceed. Thus, for any employee who wanted it, Yellow provided copious detail

on why Yellow failed and why it was unable to provide notice earlier, more than satisfying any

obligation under the WARN Act.

3

3.      In determining whether a WARN notice is satisfactory, courts look "to the purposes underlying the WARN Act" and determine "whether those purposes were satisfied under the circumstances by the notice that was given to the employees." *Schmelzer v. Office of Compliance*, 155 F.3d 1364, 1369 (Fed. Cir. 1998).  Courts thus reject arguments, like those made by Plaintiffs here, that WARN notices are insufficient where the former employee "suffered no prejudice as a result of the technical defect in the … notice." *Id.* at 1369 (holding that even if a technical defect in a WARN notice existed, former employee had no claim where he was not prejudiced by the defect).  Here, Plaintiffs have not explained—much less cited any evidence whatsoever showing— how they were actually prejudiced by any alleged deficiency in the notice's explanation of why notice could not be given earlier, especially in light of the information provided to employees in the weeks leading up to the layoffs and the highly public nature of the IBT's strike threat and the Yellow-IBT negotiations.  Under basic rules of civil procedure, Plaintiffs cannot submit such evidence for the first time on reply.  Nor would it even be possible to show such alleged "prejudice" on a classwide basis.  Yellow expects that discovery of named plaintiffs and other putative class members—which has not yet occurred—will further confirm that there is no prejudice.  Given Yellow's prior communications and evidence showing a lack of prejudice, Plaintiffs cannot establish this essential element as a matter of law and their complaints about the notice fail.  As a a minimum, the facts regarding prejudice are disputed and must await discovery and trial.

4.      The WARN Act expressly states, and Third Circuit precedent expressly holds, that the WARN Act applies only to an "employer," and the Act defines an employer to only include a "business enterprise."  29 U.S.C. § 2101(a)(1).  Plaintiffs argue that because Yellow had not filed for Chapter 11 when it laid off its employees, it must have been an employer.  Pls. Mem. 13-18. But nothing in the statutory text says that all entities that have workers outside of bankruptcy are

"employers," or that an entity cannot cease to be a "business enterprise" outside of bankruptcy. Moreover, the seminal Third Circuit precedent of *In re United Healthcare System, Inc.*, adopted a test that looks to the entity's actual conduct and activities—not whether it filed for bankruptcy—in determining whether it is a "business enterprise" within the meaning of the statute and thus an "employer." 200 F.3d 170, 176 (3d Cir. 1999). Nothing in *United Healthcare*—or any other case—holds that an entity must file for bankruptcy to not be a "business enterprise." Such a requirement also would be absurd: if an entity had ceased operating its business and laid off all employees on January 1 at noon, under Plaintiffs' argument it would not be a "business enterprise" if it filed for bankruptcy at 11:55 a.m., but would still be a business enterprise if it filed for bankruptcy at 12:05 p.m. Such a mechanistic result would defy both the WARN Act and *United Healthcare*. Adopting Plaintiffs' argument also would be bad policy; it would result in struggling companies filing precipitous bankruptcy petitions to ensure that are in bankruptcy before laying off any employees, to the detriment of bankruptcy courts and such entities' stakeholders. For all these reasons, the Court should reject Plaintiffs' argument.

5.      Plaintiffs rely on the California and New Jersey Acts, which might apply to certain former employees who worked in those states and were employees at the time of the layoffs. Both those Acts apply only to "employers," which should be interpreted consistently with the federal WARN Act to exclude entities that are no longer operating a business, and thus neither was violated for the threshold reason described above. Moreover, California expressly recognizes the faltering company exception to WARN claims. While Plaintiffs complain that Yellow did not comply with the California statute, in fact Yellow was in contact in August 2023 with the California Employment Development Department ("EDD"), which requested various information relating to the layoffs which Yellow provided and will continue to be in contact going forward.

Yellow also has sent a letter formally requesting, to the extent necessary, a finding that Yellow satisfies the faltering company exception. Thus, Yellow has satisfied the California statute, and at a minimum, summary judgment cannot be granted.

6. Finally, Plaintiffs ignore that over 75% of the putative class members signed written agreements where they released their claims, including WARN claims, in exchange for severance. Such putative class members are barred from bringing any WARN claims against the Company and thus arguing that Yellow violated any WARN acts. Plaintiffs' summary judgment arguments thus are irrelevant to the vast majority of former non-unionized employees.

For all these reasons, Plaintiffs' motion for partial summary judgment should be denied in its entirety. Summary judgment will ultimately be the correct result in this case, but in favor of the Defendants, as Plaintiffs will not be able to contest the facts and are entitled to nothing.

## <u>STATEMENT OF FACTS</u>[2]

### A.   The Importance Of One Yellow To The Company.

Before the events leading to its Chapter 11 filing, Yellow offered its customer a full range of services for transporting goods through its North American ground distribution network. Ex. 3, Hawkins Decl. ¶ 6. On an average workday, Yellow's approximately 30,000 employees handled approximately 50,000 freight shipments. *Id.* ¶ 9. Of Yellow's 30,000 employees, approximately 22,000 were unionized, with the vast majority of these being represented by the IBT. *Id.*

---

[2] This statement of facts includes only facts relevant to Plaintiffs' motion. A more detailed explanation of the facts relevant to the various WARN claims is included in Debtors' Third Omnibus (Substantive), Fourth Omnibus (Substantive), And Fifth Omnibus (Substantive) Objections To Proofs Of Claim Alleging WARN Liability, and the related declarations, which are being filed on the Docket in connection with this Objection and are expressly incorporated by reference here. *See* Case 23-11069, Docs. 2576 (Third Omnibus Objection), Ex. 1, Doc. 2579 (Declaration of Brian Whittman ("<u>Whittman Decl</u>")), Ex. 2, Doc. 2580 (Declaration of Cody Kaldenberg ("<u>Kaldenberg Decl.</u>")), Ex. 3, Doc. 2581 (Declaration of Darren Hawkins ("<u>Hawkins Decl.</u>")), Ex. 4, 2852 (Declaration of Sarah Statlander ("<u>Statlander Decl.</u>")).

Yellow had pursued various acquisitions of transportation companies over the years, resulting in a number of different brands within the Yellow family. *Id.* ¶ 12. This resulted in numerous operating companies within Yellow's corporate structure competing for the same business. *Id.* ¶ 18. Such inefficiencies harmed Yellow's ability to compete. *Id.*

Yellow developed the One Yellow restructuring initiative, intended to unify its various companies, modernize the business, and upgrade the efficiency of its operations so that the company could continue to compete successfully. *Id.* ¶ 24. All of the Company's stakeholders, including its employees, customers, creditors, and shareholders, knew and understood the criticality of the successful and timely implementation of each phase of One Yellow. *Id.* ¶ 25.

The Company projected that One Yellow would significantly improve its finances. Proceeding with One Yellow would have allowed Yellow to achieve operational savings of approximately $22.85 million per month. *Id.* ¶ 73. Yellow projected that One Yellow would increase EBITDA from $341.4 million for the 12 months ending March 31, 2022, to $450 million within one full year of implementation, an increase of over 30%. *Id.* ¶ 19. Yellow also expected that One Yellow would create an opportunity to capture over $675 million in annual revenue with favorable operating margins. *Id.* In sum, One Yellow was a vital strategic initiative, and Yellow's go-forward success depended on completing it. *Id.* This need was widely understood. *Id.* ¶ 25.

**B.      Despite Yellow's Best Efforts, Negotiations With The IBT Ultimately Failed.**

From 2022 until July 25, 2023 Yellow sought to negotiate with the IBT over the changes needed to allow One Yellow to proceed. *E.g.*, *id.* ¶¶ 28, 33-39, 41, 44, 46, 48-56, 61, 86.

Because of the IBT's delay, Yellow's liquidity, though sufficient for operations, began declining. *Id.* ¶¶ 65, 72, 86. Yellow retained investment bank Ducera Partners to seek relief from existing lenders and work with new potential financiers. From late May through late July, Ducera

contacted Yellow's existing lenders, potential new lenders, and a private equity fund, all with the goal of improving Yellow's liquidity. Ex. 2, Kaldenberg Decl. ¶¶ 7-18.

As a result of the Company's declining liquidity, Yellow sought further ways to improve liquidity as it continued seeking to negotiate with the IBT. *E.g.*, Hawkins Decl. ¶ 75. Accordingly, on June 14-15, Yellow asked the Central States health, welfare, and pension funds covering certain unionized members to defer contributions due in July and August, with a promise that this would only be a short-term deferral which would be promptly repaid, with interest, as Yellow had previously done. *Id.* ¶ 72. Instead of negotiating over deferrals—as Central States, IBT, and Yellow had done in the past, *id.* ¶¶ 13-15—on July 17 Central States sent a memorandum stating that Yellow's participation in the funds would be terminated effective July 23, *id.* ¶ 88. Hours later, the IBT gave a 72-hour notice that it intended to strike on July 24—something that shocked Yellow and everyone else, as IBT had done nothing of the sort for nearly 30 years. *Id.*

Yellow took a number of steps in response to the strike threat, including on July 19 filing a lawsuit seeking a temporary restraining order and preliminary injunction to, among other things, enjoin the Union from engaging in a strike or other work stoppage. *Id.* ¶ 95. On Friday, July 21, the Kansas District Court denied Yellow's TRO and PI on the grounds that it lacked jurisdiction. In denying that relief, the court prophetically stated that "I will say that I understand the grave consequences that may flow from this. I hope the union understands that perhaps 22,000 or 30,000 jobs will be lost. It could be a situation where you win a battle and lose a war, I don't know."[3]

The court's comments appeared to have opened the IBT's eyes as to the potential ultimate result of its intransigence. After months of obstruction, on July 23 the IBT reached out to the

---

[3]    Transcript of Hearing on Motion for Temporary Restraining Order, at 54:14-17, *Yellow Corp., v. Int'l Brotherhood of Teamsters, et. al.*, No. 23- CV-1131-JAR (D. Kan. July 21, 2023).

Company to engage in negotiations. Hawkins Decl. ¶ 98. As a result of these discussions, and the IBT's request, Central States agreed to extend benefits for Yellow's workers. *Id.*

But the uncertainty caused by the IBT's strike threat had caused customers to drop Yellow as a carrier, and competitors immediately absorbed Yellow's shipments. On July 12, Yellow picked up 44,550 shipments. *Id.* ¶ 86. But on July 19, two days after the strike threat, Yellow picked up only 32,500 shipments, a drop of nearly 25% in two days. *Id.* ¶ 94. On July 21, Yellow picked up just 10,450 shipments, meaning that 75% of its business was gone within four days of the IBT's strike notice. *Id.* ¶ 97. Given the plight of the company and the ongoing disruptions to the Company's business, to ensure that existing orders could be fulfilled Yellow decided to begin the process to discontinue accepting new shipment orders on July 24, 2023. *Id.* ¶ 100.

Even after Yellow stopped accepting additional shipments, it continued to work to save the Company. Yellow and the IBT continued the negotiations that had started on July 23, and by July 25 the IBT finally conditionally approved the operational changes necessary to implement Phase 2 of One Yellow. Hawkins Decl. ¶ 102. Yellow also provided the IBT with information about the Company's communications with the federal government, hoping the IBT might improve the chances that the federal government would intervene to aid the Company. *Id.* But the optimism created by the IBT finally agreeing to Phase 2 operational changes proved short-lived. The damage was done, and the customers lost during the strike threat would not return. *Id.* ¶ 103. At a July 26 board of directors meeting, the board discussed the Company's liquidity, and depending on the pace of the liquidity decline, the timing of a potential filing under chapter 11 of the Bankruptcy Code. *Id.* ¶ 104. On that same date, Yellow's delivered shipments fell to nearly zero. *Id.* ¶ 105. Because of the strike threat devastating Yellow's business, the Company implemented a full scale winddown of its business operations and began working on its liquidation. *Id.* ¶¶ 112-14.

On July 28, the Company terminated approximately 3,500 non-union employees, most of whom executed release agreements in consideration for severance payments from the Company. *Id.* ¶ 106.   WARN notices, which included the release agreements, were provided to such employees three days later, on July 31.  *Id.* ¶ 108

### C.    Yellow's Communications With Plaintiffs And Other Employees Regarding The Unions Negotiations And Disastrous Results If They Failed.

Throughout its efforts to negotiate with the IBT, and particularly during June and July 2023, Yellow kept its employees apprised of their status, as well as that the failure of negotiations and inability to implement One Yellow would result in the Company's end and loss of 30,000 jobs. After discussions with the Union in April 2023, Yellow organized town hall meetings with many of its 8,000 non-union employees to discuss the consequences of a failed negotiation with the Union.  *Id.* ¶ 90.  Yellow made it abundantly clear to those employees that if a deal with the IBT was not reached, both the union and non-union employees could lose their jobs.  *Id.*

On June 8, 2023, Yellow's CEO Darren Hawkins sent an email to all Yellow employees regarding the ongoing impasse with the IBT.  *Id.* ¶ 69; Hawkins Decl., Ex. 18.  This letter begins by explaining the importance of One Yellow to the Company and its survival.  Hawkins Decl., Ex. 18.  It then explains that "[f]or months, we've made a good faith effort to work with IBT leadership. We've been consistent in our outreach, offering meeting after meeting, many of which the IBT has ignored." *Id.*  The letter noted the public militant rhetoric of IBT president Sean O'Brien and explained that "until the IBT leadership stops the posturing and deals with the reality of the current situation, he is leading you down a road to ruin."  *Id.*  Despite these challenges, Hawkins emphasized Yellow's continued efforts on behalf of the Company and its employees:  "Let me be clear: we're not giving up on Yellow, and our conviction about our mission and our employees (union and non-union) and One Yellow is not weakening."  *Id.*  "I will do everything in my power

to strengthen this company and to preserve jobs. I will continue to fight for you, for the full implementation of One Yellow and for our customers and will keep you apprised of updates." *Id.*

On June 13, 2023, Hawkins sent another email to all Yellow employees. *Id.* ¶ 71. This letter addressed the IBT's recent rejection of Yellow's latest proposal, and language from IBT president O'Brien. Hawkins Decl., Ex. 19. The letter explained that "If Mr. O'Brien truly cares about his Teamsters and their jobs, he needs to knock this off and permit his team to come to the table immediately. We'll meet him anytime, anyplace. Sean O'Brien's baseless attacks are irresponsible when we have the jobs, lives and families of so many Teamsters and other employees on the line." *Id.* Thus, the letter again explained that the Company was doing everything it could to negotiate with the IBT, and the failure of negotiations would result in the loss of Yellow's jobs.

On June 21, 2023, Hawkins sent another email communication to all Yellow employees. *Id.* ¶ 75. "Yellow is doing everything possible to meet with the [IBT] to discuss the future of One Yellow and the value of Yellow jobs." Hawkins Decl., Ex. 23. But as "a consequence of our inability to proceed with One Yellow, combined with the challenging business conditions confronting the entire LTL industry, Yellow has recently been operating at a loss as it continues to serve its customers." *Id.* Yellow noted that it was "working with its lenders to provide financial support in the near term until a broader refinancing is possible … ." *Id.* The letter also described how the Company had requested a temporary deferral of its contributions to Central States. *Id.* It closed by explaining: "We hope this will provide Yellow with more time to negotiate with the Teamsters, complete the implementation of One Yellow, and secure necessary financing that will put Yellow in a stronger financial position going forward." *Id.* Thus, this letter explains, among other points, how Yellow was negotiating with its lenders to secure additional liquidity and more time to negotiate with IBT and advance One Yellow.

On July 20, after the IBT had issued its strike threat, Hawkins sent another email to all Yellow employees.  *Id.* ¶ 96.  The letter explained that the IBT had been degrading Yellow "instead of having direct, productive negotiations that could put Yellow on a better path and save 30,000 jobs."  Hawkins Decl., Ex. 27.  Yellow had proposed a substantial pay increase in an effort to advance negotiations.  *Id.*  "Commencement of meaningful negotiations with the Teamsters would set the stage for Yellow to reengage in comprehensive refinancing efforts with its lenders while clearing a path to advance One Yellow.  All stakeholders - lenders, shareholders, employees, and customers need to see progress."  *Id.*  The letter ended by disclosing letters detailing Yellow's offer to the IBT and stating: "I encourage you to read them to see we are sincere about doing everything in our power to save all Yellow jobs."  *Id.*  Thus, this letter, sent shortly before Yellow's collapse and the mass layoffs, yet again emphasized the need for the IBT to agree to One Yellow.  Moreover, the letter explained how Yellow had been working with lenders to refinance the Company's debt, and how they—and all other stakeholders—needed to see progress on One Yellow.  Yellow's management was continuing to do everything it could to advance those negotiations, but the failure of those discussions would mean the loss of all Yellow jobs.

## ARGUMENT

The federal WARN act provides that an "employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to representatives of the affected employees, or the affect employees themselves, and to certain state entities.  29 U.S.C. § 2102(a).  WARN creates a civil action against an "employer" for violations, subject to reductions for the employer's payment of wages, contributions on the employee's behalf, or the employer's voluntary payments to employees.  29 U.S.C. § 2104(a).

By its terms, the act only applies to an "employer," defined as a "business enterprise" that employs 100 or more persons.  29 U.S.C. § 2101(a)(1).  The WARN Act also contains a number

of exceptions.   One of these is the faltering company exception, which excuses a lack of notice where at the time notice would have been required the company was actively seeking capital or business which would have allowed the company to avoid a shutdown.   29 U.S.C. § 2102(b)(1). The other is that an "employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."   29 U.S.C. § 2102(b)(2)(A).   WARN also provides for a discretionary reduction in any liability or penalties for any good faith violations.   29 U.S.C. § 2104(a)(4).

The Third Circuit has rejected interpretations of the WARN act and its exceptions that "might require an employer to provide frequent WARN notice" so as to "require an economically viable employer to provide notice of a possible—but unlikely—closing."   *Hotel Emps. & Rest. Empls. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 185 n.7 (3d Cir. 1998).   The Third Circuit explained that such frequent notices would be antithetical to the Act's purposes:

> Once the employer's creditors learn of the notice, they may seek to enforce existing debts and become unwilling to extend the employer more credit.   In addition, employees may overestimate the risk of closing and prematurely leave their employer, forfeiting (among other things) seniority and unvested benefits.   Such behavior by creditors and employees would increase the chance that an employer will be forced to close and lay off its employees, harming precisely those persons WARN attempts to protect.

*Id.*; *see AE Liquidation, I*, 556 B.R. at 618 ("The WARN Act allows leeway for a company's exercise of reasonable business judgment, and the regulations are intended to encourage employers to take all reasonable actions to the preserve the company and the jobs."); *In re Jevic Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013) (where "events are indicative of a company attempting to stave off layoffs, and attempting to save jobs and the company," then "[i]t would run counter to the WARN Act's policy of encouraging employers to take all reasonable action to preserve the company and the jobs to impose liability upon the Debtors for not giving notice sooner

than they did"); *In re Flexible Flyer*, 511 F. App'x 369, 374 (5th Cir. 2013) ("The WARN Act allows good faith, well-grounded hope, and reasonable expectations. Its regulations protect the employer's exercise of business judgment and are intended to encourage employers to take all reasonable actions to preserve the company and the jobs. Holding [entities] liable for a WARN Act violation on the facts found by the bankruptcy court would serve only to encourage employers to abandon companies even when there is some probability of some success.").

For summary judgment, Plaintiffs, as "the party moving for summary judgment … bear[] the burden of demonstrating the absence of any genuine issues of material fact." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). When "determining whether the moving party has proven the absence of a genuine material issue of fact, the facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be regarded as true and the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Id.* at 1080-81 (cleaned up). If "there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *Id.* at 1081 (cleaned up).

If anything, the indisputable evidence here demonstrates that summary judgment should be granted in Debtors' favor. Plaintiffs' brief repeatedly mischaracterizes or ignores both the governing law and all relevant facts showing the Debtors' have established there is no WARN liability here. For now, Plaintiffs' motion should be denied.

# I.   AS A MATTER OF THIRD CIRCUIT LAW, AFTER-THE-FACT NOTICE CAN SATISFY THE WARN ACT. [4]

Plaintiffs' first argument—that post-termination notice cannot satisfy the statute, Pls. Memo. at 7-8—contradicts well-established Third Circuit law they make no effort to distinguish. Plaintiffs cite the language of a few DOL regulations, but none of these state that post-termination notice is impermissible.  In fact, the DOL's own regulations acknowledge that "the employer must give as much notice as is practicable … and this may, in some circumstances, ***be notice after the fact***." 20 C.F.R. § 639.9 (emphasis added).

Third Circuit precedent similarly holds that "as much notice as is practicable" can be after-the-fact notice.   In *AE Liquidation II*, the company informed its employees they were being furloughed indefinitely on February 18, 2009.  866 F.3d at 521.  On February 24, after a sale of the company fell through, the company sent all employes an email stating that their furloughs were being converted to a layoff effective February 19.  *Id.* at 524-25.  Even though the WARN notice was not sent until five days after the layoffs occurred (the notice was sent on February 24 for layoffs effective February 19), the Third Circuit held it was sufficient.  *Id.* at 524-25; *see also AE Liquidation I*, 556 B.R. at 624-25 (rejecting plaintiffs' argument that after-the-fact notice cannot satisfy the WARN Act, and holding that the employer's five day after-the-fact notice constituted "as much notice as practicable under the circumstances, even if it was after the fact"); *Butler v. Fluor Corp.*, 511 F. Supp. 3d 688, 719 (D.S.C. 2021) (holding that notices provided on August 4 and 9-10 was "as soon as practicable" after layoffs occurred on July 31).

---

[4]  If the Court finds that Yellow was not an "employer" at the time of the layoffs (which it should, as Plaintiffs do not offer, and will never be able to offer, any facts undermining the sworn testimony already provided by Yellow), then the WARN Act does not apply at all and the timing or content of Yellow's WARN notices is irrelevant.  At this point, the Court could deny Plaintiffs' premature motion for "partial summary judgment" for that reason alone.

In contrast to this established Third Circuit precedent, Plaintiffs do not cite a single case from any jurisdiction holding that post-termination notice is impermissible.  Nor do they even cite, much less distinguish, the controlling precedent of *AE Liquidation II*.  Plaintiffs' callous failure to even appraise the Court of the applicable law in this Circuit (let alone attempt to distinguish it) is particularly notable given that Yellow filed detailed Objections to all filed WARN claims weeks before Plaintiff's filed their partial summary judgment motion, and in those filings, prominently cited *AE Liquidation* and *Butler* in explaining that post-termination notice is permissible.[5]

Here, Yellow sent a WARN notice—including the severance agreement that over 75% of the non-union employees, including two of the four named Plaintiffs, signed—by July 31, 2023.  This three-day period is less than the five days in *AE Liquidation* and the four to ten days in *Butler*.  Moreover, this timing was as soon as practicable given Yellow's efforts up until the last second to save employees' jobs.  As explained previously, the IBT withdrew the strike threat on July 23.  Through July 25, Yellow and the IBT negotiated the Union's conditional agreement to the One Yellow Phase 2 operational changes, and Yellow encouraged the IBT to seek federal intervention to bolster the Company.  Only on July 26, did it become apparent that the strike threat's damage was irreversible.  At this point, Yellow needed time to prepare and send WARN notices to thousands of employees, which required the few days to July 31.  *Compare Butler*, 511 F. Supp. 3d at 719 (holding a lengthier delay was "as soon as practicable" because of "the presence of thousands of workers at the job site, and the abrupt nature of the shutdown").  Thus, Yellow "g[a]ve as much notice as is practicable" under the circumstances.  Plaintiffs' argument is clear legal error that defies binding Circuit law; it should be rejected.

---

[5] *See* Debtors' Third Omnibus (Substantive), Fourth Omnibus (Substantive), And Fifth Omnibus (Substantive) Objections To Proofs Of Claim Alleging WARN Liability ¶¶ 106-07.  Case No. 23-11069, Docs. 2576, 2577, 2578.

## II.   YELLOW'S NOTICE PROVIDED SUFFICIENT DETAIL, ESPECIALLY IN THE CONTEXT OF YELLOW'S ABUNDANT PRIOR COMMUNICATIONS.

Under the faltering company and unforeseeable business circumstances exceptions (though not when an entity is a liquidating fiduciary), an employer "shall give as much notice as is practicable and at that time shall give a ***brief*** statement of the basis for reducing the notification period."  29 U.S.C. § 2102(b)(3) (emphasis added); *see also* 20 C.F.R. § 639.7(d) (further discussing the notice's content).  While Plaintiffs complain that Yellow's notice did not provide sufficient detail, their argument is meritless.

The notice explains that the "Company was not able to provide earlier notice of the Shut Down as it qualifies under the 'unforeseeable business circumstances,' 'faltering company,' and 'liquidating fiduciary' exceptions set forth in the WARN Acts."  Hawkins Decl., Ex. 28.  (The "liquidating fiduciary" exception refers to the argument that Yellow was not an "employer" at the time of the layoffs, further discussed in Section IV.)  The notices also explain that the closure is permanent, all employees were being terminated, and no bumping system (where a more senior employee displaces a more junior one) or other jobs opportunities will be available.  *Id*.

Moreover, yet again, controlling Third Circuit precedent that Plaintiffs neither cite nor attempt to distinguish holds that the sufficiency of the notice should be considered in light of other communications made to employees.  In *Kalwaytis v. Preferred Meal. Systems, Inc.*, Preferred Meal Systems sent a WARN notice to employees on June 26, 1992, saying they would be laid off but that it would contract with another company, Culi-Services, to offer employment to those workers.  78 F.3d 117, 119 (3d Cir. 1996).  On July 10, Preferred sent another letter stating that Culi-Services would not be offering employment to all workers, and any employment offers would depend on Culi-Services' discretion.  *Id*.  As the Third Circuit explained, the WARN Act reflects "[f]lexibility in the notice requirement," and it considered the two letters together to conclude

"they do meet the statutory requirements of notice." *Id.* at 121-22. Relying on *Kalwaytis*, *AE Liquidation I* later held that "the Third Circuit has allowed that multiple communications to employees, read together, may satisfy the statute." 556 B.R. at 626; *see also id.* at 618 (holding that the "Court may also consider whether multiple communications to employees, read together, satisfy the statute"). *AE Liquidation I* expressly rejected the employees' argument that "piecemeal communications" were insufficient, and then considered together a February 18 email announcing furloughs and a February 24 email converting the furloughs to permanent layoffs in determining that this content was sufficient to satisfy the WARN Act. *Id.* at 626 ("the Court finds no genuine issue of material fact that these communications, considered together, contain the information required by the statute"). Plaintiffs once again ignore these controlling cases, even though Yellow filed its Objections to WARN claims weeks before Plaintiffs filed their partial summary judgment motion and cited these cases in support of considering communications together.

Here, the undisputed evidence establishes that Yellow sent several written communications to its employees in June and July 2023 explaining the circumstances facing the Company, which should be considered in conjunction with the July 31 WARN notices. Ex. 3, Hawkins Decl. ¶¶ 69, 71, 75-76, 78, 96; *see supra* pp. 10-12. These communications, one of which was sent on July 20, just days before the layoffs, provide abundant explanation of the basis for reducing the notification period. These communications explain the importance of One Yellow, that Yellow was working with lenders who needed to see progress on One Yellow, the IBT's intransigence, that all Yellow jobs would be lost if One Yellow were not executed, and that Yellow was doing everything it could to achieve One Yellow and save jobs. Providing mass layoff notices would have destroyed any chance of saving the Company. No reasonable employee can claim that they did not know why Yellow conducted a mass layoff or why it could not have given notice sooner.

Plaintiffs offer zero evidence to suggest that any employee was unaware of any of these things, and thus summary judgment should be denied even if all of their other arguments were true. None of the Plaintiffs or any other putative class members could honestly declare under oath to their unawareness. Plaintiffs' effort to obtain any relief at all on this score—let alone try to make that point on a classwide basis—has no merit. Courts regularly reject class claims where a significant number of putative class members had knowledge of allegedly undisclosed facts.[6]

Instead of distinguishing *Kalwaytis* or *AE Liquidation I*, Plaintiffs rely on inapposite out-of-circuit cases. But none of those cases, even if they were persuasive (they are not), involved the kind of extensive communications with employees explaining the circumstances of the layoff and why notice could not be provided earlier that is present here. In any event, these cases simply are irrelevant given *Kalwaytis* or *AE Liquidation I* and the record of employee communications here. At a minimum, these employee communications create a fact issue regarding whether the Plaintiff employees (and indeed all of the terminated employees) received a sufficient explanation, and thus preclude summary judgment in any Plaintiff's (let alone all Plaintiffs') favor.

## III. PLAINTIFFS FAIL TO PRESENT ANY ARGUMENT OR EVIDENCE OF PREJUDICE RESULTING FROM THE SUPPOSED NOTICE DEFICIENCIES.

Even if Yellow's notice were technically deficient (and it was not), Plaintiffs would need to show they were prejudiced by any deficiency, which they utterly failed to do and cannot do.

---

[6] *E.g.*, *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 599 (3d Cir. 2012) (reversing class certification alleging vehicles were defective because "if a class member knew about the alleged "defects" prior to purchase or lease, then that knowledge could break the proximate cause link between the alleged defect and any damages suffered. Determining whether a class member had such knowledge requires an individualized inquiry."); *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 256-57 (5th Cir. 2020) (reversing class certification where putative class members may have had knowledge of the facts); *In re Initial Pub. Offering Secs. Litig.*, 471 F.3d 24, 43-44 (2d Cir. 2006) (reversing class certification where "widespread knowledge … would precipitate individual inquiries as to the knowledge of each member of the class"); *Thorn v. Jefferson-Pilot Ins. Co.*, 445 F.3d 311, 326 (4th Cir. 2006) (affirming denial of class certification where "the district court here must conduct an individual inquiry into the information each class member actually possessed to determine whether each class member had actual or constructive knowledge" of defendant's practices).

In *Schmelzer v. Office of Compliance*, the Federal Circuit Court of Appeals explained that "[c]ourts that have addressed technically deficient WARN Act notices have rejected the 'strict compliance' test pressed by" plaintiff.  155 F.3d 1364, 1369 (Fed. Cir. 1998).  "Instead, they have looked to the purposes underlying the WARN Act and determined whether those purposes were satisfied under the circumstances by the notice that was given to the employees." *Id.*  Schmelzer argued that the WARN notice he received was deficient because it did not square with the regulatory requirements of 20 C.F.R. § 639.7(d), and did not specify that his job would be terminated or the date of termination.  *Id.* at 1367.  The Federal Circuit rejected these arguments, holding that "[i]t is clear that Mr. Schmelzer suffered no prejudice as a result of the technical defect in the December 13, 1995 notice." *Id.* at 1369.  This was because he had actual knowledge that another company was set to take over his functions, and that company was interviewing candidates to work in the new operation. *Id.*  "It is difficult to see how the failure to supply a fact already known by the employee undermines that purpose" of the WARN Act. *Id.* at 1369-70.[7]

Plaintiffs provide no argument or evidence concerning how any Plaintiff or putative class member was prejudiced by not receiving additional detail about why Yellow could not provide notice sooner.  They cannot submit such evidence for the first time in reply.[8]  Moreover, as in

---

[7]  *See also Nagel v. Sykes Enters., Inc.*, 383 F. Supp. 2d 1180 (D.N.D. 2005) (collecting cases, and holding that omissions of information about bumping rights, despite being required by regulation, did not invalidate notice); *Marques v. Telles Ranch, Inc.*, 867 F. Supp. 1438, 1446 (N.D. Cal. 1994) (holding that WARN notice was sufficient despite not include including information about bumping rights or the name and number of a company official to contact for further information, despite being required by regulation), *aff'd*, 1997 WL 811889, at *1 (9th Cir. 1997); *Butler v. Flour Corp.*, 511 F. Supp. 3d 688, 719-20 (D.S.C. 2021) (holding that WARN notice containing an email address instead of the required phone number did not invalidate compliance, citing *Schmelzer*).

[8]  *Alston v. Forsyth*, 379 F. App'x 126, 129 (3d Cir. 2010) (vacating an order granting summary judgment wherein the district court accepted an argument that was raised for the first time in a reply brief as being dispositive of claims, because there was no meaningful opportunity to present arguments or evidence in opposition to the decisive issue); *Bland v. Lewis*, 2016 WL 3762707, at *3 n.3 (E.D. Pa. July 13, 2016) ("Because these arguments were raised in the Correctional Officers' supplemental brief and Mr. Bland did not have a proper opportunity to respond to these newly-asserted bases for summary judgment, the Court will not address the merits of these arguments and will not grant summary judgment on these grounds.") (collecting cases).

*Schmelzer*, any employee who cared had already received abundant information about the reasons why from the Company's several communications in June and July, as well as the IBT's public statements. *See* Section II & supra at pp. 10-12. Notably, Yellow's notices **did** include all the information that would have been significant to employees, including that the closure is permanent, all employees were being terminated, no bumping system or other jobs opportunities will be available, and it identified a contact person and provided her phone number for employees who had additional questions. Ex. 3, Hawkins Decl., Ex. 28. There simply is no basis to find that providing additional detail regarding why Yellow could not provide notice earlier would have made any difference to former employees, and thus no grounds to find WARN liability because Yellow's notice allegedly did not include sufficient information.[9]

Moreover, given that the parties are conducting discovery, Plaintiffs' notice-related summary judgment arguments should also be denied under Federal Rule of Civil Procedure 56(d). That Rule provides for a court to defer or deny a motion, or allow discovery, to permit the defending party to present facts opposing summary judgment. Fed. R. Civ. P. 56(d). Yellow intends to conduct discovery of named plaintiffs and other putative class members and claimants to confirm that none were prejudiced by the WARN notices not including additional detail regarding why Yellow could not provide notice sooner. Ex. 5, Slade Decl. ¶ 5. Given the existing record and this future discovery, the facts either establish that there was no prejudice or that the issue of prejudice is disputed, making summary judgment in any Plaintiff's favor (let alone all Plaintiffs' favor) on their notice arguments plainly inappropriate.

---

[9] Similar to knowledge, courts regularly hold that a plaintiff who does not care about an alleged omission or other misconduct cannot show causation or injury and has no claim, and thus no class claim can exist where individual class members differ in whether they cared. *E.g.*, *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 611 (3d Cir. 2012); *Owen v. Gen. Motors Corp.*, 2007 WL 1655760, at *5 (W.D. Mo. June 5, 2007), *aff'd*, 533 F.3d 913 (8th Cir. 2008); *Marotto v. Kellogg Co.*, 415 F. Supp. 3d 476, 482 (S.D.N.Y. 2019); *Bratton v. Hershey Co.*, 2018 WL 934899, at *2 (W.D. Mo. Feb. 16, 2018); *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 459 (N.D. Ill. 2013); *Oscar v. BMW of N. Am., LLC*, 2012 WL 2359964, at *4-5 (S.D.N.Y June 19, 2012).

## IV.   UNDER THIRD CIRCUIT PRECEDENT, A COMPANY NEED NOT FILE FOR BANKRUPTCY TO CEASE BEING AN "EMPLOYER" UNDER WARN ACTS.

The Third Circuit and other courts have held that a liquidating company is not an employer under the WARN Acts and has no obligation to provide notice, known as the liquidating fiduciary exception. Specifically, the federal WARN Act applies only to an "employer": "An *employer* shall not order a plant closing or mass layoff until the end of a 60-day period after the *employer* serves written notice … ." 29 U.S.C. § 2102(a) (emphasis added). And an "employer" is defined as a "business enterprise" that employs 100 or more employees. 29 U.S.C. § 2101(a)(1).

After reviewing WARN Act authority, the Third Circuit held that a liquidating company is not an "employer." *In re United Healthcare Sys.*, 200 F.3d at 177-79. Among other sources, the Third Circuit relied on the Department of Labor's ("DOL") commentary on WARN regulations stating that an employer includes entities "'which *engage in business* (i.e., take part in a commercial or industrial enterprise, supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments).'" *Id.* at 177 (quoting 20 C.F.R. § 639.3(a)(1)(ii), 54 Fed. Reg. 16,042, 16,065 (1989)). The "'DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligation of the former employer because the fiduciary is not operating a 'business enterprise' in the normal commercial sense.'" *Id.* (quoting 54 Fed. Reg. 16,045). The Third Circuit explained that "the commentary's focus on the bankruptcy fiduciary's responsibilities indicates that whether a bankrupt entity is an 'employer' under the WARN Act depends in part on the nature and extent of the entity's business conduct and activities while in bankruptcy." *Id.* "The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an

'employer;' the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act." *Id.* at 178.[10]

Plaintiffs do not dispute that Yellow had ceased to operate as a going concern by the time it terminated non-unionized employees on July 28. Nor could they, as the evidence demonstrates Yellow had done exactly that. Instead, Plaintiffs argue for a bright-line rule that no entity could qualify for the liquidating fiduciary exception unless it has filed for bankruptcy prior to laying off its employees. Pls. Memo. at 13-18. This argument is inconsistent with both the statutory text and the Third Circuit's controlling decision in *United Healthcare*.

The WARN Act defines an employer to only include a "business enterprise." 29 U.S.C. § 2101(a)(1). Nothing in the statutory text says that all entities with workers outside of bankruptcy are "employers," or that an entity cannot cease to be a "business enterprise" outside of bankruptcy. Plaintiffs' interpretation would rewrite the statute to either delete the term "business enterprise" or add that the WARN Act applies to all entities outside of bankruptcy, contrary to basic canons of statutory interpretation. *E.g.*, *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 282 (2018) ("It is not our function to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have intended."); *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951) ("Congress expresses its purpose by words. It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort."). Plaintiffs strain to find textual support for their argument by asserting that Congress could have included language that an entity was no longer an employer if it was shutting down, Pls. Memo. at 15, but there was

---

[10]  In addition to *United Healthcare*, the "'liquidating fiduciary' principle has been recognized by courts throughout the country." *In re MF Glob. Holdings Ltd.*, 481 B.R. 268, 280 (Bankr. S.D.N.Y. 2012) (collecting cases); *see also Chauffeurs, Sales Drivers, Warehousemen Helpers Union Local 572 v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995) ("WARN's obligations ... can apply ... only where the [secured] creditor operates the debtor's asset as a 'business enterprise' in the 'normal commercial sense' ...; where the creditor . . . acts only to preserve the business asset for liquidation or sale, the notice requirement of WARN will not apply."); *In re Century City Doctors Hosp., LLC*, 2010 WL 6452903, at *6-7 (B.A.P. 9th Cir. Oct. 29, 2010) (same as *Weslock*).

no need to include such language where Congress had already limited "employers" to "business enterprises."  To the contrary, if Congress had intended the WARN Act to apply to all entities outside of bankruptcy, it would have said so.  But the WARN Act contains no such language. Plaintiffs' attempt to rewrite the statute to add or subtract text should be rejected.

Moreover, the seminal Third Circuit precedent of *United Healthcare* adopted a test that looks to the entity's actual conduct in determining whether it is a "business enterprise" within the meaning of the statute and thus an "employer."  200 F.3d at 176-78.  "The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an 'employer;' the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act."  *Id.*  Nothing in *United Healthcare* says the liquidating fiduciary exception is limited to those who had filed bankruptcy. Moreover, while Plaintiff cites portions of DOL regulations, none of them say that an entity cannot be a liquidating fiduciary unless it has filed for bankruptcy.  Instead, controlling Third Circuit precedent looks to whether the entity more closely resembled a going concern or was winding up its affairs at the time of the layoffs—and the facts here show Yellow was doing the latter.

That Plaintiffs' argument is absurd and contradicts the functional, fact-based analysis of *United Healthcare* can be shown by a simple hypothetical.  Suppose an entity had ceased operating and laid off its employees on January 1 at noon.  Under Plaintiffs' argument it would not be a "business enterprise" if it filed for bankruptcy at 11:55 a.m., but would still be a business enterprise if it filed for bankruptcy at 12:05 p.m.  Plaintiffs believe such a dramatic difference would result even though the actual facts about the entity's lack of operations would be the exact same in both circumstances.  Such a mechanistic, bright-line result is contrary to the WARN Act's use of "business enterprise" and the Third Circuit's reasoning in *United Healthcare.*

24

Plaintiffs cite two out-of-circuit cases in support of their theory, but both are easily distinguishable.  In *In re Jamesway Corp.*, the defendant argued that it became a liquidating fiduciary by filing for chapter 11 on October 18, 1995.  235 B.R. 329, 337 (Bankr. S.D.N.Y. 1999).  But the layoffs had occurred on October 12, so even under the defendant's own argument it was not a liquidating fiduciary when the layoffs occurred.  *Id.* at 343-44.  The defendant did not even argue it was not an "employer" before filing bankruptcy, and thus the opinion does not even address the facts and arguments here.  *Law v. American Capital Strategies, Ltd.* is even further afield, as there the court rejected the liquidating fiduciary exception because when the layoffs occurred it was still operating as a trucking business.  2007 WL 221671, at *16 (M.D. Tenn. Jan. 26, 2007); *see also id.* at *17 (defendant was "continuing to carry on its business").  Neither case can undermine the plain language of the WARN Act stating that its obligations do not apply to entities that are not "business enterprises," regardless of whether they have filed for bankruptcy, and the Third Circuit's analysis in *United Healthcare*.

## V.   YELLOW WAS NOT AN "EMPLOYER" UNDER EITHER THE NEW JERSEY OR CALIFORNIA WARN ACTS.

Plaintiffs' argument that summary judgment should be granted under the New Jersey and California WARN Acts, Pls. Memo. 5-6, 15, fails because Yellow was not an "employer" the time of the layoffs under either statute and also because the faltering company exception applies under the California statute.  Similar to the federal WARN Act, the New Jersey and California WARN Acts apply only to an "employer."  *E.g.*, Cal. Lab. Code § 1401(a); N.J. Stat. Ann. § 34:21-2.  Yellow is unaware of any case (and Plaintiffs cite none) holding that "employer" under the New Jersey and California Act should be interpreted differently than the federal Act on which they are

based.  To the contrary, courts have consistently interpreted the New Jersey and California WARN Acts as parallel to the federal Act.[11]

For the reasons explained previously in Section IV, Yellow is not an "employer" under the federal WARN Act, and thus likewise is not an "employer" under the New Jersey or California Acts.  Accordingly, summary judgment should be denied for both claims.

Moreover, Plaintiffs acknowledge that the California WARN Act recognizes the faltering company exception, where a company is actively seeking business or financing when it would otherwise have been required to seek notice.  Pls. Memo. at 5-6.  Plaintiffs argue Yellow did not comply with California provisions requiring that information be provided to the relevant California agencies, but in fact Yellow was in contact with the California Employment Development Department ("EDD") in August 2023, which requested various information relating to the layoffs.  Ex. 6, Butler Decl. ¶ 7.  Yellow provided the information the EDD sought and also responded to a follow-up request.  *Id.* ¶¶ 7-9.  Thus, the relevant California agency was well aware of the layoffs.  Moreover, to remove any doubt on whether the faltering company exception applies under California law, on April 18, 2024 Yellow sent a letter to the California Department of Industrial Relations providing additional information and formally requesting, to the extent necessary, a finding that the exception is satisfied.  Slade Decl. ¶¶ 6-7.  Given the information that Yellow provided to the California agencies, the California statute is satisfied.  Alternatively, at a minimum, summary judgment on this issue should not be granted while Yellow's request is pending.

---

[11]   *DeRosa v. Accredited Home Lenders, Inc.*, 22 A.3d 27, 36 (N.J. Super. Ct. App. Div. 2011) ("the New Jersey [WARN] Act was modeled after its federal counterpart, and the two statutes share the same purpose of protecting workers and communities by requiring employers to provide notice of plant closings and mass layoffs"); *Heinz v. Dubell Lumber Co.*, 2020 WL 6938351, at *3 (D.N.J. Nov. 25, 2020) ("The New Jersey WARN Act was modeled after its federal counterpart ....  New Jersey courts often look to the federal WARN Act regulations and case law for guidance in interpretation the New Jersey Act"); *Ramcharan v. A.F.L. Quality, Inc.*, 2014 WL 4388579, at *3 (D.N.J. Sept. 5, 2014), *on reconsideration in part*, 2015 WL 4275534 (D.N.J. Apr. 14, 2015) ("The NJ WARN Act, modeled on its federal counterpart …"); *Int'l Bhd. of Boilermakers v. NASSCO Holdings, Inc.*, 226 Cal. Rptr. 3d 206, 213 (Cal. Ct. App. 2017) ("the federal WARN Act (on which the California WARN Act was patterned)").

For this additional reason, Plaintiffs' summary judgment motion on the California WARN Act should be denied.

## VI.     THE VAST MAJORITY OF PUTATIVE CLASS MEMBERS' CLAIMS ARE BARRED BY RELEASES THEY VOLUNTARILY SIGNED.

Finally, Plaintiffs ignore that their summary judgment arguments are irrelevant to the vast majority of non-unionized former employees who voluntarily signed written agreements where they released their claims.  On July 28, 2023 the Company terminated approximately 3,500 non-union employees.  Hawkins Decl. ¶ 106.  All eligible non-union employees laid off on that date were offered a Notice of Separation & Release of Claims ("Severance Agreement") in which they would be paid severance (calculated based on years of service and/or position) in exchange for a release of claims.  Ex. 4, Statlander Decl. ¶ 7.  The Severance Agreement expressly required a release of all claims, including claims under the federal WARN Act and its state level equivalents. Statlander Decl., Ex. 1, Notice of Separation & General Release of Claims at 1.  More than 2,700 former employees signed the Severance Agreement.  Statlander Decl. ¶ 9.

The law is unanimous that signing a release of all claims against one's employer waives the employee's rights under the WARN Act.  *See Ellis v. DHL Exp. Inc., (USA)*, 633 F.3d 522, 528 (7th Cir. 2011) (holding that WARN Act claims can be waived by a general release form); *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798-99 (5th Cir. 2000) (holding employees waived their WARN Act claims when they voluntarily signed releases in exchange for separation payments); *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 937 (5th Cir. 1994) (same); *Drake v. U.S. Enrichment Corp.*, 63 F. Supp. 3d 721, 724-25 (W.D. Ky. 2014) (finding salaried employees' WARN Act claims were barred by severance agreement and general release executed at the time of termination).

Over 2,700 of Yellow's 3,500 former non-unionized laid off on July 28, 2023—more than 75%—are subject to binding releases and have no WARN claims.  Plaintiffs' summary judgment arguments are irrelevant to them as they cannot recover regardless of the outcome of this motion.

## CONCLUSION

Plaintiffs' arguments contradict the WARN Act's language, Third Circuit precedent, and the facts of this case.  There certainly is no basis for Plaintiffs to obtain summary judgment in *their* favor, let alone in favor of *all* non-bargaining unit employees, and there is no WARN liability here. For now, Plaintiffs' motion for partial summary judgment should be denied in its entirety.

April 19, 2024

Respectfully submitted,


*  Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | Michael B. Slade (admitted *pro hac vice*) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 333 West Wolf Point Plaza |
| P.O. Box 8705 | Chicago, Illinois 60654 |

Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                tcairns@pszjlaw.com
                pkeane@pszjlaw.com
                ecorma@pszjlaw.com

Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                david.seligman@kirkland.com
                michael.slade@kirkland.com

-and-


Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          allyson.smith@kirkland.com


Counsel for the Debtors and Defendants