## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |
| | ) |

Response Deadline: March 26, 2024, at 4:00 p.m. (ET)
Hearing Date: April 11, 2024, at 11:00 a.m. (ET)

### DEBTORS' FIFTH OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WARN LIABILITY

THIS OBJECTION SEEKS TO DISALLOW, REDUCE, OR EXPUNGE CERTAIN CLAIMS. PARTIES RECEIVING THIS OBJECTION SHOULD REVIEW SCHEDULE 1 TO THE PROPOSED ORDER TO DETERMINE IF THEIR CLAIM IS SUBJECT TO THIS OBJECTION.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this fifth omnibus objection to the claims (this "Objection") and respectfully request an order, substantially in the form attached hereto as **Exhibit A** (the "Order"): (a) disallowing and expunging each of the claims identified on Schedule 1 to Exhibit A attached hereto, or to the extent the claim mixes other non-WARN related claims to expunge the WARN related portion of the claim (the "No Liability WARN Claims); and (b) granting related relief.[2]  In support of this

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]    This Court previously entered the *Order (I) Modifying the Requirements of Local Rule 3007-1(F)(I) and (II) Granting Related Relief* [Docket No. 1068], which permits the Debtors to file four substantive omnibus claims objections per month, each containing up to 500 claims. To date, the Debtors have identified over 1,300 proofs of claim asserting WARN liability.  The Debtors are thus filing the Third, Fourth, and Fifth Omnibus Objections contemporaneously, each objecting to proofs of claim asserting WARN liability on substantially similar grounds.

Objection, the Debtors rely on the declarations of Darren Hawkins, Cody Kaldenberg, Brian Whittman, and Sarah Statlander (the "Declarations") filed contemporaneously herewith.  In further support of this Objection, the Debtors respectfully state as follows:

## JURISDICTION

1.      The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by this Court in connection with this Objection if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

3.      Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested in this Objection are §§ 105(a) and 502(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 3007 and 9004, and Local Rule 3007-1.

## INTRODUCTION

5.      Under some circumstances, federal and (where they exist) state Worker Adjustment and Retraining Notification ("WARN") Acts can require employers to provide employees with approximately 60 days of notice before a mass layoff or plant closing.  At the same time, WARN Acts are not suicide pacts, and the law encourages employers to "take all reasonable action to preserve the company," *In re Jevic Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013), by

2

providing "leeway for a company's exercise of reasonable business judgment," *In re AE Liquidation, Inc.*, 556 B.R. 609, 618 (D. Del. 2016), *aff'd*, 866 F.3d 515 (3d Cir. 2017).

6.      The circumstances requiring WARN notice are far removed from the facts here. Yellow Corporation ("<u>Yellow</u>" or the "<u>Company</u>"), prior to ceasing its business operations, exercised reasonable business judgment in attempting to preserve its business and avoid laying off nearly its entire work force.  Throughout the first half of 2023, Yellow undertook a series of initiatives meant to position the Company for long-term success and preserve the jobs of its 30,000 employees, roughly 22,000 of which were unionized.  Chief among these was the final completion of One Yellow, a vital multi-year strategic initiative launched in 2019, that ultimately would unify the different entities under the Yellow corporate umbrella, optimize its operational network, enable it to better compete with the non-union carriers who dominate its market, and save the Company hundreds of millions annually.  By the start of 2023, the completion of One Yellow primarily required completing Phase 2 of its network optimization plan.  With Phase 1 having been completed in late 2022—and with the Company's largest union, the International Brotherhood of Teamsters ("<u>IBT</u>" or "<u>Union</u>"), having already agreed to every other One Yellow change in the preceding period—the Company entered 2023 confident that the Union would agree to these final but critical changes.

7.      Like any unionized employer, Yellow also assumed that its ongoing negotiations with the IBT over the completion of One Yellow would include the standard give-and-take that often informed significant operational changes.  This assumption was based on the historical record: in 2009-10, 2014, and 2020, Yellow and the IBT had negotiated hard but ultimately navigated challenging financial circumstances.  Based on this historical record, Yellow understood

3

that the IBT would drive a hard bargain but never drive the Company to the brink of failure, which would risk losing 22,000 unionized jobs.

8.  Throughout the first half of 2023, the IBT made a series of demands as a precondition for its agreement to proceed with One Yellow.  These ranged from expanding existing agreements, pay increases, allowing membership to vote on the One Yellow operational changes, and others.  Yellow bargained in good faith regarding each of these demands, and conceded key points to the Union, expecting they would secure the IBT's agreement to proceed with the vital work of completing One Yellow.  But despite Yellow's efforts—and to the Company's surprise given the pre-2023 negotiations with the Union—the IBT refused to allow One Yellow to proceed.

9.  The IBT's intransigence culminated on July 17, 2023, when, without any warning, the IBT issued a highly publicized threat to strike, starting on July 24, 2023.  This strike was premised on Yellow temporarily deferring contributions to union health, welfare, and pension funds to preserve liquidity, a step necessary only because of the IBT's refusal to proceed with One Yellow.  In the parties' prior practice, when the Company faced liquidity concerns, as in 2009-10 and in 2020, the Company and Union worked together to obtain deferrals of such payments.  The Company expected in July 2023 that it, the IBT, and funds could again work out an agreement. But to Yellow's surprise, the Union used these same deferments to issue a strike notice for the first time in decades.  Even then, Yellow acted swiftly and decisively to attempt to prevent the strike, including filing a lawsuit and moving for a temporary restraining order in the District of Kansas (which was denied).

10.  But that strike threat (over issues that could have been easily resolved) scared off Yellow's customers, leading to the sudden, unexpected collapse of Yellow in a matter of days. Yellow went from picking up over 40,000 shipments daily on July 17 to under 10,000 on July 21,

4

to nearly zero on July 26.  Yellow was shocked at the rapidity of its knife-edge transition from an

operating business to an entity existing only to liquidate its assets for the benefit of its stakeholders.

11.     The Company had no time to plan, much less provide WARN notice for, what

became mass layoffs on July 28 and July 30, 2023.  Those layoffs, and the unexpectedly abrupt

manner in which they occurred, are solely the fault of the IBT, which for reasons best known to it

decided to act directly contrary to the interests of the approximately 20,000 Teamsters then

employed at Yellow by taking deliberate steps to execute, rather than save, Yellow.  Under such

circumstances, providing 60 days of notice under WARN Acts was neither feasible nor required.

Thus, the WARN Act claimants have no valid claims for multiple independent reasons.

12.     *First*, WARN applies only to an "employer."  Under binding Third Circuit

authority, a debtor or other entity that is not operating on a going concern basis, but instead is

winding up its affairs and liquidating, is not an "employer" and not subject to WARN obligations.

*In re United Healthcare Sys., Inc.*, 200 F.3d 170, 177-79 (3d Cir. 1999).  By July 26, 2023, Yellow

had implemented the process to discontinue accepting new shipments, was completing delivery of

its final packages, was preparing for bankruptcy, and thus was no longer an employer.  Instead,

Yellow's efforts had turned to filing for chapter 11 and winding up its affairs.  Thus, when the

layoffs occurred Yellow was no longer an "employer" and the WARN Acts did not apply to it.

13.     Moreover, even for employers (which Yellow was not at the relevant time) WARN

acts recognize exceptions, two of which apply here.  Thus, the *second* reason notice is not required

is that the faltering company exception applies where (as here) the employer was actively seeking

capital or business that would have enabled it to avoid layoffs and believed providing a WARN

notice would have prevented the Company from obtaining the capital or business.  At the time

relevant to the faltering company exception, Yellow was actively pursuing the One Yellow

initiative, repeatedly and persistently attempting to get the Union to agree to a change of operations to allow One Yellow to proceed.  Achieving One Yellow would have provided Yellow with savings in the projected amount of $22.85 million per month, providing Yellow with additional capital and allowing it to compete for business that would have enabled the Company's long-term success and avoid any layoff.  Yellow also had retained the investment bank Ducera Partners, which was was actively negotiating with existing lenders, potential new lenders, and private equity fund Atlas Holdings to obtain new cash that would have extended Yellow's runway and allowed the Company to continue.  Providing a WARN notice during these sensitive negotiations would have scared off the Company's customers and any potential new financing, leading to its collapse, the same as the effect of the Union's highly publicized strike threat.

14.     The other exception and *third* reason Yellow has no WARN Act liability is that it was not foreseeable that the Union would choose to exterminate Yellow rather than negotiate Phase 2 of One Yellow.  Specifically, the IBT threatened a strike despite Yellow's repeated good faith efforts to negotiate the IBT's agreement to the essential One Yellow initiative.  Over the past decade-plus, the IBT had engaged in hard bargaining but never issued a strike threat, even when it had the legal right to do so, or took actions that could destroy the company.  Indeed, the IBT had previously worked with the Company on temporarily deferring contributions to the health, welfare, and pension funds when necessary to preserve Yellow's liquidity, but here the IBT used that as a trigger for striking.  Moreover, in the months leadings up to that threat, Yellow was diligently working to save the Company.  The result of that strike threat was Yellow's rapid collapse over just several days, going from delivering 40,000-plus packages to nearly zero, as customers fled from the Company.  Thus, Yellow could not have expected (nor would any reasonable person have expected) that the IBT would deliberately end the careers of 22,000 unionized employees.

DE:4862-4403-2685.1 96859.001

15.     *Fourth*, even if a company is an employer and no exception applies, the amount of any liability may be reduced in the court's discretion if the absence of notice was in good faith and the employer had reasonable grounds for believing that this omission was not a violation of the WARN act.  Throughout the first half of 2023, Yellow was negotiating in good faith with the IBT—repeatedly conceding to Union demands—in an attempt to secure the IBT's approval of One Yellow Phase 2.  Indeed, just a few days before the layoffs, Yellow had finally secured the IBT's conditional agreement to proceed with the operational changes necessary for One Yellow.  The Company also was actively seeking financing to improve its liquidity, including negotiating with potential financiers even after the Union issued its strike threat.  Issuing a WARN notice of a mass layoff of nearly the entire workforce would have crushed any opportunity to save the Company.  Thus, Yellow objectively and in good faith believed it had no obligation to issue WARN notices any earlier than it did.

## **BACKGROUND**

A.    **Yellow's Business and Unionized Work Force.**

16.     Before the events leading to its Chapter 11 filing, Yellow offered its customer a full range of services for transporting goods through its North American ground distribution network.  Hawkins Decl. ¶ 6.  On an average workday, Yellow's approximately 30,000 employees handled approximately 50,000 freight shipments daily.  *Id.* ¶ 9.

17.     Of Yellow's 30,000 employees, approximately 22,000 were unionized, with the vast majority of these being represented by the IBT.  *Id.* ¶ 9.  Prior to the July 2023 strike notice, the IBT had not issued a strike notice in nearly 30 years, even when challenging economic circumstances required Yellow to seek concessions and when the IBT had a legal right to strike.  *Id.* ¶¶ 13-15.  Instead, while engaging in hard bargaining, the IBT would agree to the changes necessary to save the Company.  *Id.*

7

18.     For example, in 2009 the Company faced severe liquidity issues from the financial crisis. *Id.* ¶ 13. For several months, to maintain liquidity the Company deferred payments to the pension funds that provide pensions to its unionized members, but the IBT never issued a strike threat. *Id.*

19.     In 2014, the Company's existing collective bargaining agreement ("CBA") expired, the Company sought concessions that the IBT did not support, and the Company put its proposal to a vote by the IBT membership, which rejected it. *Id.* ¶ 14. At that point, the IBT could have sent a strike notice, but instead of doing so it engaged in good faith negotiations to reach an agreeable position for both sides that was accepted by the membership. *Id.*

20.     In 2020, the COVID pandemic again drained the Company's liquidity. *Id.* ¶ 15. Yellow determined that it needed to defer contribution to Central States, which is the fund that provide health and welfare funds, pension, and other benefits to its unionized employees. *Id.* Yellow negotiated with Central States, and its efforts were supported by the IBT. *Id.* Central States agreed to the deferral. *Id.* At no time did the IBT issue a strike notice over Yellow's deferral of contributions. *Id.*

**B.      The Benefits and Necessity of One Yellow.**

21.     Yellow had pursued various acquisitions of transportation companies over the years, resulting in a number of different brands within the Yellow family. Hawkins Decl. ¶ 12. This resulted in numerous operating companies within Yellow's corporate structure competing for the same business. *Id.* ¶ 18. Such inefficiencies harmed Yellow's ability to compete with other transportation carriers. *Id.*

22.     Yellow developed the One Yellow restructuring initiative, intended to unify its various companies, modernize the business, and upgrade the efficiency of its operations so that the

8

company could continue to compete successfully. *Id.* ¶ 24. One Yellow required execution in three carefully planned phases. *Id.* ¶ 26. All of the Company's stakeholders, including its employees, customers, creditors, and shareholders, knew and understood the criticality of the successful and timely implementation of each phase. *Id.* ¶ 25.

23.    The Company projected that One Yellow would significantly improve its finances. Proceeding with One Yellow would have allowed Yellow to achieve operational savings of approximately $22.85 million per month. *Id.* ¶ 73. Yellow projected that One Yellow would increase EBITDA from $341.4 million for the 12 months ending March 31, 2022, to $450 million within one full year of implementation, an increase of over 30%. *Id.* ¶ 19. Yellow also expected that One Yellow would create an opportunity to capture over $675 million in annual revenue with favorable operating margins. *Id*.

24.    In sum, One Yellow was Yellow's most vital strategic initiative, and Yellow's survival depended on completing it as soon as possible. *Id*. This need was widely understood, including by the IBT. *Id.* ¶ 25.

## C.    Yellow's Repeated Good Faith Attempts to Negotiate with the IBT Over the Changes Necessary for One Yellow.

25.    One Yellow would proceed in three phases, the first phase covering approximately 20% of Yellow's network. Hawkins Decl. ¶ 26. Under Yellow's CBA, when Yellow made a changes of operations ("CHOPS") it and the IBT would resolve the seniority of affected Union members. *Id.* ¶ 27. The CHOPS process is usually routine and easily dealt with through the contractual mechanisms set forth in the CBA. *Id*.

26.    During the first phase of One Yellow, the Company negotiated with the IBT over the CHOPS necessary to implement Phase 1. *Id.* ¶ 28. In August 2022, the IBT approved the Phase 1 CHOPS quickly and without any issue. *Id*.

DE:4862-4403-2685.1 96859.001

27.    Yellow promptly proceeded with Phase 1. *Id.* This phase was a success, and in the fourth quarter of 2022 Yellow had its best operating income in 16 years. *Id.* ¶¶ 20, 30. Because of Phase 1's success, Yellow was in a strong financial position as it prepared for Phase 2, the largest and most important phase which covered approximately 70% of the Company's network. *Id.* ¶ 26. Nevertheless, the Company needed to complete all Phases of the Yellow One initiative to effectively compete against both non-unionized companies, which have lower operational costs than unionized ones, and its remaining union competitors. *Id.* ¶¶ 30-31.

28.    Soon after the Phase 1 CHOPS approval, on October 19, 2022, Yellow submitted the Phase 2 CHOPS to the Union for approval. *Id.* ¶ 33. This CHOPS mirrored the Phase 1 CHOPS the Union had approved just two months earlier. *Id.* Yellow thus expected the Union would approve the Phase 2 CHOPS without significant difficulties. *Id.* ¶¶ 33-34.

29.    Instead of simply approving the Phase 2 CHOPS, the IBT began asking for concessions. *Id.* ¶ 34. Throughout the first half of 2023, Yellow believed it could convince the Union to see reason and agree to resolve the Phase 2 issues, as the parties had for the Phase 1. During this time, Yellow repeatedly conceded to Union demands, expecting this would clear the way for the Company and Union to proceed with the essential One Yellow initiative.

30.    For example, the Union insisted that Yellow expand a designated terminal agreement permitting road drivers to unload freight and swap trailers themselves, and Yellow agreed. *Id.* ¶¶ 34-39, 41. In early April 2023, the Union demanded that IBT member employees be allowed to vote on the revised Phase 2 CHOPS, and Yellow agreed. *Id.* ¶¶ 44, 46. Also in April 2023, the Union demanded that Yellow agree to reopen the CBA to increase monetary compensation for IBT members, and on April 21 Yellow agreed to that demand. *Id.* ¶¶ 48-55. When Yellow accepted the Union demand to reopen the CBA, the Union then conditioned any re-

10

opening on the union being allowed to strike and that all terms would be submitted to the IBT membership for a vote.  *Id.* ¶¶ 55-56.  On May 25, 2023, the Union demanded that its support of Phase 2 was conditioned on Yellow agreeing to pay an immediate $1.50 wage increase.  *Id.* ¶ 61. On July 12, Yellow agreed to this hourly increase in the context of a five-year agreement that would enable Yellow to achieve the One Yellow network modernization.  *Id.* ¶ 86.

31.     Yellow explained to its employees the consequences of not agreeing to Phase 2.  In April 2023, Yellow provided the IBT with secure access to Yellow financial records and documents showing that Yellow would have liquidity concerns that could only be avoided if Phase 2 moved forward.  *Id.* ¶¶ 50, 52.  Yellow also organized town hall meetings with thousands of non-union employees to explain the consequences to the Company if a deal with the Union on Phase 2 were not reached.  *Id.* ¶ 90.  On June 8, the Company sent an email to Yellow's employees regarding the ongoing impasse with the IBT.  *Id.* ¶ 69.  Yellow also prepared additional written communications to be mailed to employees' homes that would emphasize the importance of One Yellow to the Company's future.  *Id*.

32.     Throughout this period, the Union's self-described "militant" line was believed to be part of the IBT's approach to gain leverage in negotiations and extract concessions from Yellow. The reason is simple:  any absolute IBT refusal to support One Yellow would be irrational; it risked not only destroying the Company but also losing the jobs of the more than 20,000 employees the IBT purported to represent.

**D.     Yellow's Efforts To Obtain New Financing To Improve Its Liquidity.**

33.     The Union's delay in approving the necessary operational changes in Phase 2, combined with challenging business conditions, caused Yellow to begin losing liquidity.  On June 5, 2023, Yellow had a total liquidity of nearly $157 million, which dropped to under $125 million

by June 23, and less than $92 million on July 12.  Hawkins Decl. ¶¶ 65, 72, 86.  These amounts were sufficient for Yellow to continue operations.  At the same time, these decreases represented a concerning trend, causing Yellow to explore methods of shoring up its liquidity to continue negotiations with the IBT to proceed with One Yellow Phase 2.

34.    Yellow had previously hired investment banker Ducera Partners in January 2023 to help it evaluate strategic financial alternatives.  Kaldenberg Decl. ¶ 7.  Yellow was optimistic and, at the time, had no idea that it would be fighting for its life within six months—to the contrary, it had every reason to believe it would be operating for years.

35.    On May 26, 2023, Ducera sent a proposal to Yellow's existing lenders that would modify the loans to improve liquidity, including changes to the collateral that would allow for increased loans and additional borrowing.  *Id.* ¶ 12.  This included Ducera offering proposed terms to modify Yellow's term loan with Apollo Global Management.  *Id.*  These terms included expediting the sale of a shipping terminal in Compton to use the net sale proceeds to pay down the loan, ability to pay interest in-kind, and a waiver of the minimum EBITDA covenant through the end of of 2023.  *Id.*

36.    On June 5, Ducera reached out to new potential asset-based lenders to refinance the Company's existing asset-based loans to provide additional financing that would increase Yellow's cash-on-hand and liquidity.  *Id.* ¶ 13.  At the same time, Ducera entered into negotiations with the Company's existing asset-based lenders to potentially modify the borrowing base, again with the goal of bringing in additional cash to enhance liquidity.  *Id.*

37.    On June 8, Ducera began discussions with private equity fund Atlas Holdings regarding a potential debt or equity investment in Yellow.  *Id.*  Given Atlas's existing holdings and relationships, Ducera believed that Atlas was in a strong place to provide favorable financing

DE:4862-4403-2685.1 96859.001

solutions to the Company.  *Id.* ¶ 15.  Members of Atlas, including a co-founder and managing partner, met with representatives of Yellow and Ducera on July 12 and 13.  *Id.*  At Yellow's July 17 board meeting, a Ducera partner explained that Atlas had a strong interest in a transaction with Yellow, while noting that time was of the essence.  *Id.*  During this entire period, Yellow had no reason to believe that the IBT would soon take precipitous and irrational action that would kill the Company within a week.

38.     Even after the July 17 strike notice, Ducera remained in communication with the Atlas.  On July 18, the day after the strike notice, Atlas sent an extensive list of diligence requests to the Company.  *Id.* ¶ 17.  Throughout the following week, Ducera remained in close contact with Atlas, continuing to discuss a potential refinancing in back-and-forth communications.  *Id.*  The private fund's interest only ended as continuing events showed that the Company's customers had left to competitors and there was no clear means of implementing One Yellow.  *Id.* ¶ 18.

**E.     The IBT's Unforeseeable Strike Threat.**

39.     In the weeks leading up to the IBT's July 17 strike threat, Yellow's overall business was stable.  As noted previously, on an average workday, Yellow handled approximately 50,000 freight shipments daily.  Hawkins Decl. ¶ 9.  On June 5, the Company picked up approximately 50,000 shipments; it picked up approximately 45,950 shipments on June 23, and approximately 44,550 shipments on July 12.  *Id.* ¶¶ 65, 72, 86.  Thus, Yellow's business during June and July was consistent with its typical operations.

40.     Nevertheless, because of the Company's declining liquidity, Yellow was obliged to seek further ways to maintain its liquidity as it continued to negotiate with the IBT.  *Id.* ¶ 75. Accordingly, on June 14-15, Yellow asked the Central States health, welfare, and pension funds covering its unionized members to defer contributions that would be due in July and August, with

13

a promise that this would only be a short-term deferral which would be promptly repaid, with interest, as Yellow had previously done. *Id.* ¶ 72. This was not an unprecedented step; as noted before, Yellow, the IBT, and Central States had previously negotiated deferrals of fund contributions when the Company was facing challenging economic circumstances. *Id.* ¶¶ 13-15. Yet none of the funds granted the requests. *Id.* ¶ 72.

41.    On July 7, Yellow determined to defer paying the contributions to Central States due in July and August to preserve liquidity—a step that would not have been necessary if the Union had approved One Yellow Phase 2 in a timely manner. *Id.* ¶ 89. Instead of negotiating over the deferrals—as Central States, IBT, and Yellow had done in the past, *id.* ¶¶ 13-15—on July 17 Central States sent a memorandum stating that Yellow participation in the funds would be terminated effective July 23, *id.* ¶ 88. Just hours later, the IBT gave a 72-hour notice that it intended to strike on or after July 24—something that it had not done for nearly 30 years. *Id.*

42.    Even after the IBT's strike threat, Yellow continued trying to engage with the IBT. For example, on July 18, Yellow reached out to the President's National Economic Council for advice on engaging in constructive negotiations with the IBT. *Id.* ¶ 93. But the Council advised that the IBT had no interest in talking with Yellow. *Id.*

43.    Yellow also sought legal remedies, and on July 19 filed a lawsuit seeking a temporary restraining order and preliminary injunction to, among other things, enjoin the Union from engaging in a strike or other work stoppage. *Id.* ¶ 93. On Friday, July 21, the court denied Yellow's TRO and PI on the grounds that it lacked jurisdiction. In denying that relief, the court prophetically stated that "I will say that I understand the grave consequences that may flow from

14

this.  I hope the union understands that perhaps 22,000 or 30,000 jobs will be lost.  It could be a situation where you win a battle and lose a war, I don't know."[3]

44.     The court's comments appeared to have opened the IBT's eyes as to the ultimate result of its intransigence.  After months of obstruction, on July 23 the IBT reached out to the Company to engage in negotiations.  Hawkins Decl. ¶ 98.  As a result of these discussions, and the IBT's request, Central States agreed to extend benefits for Yellow's workers.  *Id.*

45.     But the uncertainty of the strike had caused customers to drop Yellow as a carrier, and competitors immediately absorbed Yellow's shipments.  On July 12, Yellow picked up 44,550 shipments.  *Id.* ¶ 86.  But on July 19, two days after the strike threat, Yellow picked up only 32,500 shipments, a drop of nearly a quarter in two days.  *Id.* ¶ 94.  After another two days, on July 21, Yellow picked up just 10,450 shipments, meaning that three-quarters of its business was gone within four days of the IBT's strike notice.  *Id.* ¶ 97.  Given the plight of the company and due to the ongoing disruptions to the Company's business, to ensure that existing orders could be fulfilled Yellow decided to begin the process to discontinue accepting new shipment orders on July 24, 2023.  *Id.* ¶ 100.

**F.     Yellow Ceases To Operate, and Lays Off Its Employees and Issues WARN Notices.**

46.     Even after Yellow stopped accepting additional shipments, it continued to work to save the Company.  Yellow and the IBT continued the negotiations that had started on July 23, and by July 25 the IBT finally conditionally approved the operational changes necessary to implement Phase 2 of One Yellow.  Hawkins Decl. ¶ 102.  Yellow also provided the IBT with information about the Company's communications with the federal government, hoping that the

---

[3]   Transcript of Hearing on Motion for Temporary Restraining Order, at 54:14-17, *Yellow Corp., v. Int'l Brotherhood of Teamsters, et. al.*, No. 23- CV-1131-JAR (D. Kan. July 21, 2023).

DE:4862-4403-2685.1 96859.001

IBT might be able to improve the chances that the federal government would intervene to aid the Company. *Id.* But the optimism created by the IBT finally agreeing to Phase 2 operational changes proved short-lived. The damage was done, and the customers lost during the strike threat would not return. *Id.* ¶ 103.

47.     At a July 26 board of directors meeting, the board discussed the Company's available liquidity, and depending on the pace of the liquidity decline, the timing of a potential filing under chapter 11 of the Bankruptcy Code. *Id.* ¶ 104. On that same date, Yellow's delivered shipments fell to nearly zero. *Id.* ¶ 105.

48.     Because of the strike threat devastating Yellow's business, the Company implemented a full scale winddown of its business operations and began working on its liquidation. *Id.* ¶¶ 112-14. On July 28, the Company terminated approximately 3,500 non-union employees, most of whom executed release agreements in consideration for severance payments from the Company. *Id.* ¶ 106.

49.     On July 29, Yellow picked up a single shipment—its last ever. By July 30, Yellow had no shipments or customers remaining, and the Company sent notice to the IBT and other unions that it was laying off approximately 22,000 union employees. *Id.* ¶¶ 107-08.

50.     During this period, the sole purpose of Yellow and its remaining employees transitioned to liquidating the company and winding down its business while maximizing value for all stakeholders. *Id.* ¶ 113. Yellow filed for chapter 11 on August 6, 2023. *Id.* As explained in the declaration in support of its first day motions, Yellow's express purpose in filing for chapter 11 was "to effectuate an orderly, value-maximizing winddown of their business for the benefit of all parties in interest." *See Declaration of Matt Doheny, Chief Restructuring Officer, in Support*

*of the Debtors' Chapter 11 Petitions and First Day Motions* ¶ 19 (Aug. 7, 2023), ECF No. 14 ("<u>Doheny</u> <u>Decl.</u>").

51.     On July 31, 2023, the Company sent notices to its laid off and otherwise terminated employees under the WARN Act.  Hawkins Decl. ¶ 108.

**C.     The Bar Date Motion and Order**

52.     On August 31, 2023, the Debtors filed a motion to establish a claims adjudication process. *See Motion of Debtors Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof Filed by Yellow Corporation*, ECF No. 393 (the "<u>Bar Date Motion</u>"). Two weeks later, the Court granted the Debtors' Motion and set a general claims bar date of November 13, 2023 (the "<u>Bar Date</u>").

**D.     Summary of WARN Related Proofs of Claim**

53.     In aggregate, approximately 1,292 WARN-related proofs of claim were filed, which includes 13 proofs of claims filed after the Bar Date.  *See* Whittman Decl. ¶ 14.

54.     Of the 1,292 WARN-related proofs of claim, 48 were submitted by unions or union-related health or pension funds, 1,207 were filed by individual former employees, 30 were filed as purported class action claims, and 7 were filed by state taxing authorities on behalf of former employees. *Id*. ¶ 15.

55.     The majority of individual proofs of claim overlap with the union claims, as the unions filed their claims on the individuals' behalf.  Specifically, 1,147 of the individual proofs of claim that mention WARN were filed by union-represented employees, 42 were filed by non-

bargaining unit level employees (one of the 41 employees filed two claims), and 18 were filed by individuals that have not been able to be identified by Debtors as either former union or non-union employees. *Id.* ¶ 9.  Accordingly, there are between 41 and 59 individuals who are not affiliated with unions who filed proofs of claim mentioning WARN prior to the Bar Date. *Id.*

56.    Of the 41 individuals who are not affiliated with unions and were identified in the Debtors' employee rosters who filed Proofs of Claim mentioning WARN prior to the Bar Date, 32 of them had signed agreements, the majority of which were received prior to the Petition Date, in which they released all claims (including WARN claims) in exchange for severance, which was paid. *Id.* ¶ 11.

57.    The WARN-related proofs of claim typically purport to bring claims under both federal and state WARN acts.

## **RELIEF REQUESTED**

58.    By this Objection, the Debtors seek entry of the Proposed Order, pursuant to sections 105(a) and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and 9004, and Local Rule 3007-1, disallowing and expunging the No Liability Employee WARN Claims identified on Schedule 1 to the Proposed Order.

59.    The reality is that the Debtors shut down their businesses on an extremely short time frame as the result of completely irrational behavior from the IBT that neither the Debtors nor any other rational employer would have expected or planned for.  No WARN act provides for liability under these circumstances.

## **BASIS FOR RELIEF**

60.    Section 502(a) of the Bankruptcy Code provides that a filed proof of claim is "deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a).  When asserting a proof of claim against a bankruptcy estate, a claimant must allege facts that, if true, would support a

finding that the debtor is legally liable to the claimant. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Where the claimant alleges sufficient facts to support its claim, its claim is afforded prima facie validity. *Id*. A party wishing to dispute a claim's validity must produce evidence sufficient to negate the claim's prima facie validity. *Id*. at 173-74. Once an objecting party produces such evidence, the burden shifts back to the claimant to prove the validity of his or her claim by a preponderance of the evidence. *Id*. at 174. Ultimately, the burden of persuasion is on the claimant. *Id*. Once the *prima facie* validity of a Proof of Claim is rebutted, "it is for the claimant to prove his claim, not for the objector to disprove it." *In re Kahn,* 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990) (citations omitted).

61. A chapter 11 debtor "has the duty to object to the allowance of any claim that is improper." *Int'l Yacht & Tennis, Inc. v. Wasserman Tennis, Inc. (In re Int'l Yacht & Tennis, Inc.)*, 922 F.2d 659, 661-62 (11th Cir. 1991); *see also* 11 U.S.C. §§ 704(a)(5), 1106(a)(1), and 1107(a).

## A.   Federal And State Warn Acts.

### i.   The Federal Warn Act.

62. The federal WARN Act provides that an "employer shall not order a plaintiff closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to representatives of the affected employees, or the affect employees themselves, and to certain State entities. 29 U.S.C. § 2102(a). WARN creates a civil action against an "employer" for back pay and benefits for each day of a violation, subject to reductions for the employer's payment of wages, contributions (such as for health benefits or pensions) on the employee's behalf, or the employer's voluntary payments to employees. 29 U.S.C. § 2104(a).

63. By its terms, the Act only applies to an "employer," defined as a "business enterprise" that employs 100 or more employees. 29 U.S.C. § 2101(a)(1).

64.    The WARN Act also contains a number of exceptions, two of which are relevant here.  One is referred to as the faltering company exception:

> An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1).  The other is that an "employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."  29 U.S.C. § 2102(b)(2)(A).

65.    WARN also provides for a discretionary reduction in any liability or penalties for any good faith violations:

> If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

29 U.S.C. § 2104(a)(4).

66.    The Third Circuit has rejected interpretations of the WARN Act and its exceptions that "might require an employer to provide frequent WARN notice" so as to "require an economically viable employer to provide notice of a possible—but unlikely—closing."  *Hotel Emps. & Rest. Empls. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 185 n.7 (3d Cir. 1998).  The Third Circuit explained that such frequent notices would be antithetical to the Act's purposes and harm the very employees it is intended to help:

> Once the employer's creditors learn of the notice, they may seek to enforce existing debts and become unwilling to extend the employer more credit.  In addition, employees may overestimate the risk of closing and prematurely leave their employer, forfeiting (among other things) seniority and unvested benefits.  Such

20

behavior by creditors and employees would increase the chance that an employer will be forced to close and lay off its employees, harming precisely those persons WARN attempts to protect.

*Id.*; *see also In re AE Liquidation, Inc.*, 556 B.R. 609, 618 (D. Del. 2016) ("*AE Liquidation I*") ("The WARN Act allows leeway for a company's exercise of reasonable business judgment, and the regulations are intended to encourage employers to take all reasonable actions to the preserve the company and the jobs."), *aff'd*, 866 F.3d 515 (3d Cir. 2017) ("*AE Liquidation II*"); *In re Jevic Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013) (explaining that where "events are indicative of a company attempting to stave off layoffs, and attempting to save jobs and the company," then "[i]t would run counter to the WARN Act's policy of encouraging employers to take all reasonable action to preserve the company and the jobs to impose liability upon the Debtors for not giving notice sooner than they did"); *In re Flexible Flyer Liquidating Tr.*, 511 F. App'x 369, 374 (5th Cir. 2013) ("The WARN Act allows good faith, well-grounded hope, and reasonable expectations.  Its regulations protect the employer's exercise of business judgment and are intended to encourage employers to take all reasonable actions to preserve the company and the jobs.  Holding Flexible Flyer liable for a WARN Act violation on the facts found by the bankruptcy court would serve only to encourage employers to abandon companies even when there is some probability of some success.").

### ii.   State WARN Acts.

67.   A minority of states have passed laws modeled after the federal WARN Act.  Of the 50 states where Yellow's former employees worked, 40 do not have an applicable state WARN Act or similar law requiring notice of layoffs to employees.[4]  Claimants who worked in these 40 states have no state claims.

---

[4]   Alabama, Alaska, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, Nebraska, New Mexico, Nevada, North Carolina, North Dakota,

21

68.    The remaining 10 state acts[5] largely track the federal WARN Act.  *E.g.*, *In re TransCare Corp.*, 611 B.R. 160, 167 (Bankr. S.D.N.Y. 2020) ("The NY WARN Act and regulations largely mirror the US WARN Act and regulations."); *Jevic*, 496 B.R. at 165 ("The New Jersey WARN Act was modeled after its federal counterpart.").  The state statutes often cover employers with, or layoffs concerning, fewer employees than would trigger the federal Act.  *E.g.*, *MacIsaac v. Waste Mgt. Collection & Recycling, Inc.*, 36 Cal Rptr. 3d 650, 661 (Cal. App. Ct. 2005) (discussing legislative history of California act showing that it was intended to cover layoffs that would fall under the threshold of the federal WARN Act).  The state statutes typically use the same 60-day period as federal law, though some have longer or short notification periods.  *E.g.*, N.Y. Comp. Codes R. & Regs. Tit. 12 § 921 (90-day notice period); N.J. Stat. Ann. § 34:21-2 (90-day notice period); Iowa Code Ann. § 84C.3(1)(a) (30-day notice period).  Likewise, most state

---

Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming have no WARN or similar acts requiring notice to employees.

Connecticut does not have a law requiring notice for a layoff but does have a Plant Closing Law concerning an employer that closes a plant pay for continued health insurance for terminated employees.  This law, however, does not apply to employers, like Yellow, who close plants under the federal Bankruptcy Act.  Conn. Gen. Stat. Ann. § 31-51n(6).

Hawaii's Act does not apply to "[b]usiness shutdowns which occur … in connection with factors such as business failure [or] bankruptcy."  Haw. Admin. R. § 12-506-4(b).

Maryland's Act does not apply to layoffs that result from an employer filing for bankruptcy.  Md. Code Ann., Lab. & Empl. § 11-302(a).

Massachusetts has a law requiring notice for plant closing for employers that received financing from specified quasi-public agencies, which Yellow does not, Mass. Gen. Law Ch. 149, § 182, and another unfunded and unenforced law concerning giving notice of plant closing to a state agency, not employees, Mass Gen. Law. Ch. 151A, §§ 71A-71G.

Minnesota has a law that encourages providing notice of layoffs but does not require such notice.  Minn. Stat. Ann. § 116L.976.

Tennessee has a Plant Closing and Reduction in Operation Act that applies to employers when 50 to 99 employees are laid off.  Tenn. Code Ann. §§ 50-1-601 *et al.*

[5]    These are California, Delaware, Illinois, Iowa, Maine, New Hampshire, New Jersey, New York, Vermont, Wisconsin.

DE:4862-4403-2685.1 96859.001

acts contain the same exceptions and limitations as the federal Act, with a handful of exceptions, such as the New Jersey Act not providing any exceptions. *Jevic*, 496 B.R. at 165.

69.      Given the similarity of these handful of state WARN Acts to the federal Act, the same arguments establishing that the federal WARN Act does not require notice generally apply equally to the state WARN Acts.  Accordingly, claimants cannot recover on any state law WARN claims.

**B.      No Federal Or State WARN Acts Apply To Yellow, Which Was Liquidating And Thus Not An "Employer" When The Layoffs Occurred.**

70.      The Third Circuit and other courts have held that a liquidating company is not an employer under the WARN Acts and has no obligation to provide notice, known as the liquidating fiduciary exception.  Specifically, the federal WARN Act applies only to an "employer":  "An *employer* shall not order a plant closing or mass layoff until the end of a 60-period after the *employer* serves written notice … ." 29 U.S.C. § 2102(a) (emphasis added).  And an "employer" is defined as a "business enterprise" that employs 100 or more employees. 29 U.S.C. § 2101(a)(1).  State WARN acts similarly apply only to an "employer." *E.g.*, N.Y. Comp. Codes R. & Regs. tit. 12 § 921-2.1 ("… no employer may order a mass layoff … unless … the employer provides notice …"); Cal. Lab. Code § 1401(a) ("An employer may not order a mass layoff … unless … the employer gives written notice …"); N.J. Stat. Ann. § 34:21-2 ("… if an employer conducts a mass layoff, the employer who ... conducts the mass layoff" shall provide notice).

71.      Reviewing the legal authorities regarding the WARN Act, the Third Circuit held that a liquidating company is not an "employer." *In re United Healthcare Sys., Inc.*, 200 F.3d 170, 177-79 (3d Cir. 1999).  Among other sources, the Third Circuit relied on the Department of Labor's ("DOL") commentary on WARN regulations stating that an employer includes entities "'which *engage in business* (i.e., take part in a commercial or industrial enterprise, supply a service or good

23

on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments).'" *Id.* at 177 (quoting 20 C.F.R. § 639.3(a)(1)(ii), 54 Fed. Reg. 16,042, 16,065 (1989) (emphasis in *United Healthcare*). The "'DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligation of the former employer because the fiduciary is not operating a 'business enterprise' in the normal commercial sense.'" *Id.* (quoting 54 Fed. Reg. 16,045). The Third Circuit explained that "the commentary's focus on the bankruptcy fiduciary's responsibilities indicates that whether a bankrupt entity is an 'employer' under the WARN Act depends in part on the nature and extent of the entity's business conduct and activities while in bankruptcy." *Id.* "The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an 'employer;' the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act." *Id.* at 178.

72.     Applying these principles, the Third Circuit held that the hospital debtor at issue in *United Healthcare* "was operating not as a 'business operating as a going concern,' but rather as a business liquidating its affairs." *Id.* at 178. In that case, the hospital began experiencing financial difficulties in 1996, including difficulty maintaining essential supplies such as blood. *Id.* at 172. In January 1997, United Healthcare began negotiating to have the hospital purchased by another healthcare group. *Id.* But at the same time, one of United Healthcare's secured creditors, Daiwa, began expressing concern about its financial viability, suspending funding to it on February 3. *Id.* As a result, United Healthcare could not meet its operating expenses, closed its emergency room, and reduced its number of patients. *Id.* The State then gave United Healthcare emergency funding of $5 million, which allowed it to increase its number of patients. *Id.* But this did not mollify

24

Daiwa, which on February 13 issued a notice of default terminating all financing. *Id.* at 172-73. On February 16, United Healthcare agreed to sell a portions of its assets to another group and terminate its operations. *Id.* at 173. On February 19, United Healthcare filed a voluntary chapter 11 petition, and on that same day issued WARN notices to its employees. *Id.* Just a few weeks later, on March 6, United Healthcare terminated nearly all its employees immediately, continuing to retain less than 10% of its employees to secure it facilities and maintain equipment. *Id.*

73.     The Third Circuit relied on a slew of facts that parallel this case to hold that when United Healthcare laid off its employees, it was not acting as employer and thus was not subject to WARN Acts. The hospital entered Chapter 11 and ultimately "filed a voluntary bankruptcy plan under which it would liquidate its assets and cease to exist." *Id.* at 178. In the interim, the hospital had "discharged or transferred all of its patients and was no longer admitting new patients." *Id.* Accordingly, the court held, the remaining "employees were no longer engaged in their regular duties but instead were performing tasks solely designed to prepare United Healthcare for liquidation." *Id.*

74.     In addition to *United Healthcare*, the "'liquidating fiduciary' principle has been recognized by courts throughout the country." *In re MF Glob. Holdings Ltd.*, 481 B.R. 268, 280 (Bankr. S.D.N.Y. 2012) (collecting cases); *see also Chauffeurs, Sales Drivers, Warehousemen Helpers Union Local 572 v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995) ("WARN's obligations ... can apply ... only where the [secured] creditor operates the debtor's asset as a 'business enterprise' in the 'normal commercial sense' ...; where the creditor does no more than exercise that degree of control over the debtor's collateral necessary to protect the security interest, and acts only to preserve the business asset for liquidation or sale, the notice requirement of

25

WARN will not apply."); *In re Century City Doctors Hosp., LLC*, 2010 WL 6452903, *6-7 (B.A.P. 9th Cir. 2010) (same as *Weslock*).

75.     These authorities demonstrate that Yellow was a liquidating fiduciary on July 28 and 30 when it laid off its employees, and thus had no obligations under federal or state WARN Acts.  It is an indisputable fact that the IBT's threat on July 17 to strike or on after July 24 caused massive uncertainty among Yellow's customers and led directly and promptly to a sharp decline in Yellow's new business, and the business drying up entirely within approximately a week. Yellow began the process to discontinue accepting new shipment orders on July 24, 2023. Hawkins Decl. ¶ 100.  The shipments that its customers had placed sharply dwindled during the course of the two weeks from July 17 to July 26, falling from over 40,000 on July 17 to near zero.

76.     Accepting and delivering packages was the core of Yellow as an ongoing, operating business.  On July 26, Yellow's customers had left it, it was in the process of discontinuing accepting new shipments, its deliveries had collapsed to near zero, and the Company's board and employees were preparing for bankruptcy.  At that time, as a direct result of the IBT's strike threat and its aftermath, Yellow had clearly stopped as a normal business and instead had turned to liquidating.  This is the same as when the *United Healthcare* hospital stopped admitting new patients and discharged and transferred existing patients, which the Third Circuit relied on to hold that the entity was no longer a business enterprise but instead engaged in liquidating its assets and winding up its affairs.  200 F.3d at 178.  Moreover, the Yellow employees that would remain after the layoff were shifting from their regular duties serving the business—which no longer existed— and began preparing for Chapter 11 and liquidating Yellow's assets, the same as in *United Healthcare*.  Hawkins Decl. ¶ 113.  All these objective facts showing that Yellow was liquidating were corroborated by Yellow's first day declaration, which told this Court that it was

DE:4862-4403-2685.1 96859.001

"effectuat[ing] an orderly, value-maximizing winddown of their businesses for the benefit of all parties in interest." *See* Doheny Decl. ¶ 19.[6]

77.     Thus, by July 28 when the Union's strike threat forced Yellow to lay off most the companies' employees, Yellow was no longer operating as a going concern.  Instead, its only function by that time was to liquidate its assets.  Accordingly, Yellow was not an "employer" when the layoffs occurred and thus the federal and state WARN Acts did not apply to it.  All the claimants' WARN-related claims fail for this reason alone.

**C.     The WARN Acts Do Not Require Yellow To Provide Earlier Notice Under The Faltering Company Exception As It Was Actively Seeking Savings And Financing That Would Have Rescued The Company.**

78.     The faltering company exception requires the defendant to show that "(1) it was actively seeking capital at the time the 60–day notice would have been required, (2) it had a realistic opportunity to obtain the financing sought, (3) the financing would have been sufficient, if obtained, to enable the employer to avoid or postpone the shutdown, and (4) the employer reasonably and in good faith believed that sending the 60-day notice would have precluded it from obtaining the financing." *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 246-47 (3d Cir. 2008).  Actively seeking capital means "'seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of *internally generated financing*; or the employer must have been seeking additional money, credit or business through any other commercially reasonable method.'" *Id.* at 249 (emphasis added) (quoting 20 C.F.R. § 639.9(a)(1)).

---

[6]     These facts distinguish this case from *In re Start Man Furniture, LLC*, where the debtor continued operating its normal business selling furniture after filing for Chapter 11, and after the company was shut down its counsel stated that it hoped the shutdown would be temporary and that outright liquidation could be avoided.  647 B.R. 116, 122-23, 130 (D. Del. 2022).  By contrast, Yellow had begun the process to stop accepting new shipment orders and thus ended its business before laying off its employees, and expressly stated that it intended to liquidate.

###### i.     The Savings From One Yellow Satisfy The Exception.

79.     Yellow was seeking two types of financing in the months before the layoffs, both of which satisfy the faltering company exception.  The first type of financing was from the One Yellow initiative.  Proceeding with One Yellow would have allowed Yellow to achieve operational savings of approximately $22.85 million per month.  *APA* holds that the faltering company exception specifically applies to this kind of "internally generated financing," as well as "money" and "business through any other commercially reasonable method."  541 F.3d at 249.

80.     The savings from One Yellow satisfy all four elements of the faltering company exception.  *First*, Yellow was actively seeking to achieve the One Yellow savings 60 days before the layoffs, as well as before and after that period.  Yellow had already implemented Phase 1 from One Yellow in 2022, showing that it was committed to the project.  Throughout late 2022 and the first half of 2023, Yellow constantly sought to negotiate in good faith with the IBT to obtain the Union's approval of the Phase 2 CHOPS.  And Yellow repeatedly made concessions to the IBT in an effort to obtain its agreement to Phase 2.  These facts are sharply different from those in *APA*, where the debtor engaged in a single exchange with its lender and then sat around hoping the lender would offer additional financing.  *Id.* at 249.  By contrast, here Yellow took the initiative to reach out to the IBT numerous times, for months before the layoff.  The only reasons Phase 2 did not proceed was because of the IBT's unyielding intransigence, not for Yellow's lack of effort.

81.     *Second*, looking from an objective viewpoint at the time, and without the benefit of hindsight, Yellow had a realistic opportunity to achieve One Yellow.  Phase 1 of the initiative had proceeded smoothly.  The IBT agreed to the One Yellow Phase 1 CHOPS without issue, providing no hint that it would oppose the remaining Phases.  Yellow implemented the Phase 1 operational changes, and as a result Yellow achieved in the fourth quarter of 2022 its best quarterly operating

28

income in 16 years. As for Phase 2, as explained previously, a reasonable similarly situated company would have understood the IBT's apparent obstinance as an attempt to extract concessions. Indeed, in prior times such as 2009-10, 2014, and 2020, the Union had eventually cooperated with Yellow to make necessary changes for the Company's survival. And even here, the IBT eventually did conditionally agree to these changes during negotiations from July 23 to 25; while that agreement turned out to come too late, it further confirms that Yellow had a realistic opportunity to proceed with Phase 2. Based on the circumstances at the time, a reasonable company would *not* have expected the IBT to destroy the Company through a strike threat rather than agree to a CHOPS similar to the one it had agreed to less than a year earlier.

82.    *Third*, the operational savings from One Yellow would have allowed the Company to avoid (or at least postpone) any shutdown. After Phase 1, the Company had its best quarterly operating income in over a decade. Achieving Phase 2 would have provided approximately $22.85 million per month. This nearly $275 million annually obviously is substantial and would have allowed Yellow to maintain and improve its liquidity, while also refinancing its debt coming due in 2024 and 2026. Such a significant improvement in operating income also would have made Yellow more attractive to potential investors, such as the one Ducera was negotiating with.

83.    *Fourth*, that sending a 60–day notice would have precluded Yellow from obtaining the financing it sought is obvious. One Yellow depended on its employees agreeing to operational changes to integrate Yellow while continuing to provide a high level of service to customers. Sending a notice that the Company was laying off nearly all employees would have caused all employees to start looking for other jobs, severely disrupting the Company's operations. Such a notice also would have caused the Company's lenders to demand greater protection, draining Yellow's liquidity and hastening its demise. Where the layoffs involve the Company shutting

29

down, this element is easily satisfied.  "As long as Debtor's management had a reasonable prospect of securing either additional loan money or a capital investment, it is unreasonable to expect a 60 day notice of plant closing to have been given, since that would have foreclosed the possibility of staying open."  *In re Old Electralloy Corp.*, 162 B.R. 121, 125-26 (Bankr. W.D. Pa. 1993).

### ii.  Yellow's Attempts To Obtain New Financing Satisfy The Exception.

84.     Separately, Yellow's attempts to refinance its loans to obtain additional liquidity also qualify under the faltering company exception.  *First*, in the relevant time period in late May and early June, Yellow was actively seeking financing.  On May 26, 2023—squarely within the relevant time period—Yellow's investment bank Ducera sent a proposal to Yellow's existing lenders to modify the loans to improve liquidity, including freeing up collateral that would have allowed Yellow to bring in additional financing and thus cash to increase liquidity.  On June 5, Ducera contacted new potential asset-based lenders to refinance the Company's existing asset-based loans to provide additional cash and liquidity.  On the same date, Ducera also entered into negotiations with the Company's existing asset-based lenders to potentially modify the borrowing base, again with the goal of bringing in additional cash to enhance Yellow's liquidity.  On June 8, Ducera began discussions with private equity fund Atlas Holdings regarding a potential debt or equity investment in Yellow that would have provided additional cash and liquidity, which continued throughout June and July.  Thus, this is not a case where a debtor was sitting around, *cf. APA*, 541 F.3d at 249, as Yellow hired an investment banker who was actively pursuing refinancing, new financing, and new investments during the relevant time period, sending proposals to old and new lenders and negotiating with potential investors.

85.     *Second*, Yellow had a realistic opportunity to execute these refinancings, new financings, and potential new investment.  Several lenders and investors targeted by the Debtors

had discussions with Ducera and were willing to negotiate over potential financing. In particular, private equity fund Atlas Holdings had repeated calls and meetings to explore an investment in Yellow, performing substantial due diligence toward a new investment. To be sure, Yellow proceeding with the One Yellow initiative would have improved the chances of Yellow obtaining this financing. But even with the IBT's obstinance, these negotiations show that Yellow at least had a "realistic opportunity" of obtaining this financing.

86.     *Third*, the relevant legal question for this element is whether the financing would have been sufficient to "avoid *or postpone* the shutdown," and the refinancings and investments Yellow was exploring through Ducera would at least have postponed the shutdown. *APA*, 541 F.3d at 246-47 (emphasis added). The express goal of each of these options was to provide Yellow with additional cash and improve its liquidity. While achieving One Yellow was necessary to put the Company on a firm long-term economic footing, the extra money from potential refinancing, financings, and investments would have postponed any shutdown.

87.     *Fourth*, as with the savings from One Yellow, there can be no doubt that announcing a layoff of nearly all employees in late May or early June would have destroyed Yellow's attempts to refinance or obtain new financings or investments. No lender or investor would have wanted to invest money in a company that clearly was in the process of liquidating. Thus, for these two independent reasons Yellow satisfies the faltering company exception.

**D.     The WARN Acts Do Not Require Yellow To Provide Earlier Notice Because Unforeseeable Business Circumstances—The IBT's Strike Threat—Caused The Layoffs.**

88.     WARN does not require an employer to provide sixty days' notice when the closing is "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C.A. § 2102(b)(2)(A). Important indicators of whether layoffs

31

fall within the unforeseeable business circumstances exception include whether the circumstances are "sudden, dramatic, unexpected, [and/or] outside of the employer's control." *Elsinore*, 173 F.3d at 185.   "When determining whether a closing was caused by unforeseeable business circumstances, [courts] evaluate whether a 'similarly situated employer' in the exercise of commercially reasonable business judgment would have foreseen closing." *Id.* at 186.   "What is a harbinger of disaster in one context may be an everyday occurrence in another." *Id.* "Courts evaluate the [unforeseeable business circumstances] exception objectively, at the time the decisions were made, and not with the benefit of 20/20 hindsight." *AE Liquidation I*, 556 B.R. at 618.

89.    The WARN Act is not triggered by layoffs merely being "possible"; instead, layoffs must be "probable."  The Third Circuit has held "that the WARN Act is triggered when a mass layoff becomes probable—that is, when the objective facts reflect that the layoff was more likely than not." *AE Liquidation II*, 866 F.3d at 530; *see also Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005); *Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760, 765 (6th Cir. 2002); *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998).   "Companies in financial distress will frequently be forced to make difficult choices on how best to proceed, and those decisions will almost always involve the possibility of layoffs if they do not pan out exactly as planned." *AE Liquidation II*, 866 F.3d at 530.  Thus, "the triggering event does not need to be an 'out-of-the-blue' event" to satisfy the exception. *Jevic*, 496 B.R. at 161.

90.    For example, in *Elsinore*, the Third Circuit held that a casino being shut down by the state was unforeseeable even though the state Division of Gaming Enforcement had recommended the casino be closed.  173 F.3d at 187.  Even though that recommendation raised the possibility of a shutdown, it had to be balanced against other efforts to keep the casino open

DE:4862-4403-2685.1 96859.001

and the government's historical reluctance to shut down casinos, which made an ultimate shutdown unforeseeable.  *Id.*  Similarly, *AE Liquidation II* held that a mass layoff was not probable even though a deal to purchase the debtor was delayed, some of the debtors' disinterested directors were skeptical of the deal's financing, and they began contemplating liquidation.  866 F.3d at 531.

91.     Binding precedent also addresses the time frame this Court examines to determine if the circumstances causing the layoffs were unforeseeable.  An "employer may validly assert the unforeseeable business circumstance exception unless closing is foreseeable 60 days in advance and within a 14-day window."  *Elsinore*, 173 F.3d at 185.  This timing rule arise from the 60-day notice period, and DOL regulations stating that the notice must provide a 14-day window during which the closing is expected to occur.  *Id.*  Here, Yellow's layoffs occurred on July 28 and July 30, 2023, and thus the relevant time frame for determining whether the layoffs' cause was unforeseeable is May 22 to June 7, 2023.

92.     During the period in late May and early June when (in hindsight) notice would have been required, Yellow could not have foreseen that the IBT would decide to sacrifice Yellow along with 22,000 unionized jobs.  Yellow did not consider this a "possibility," much less the legally required "probability."  During this time, while the Company was facing liquidity concerns, its business was generally stable.  Yellow was regularly receiving orders for and delivering more than 40,000 packages daily.  Yellow had sufficient total liquidity—such as having nearly $157 million on June 5.  While Yellow could foresee its liquidity declining, the Company also planned measures—such as selling a terminal in Compton, California, for $80 million and negotiating with existing lenders and potential new financiers—that would extend the Company's liquidity and allow it to keep negotiating with the IBT.

DE:4862-4403-2685.1 96859.001

93.    Moreover, Yellow was actively negotiating with the IBT and repeatedly made concessions that Yellow reasonably believed would cause IBT to allow One Yellow Phase 2 to proceed.  These concessions included allowing the union membership to vote on the revised CHOPS, accepting the demand to re-open the CBA, and agreeing to a pay increase.  Yellow also reached out to union-friendly politicians for their aid in negotiating with IBT.  Starting in late May and extending through late July, Yellow was employing investment bank Ducera to negotiate with Yellow's existing and new potential lenders to increase its cash reserves and seek an investment from Atlas.  All these actions further demonstrate that there was no objective reason to believe that the Union would force Yellow to shutter.  If Yellow had realized that the IBT would destroy the Company at the end of July, it would not have bothered with any of these efforts.

94.    The IBT's rhetoric through June 7—and even up to July 16—did not include a strike threat, which is what ultimately caused the Company's end.  Moreover, Yellow's view of the IBT's conduct must be put in the context of the history of Yellow-IBT negotiations specifically, as well as union-employer negotiations generally.  As for the specific history, Yellow knew that the IBT had not issued strike threats previously, even when it had the right to do so in 2014.  Similarly, the IBT had previously worked with Yellow to preserve the Company in challenging financial circumstances.  These included the IBT seeking to have Central States agree to deferring Yellow's contributions, as had happened in 2010 and 2020—and as would eventually happen again on July 23, 2023.  Yellow's belief based on history and logic was that the IBT, while engaging in hard bargaining, would not destroy the Company.

95.    Yellow's understanding of the IBT's position must be understood in the context of employer-union negotiations generally.  As the Third Circuit has held, a court must "evaluate whether a '*similarly situated employer*' in the exercise of commercially reasonable business

34

judgment would have foreseen closing." *Elsinore*, 173 F.3d at 186 (emphasis added).  A reasonable similarly situated employer—that is, one with a unionized work force—would believe that union obstinance was a typical negotiating tactic to extract concessions from the employer, not a suicide pact to destroy the Company and over 22,000 union jobs.  That is, the IBT's statements in the first half of 2023 "must be viewed in the context of collective bargaining, which is a robust and dynamic negotiation process where leverage is sought through posturing." *N. Am. Airlines, Inc. v. Int'l Bhd. of Teamsters, AFL-CIO*, 2005 WL 646350, at \*14 (S.D.N.Y. Mar. 21, 2005); *see also NLRB v. WPIX, Inc.*, 906 F.2d 898, 902 (2d Cir. 1990) (describing negotiation where union "dismissed certain company proposals as being 'ridiculous' or a 'slap in the face' to the bargaining unit" and "both sides engaged in some exaggeration, posturing and dilatory tactics").  "Employers and unions can be expected to take aggressive bargaining positions and freely threaten dire consequences when they are rejected." *Fed. Exp. Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 964-65 (D.C. Cir. 1995); *see also N. Am. Airlines*, 2005 WL 646350, at \*14 (rejecting employers' arguments that IBT engaged in self-help, such as work slowdowns, during negotiations:  "what the record reveals is much posturing and bravado of a type that is often found in labor negotiations").  "What a party tells its partisans during negotiations, perhaps to rally support, may well have little bearing on the terms of employment that party ultimately accepts." *WPIX*, 906 F.2d at 902.

96.    In addition to this general context of union-employer negotiations, Yellow had no reason to believe that the IBT would irrationally destroy the Company and put 30,000 employees— including 22,000 union employees—out of work.  Yellow presented its financial information to the IBT, and thus the Union could see the operational and liquidity challenges the Company faced and the need for One Yellow.  Even after the IBT announced its strike threat, a reasonable

employer in Yellow's circumstances would have believed the threat was another effort to extract more concessions, and that the strike could be averted.  In fact, the IBT did withdraw its strike threat on July 23—just as a reasonable, similarly situated employer would have expected, especially given the Yellow-IBT bargaining history in 2010, 2014, and 2020—but unfortunately the damage of driving away Yellow's customers had already been done and the IBT's withdrawal came too late.  Neither Yellow nor any other similarly situated employer would have foreseen— not just as a possibility, but as a probability—that IBT would deliberately put the Company out of business to the detriment of tens of thousands of its own members.

97.    Even after June 7, 2023, Yellow had no objective reason to see a mass layoff as probable.  While the Company's liquidity was decreasing, its shipments were stable through July 17.  Yellow continued to negotiate with—and make concessions to—the IBT in the belief that the union would agree to One Yellow Phase 2 and save 22,000 unionized jobs before Yellow ran out of liquidity.  Yellow continued to take steps, including through Ducera, to renegotiate its loans to raise fresh cash as well as obtain a liquidity injection from Atlas, to maintain its liquidity and continue normal operations.

98.    Even after the July 17 strike threat, which came less than two weeks before the layoffs, the objective circumstances show that mass layoffs were not a probability.  Yellow filed a suit to enjoin any strike, and its motion was not denied until July 21, demonstrating that Yellow was working to avoid any strike and preserve the Company.  Yellow also continued to seek all avenues to negotiate with the IBT.  Those efforts eventually were successful on July 23 and the following days, when the IBT withdrew its strike threat and finally conditionally agreed to the One Yellow Phase 2 changes.  The IBT's own actions demonstrate that it must have believed the Company could have been saved, as otherwise there would have been no point in negotiating with

DE:4862-4403-2685.1 96859.001

Yellow.  Moreover, Ducera's communications with Atlas on and after July 18 showed that Atlas was still interested in investing in Yellow even after the strike threat.  Even through July 25, Yellow had been negotiating with IBT and providing it with information regarding Yellow's communications with the federal government so that the IBT could use its government contacts to seek relief.  Only at that point, as Yellow's shipment pickups fell near to zero on July 26, did the fact that the strike threat's damage was irreparable become apparent.  Thus, not until July 26 did the end of the Company and resulting mass layoffs become a probability.

99.     In sum, during the relevant period from May 22 to June 7, 2023—and even afterward—Yellow was vigorously negotiating in good faith to obtain the IBT's consent to the Phase 2 CHOPS and taking other steps to shore up its liquidity and continue operating for the foreseeable future.  Even after the IBT's strike threat, Yellow continued its efforts to save the Company, and that those efforts had a reasonable probability of success is supported by the Union's conduct from July 23 to 25 and Atlas's continued interested in Yellow.  Yellow did not foresee that the Union would drive it out of business and destroy more than 20,000 jobs of its own members, and for that reason, Yellow is exempted from the notice period of the federal WARN Act and all state acts recognizing this exception.

**E.     Yellow Acted In Good Faith In Not Issuing WARN Notices Sooner, Which Would Have Destroyed Its Attempts To Save The Company.**

100.     If an employer acted "in good faith and [] the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section."  29 U.S.C. § 2104(a)(4).  The facts here, both from the viewpoint of Yellow and an objective reasonable company, establish that Yellow acted in good faith in not providing earlier notice of the layoffs.  Not until July 26— as Yellow's customers had fled, its shipment pickups approached zero, the IBT's belated

conditional agreement to Phase 2 proved too little too late, and the board of directors contemplated bankruptcy—did both Yellow's subjective belief and the objective facts show that the Company could not be saved.

101.    During the late May to early June time frame where—in hindsight—notice would have been provided, Yellow had no reason to believe notice was required.  The Company's business was stable.  Liquidity was a concern, but the Company had enough money to operate and was developing methods to preserve liquidity.  The Company was actively attempting to negotiate with the IBT to proceed with One Yellow Phase 2.  The Company had impressed on the IBT the need for proceeding with Phase 2, including through providing financial information.  Based on Yellow's negotiating history with the IBT, Yellow reasonably expected that the IBT would not destroy the Company.  The Company also was negotiating with its existing creditors, potential new creditors, and private equity fund Atlas for cash that would improve its liquidity.  Given all these facts, Yellow had no reason whatsoever to believe than in late May to early June the Company would cease to exist two months later.  Accordingly, Yellow had no reason to issue WARN notices, as during late May and early June it reasonably believed no layoffs would be necessary, much less that the Company would collapse.  Indeed, issuing WARN notices at that time would have guaranteed the Company's end with no benefit to its workers or other stakeholders.

102.    Even after the period 60 days before July 28 and July 30, events showed the Company had no reason to expect a mass layoff through July 17.  To be sure, once the IBT issued its strike threat, the danger to the Company increased, but Yellow continued to believe the Company would survive, and that belief is supported by the objective facts.  Atlas was still interested in investing in Yellow after July 18, even with knowledge of the strike threat.  Yellow

believed its court action could stop the Union from striking.  While that effort failed, the judge's prophetic words appear to have caused the IBT to negotiate in good faith.  From July 23 to July 25, Yellow and the IBT negotiated, with the IBT withdrawing its strike threat and then conditionally agreeing to the Phase 2 operational changes.

103.    "Accordingly, even if the Debtor had violated the WARN Act, the mitigating circumstances would negate any penalty." *Old Electralloy*, 162 B.R. at 126.

**F.    Yellow's WARN Notices Satisfy All The Requirements For The Exceptions To Apply.**

104.    Under the faltering company and unforeseeable business circumstances exceptions (though not when an entity is a liquidating fiduciary), an employer "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3); *see also* 20 C.F.R. § 639.7(d) (further discussing the notice's content).  Yellow's WARN notices easily satisfy both these requirements.

105.    As for timing, the DOL's own regulations acknowledge that "the employer must give as much notice as is practicable … and this may, in some circumstances, be notice after the fact." 20 C.F.R. § 639.9.  Third Circuit precedent similarly holds that "as much notice as is practicable" can be after-the-fact notice.  In *AE Liquidation II*, the company informed its employees they were being furloughed indefinitely on February 18, 2009.  866 F.3d at 521.  On February 24, after a sale of the company fell through, the company sent all employes an email stating that their furloughs were being converted to a layoff effective February 19. *Id.* at 524-25.  Even though the WARN notice was not sent until five days after the layoffs occurred (the notice was sent on February 24 for layoffs effective February 19), the Third Circuit held it was sufficient. *Id.* at 524-25; *see also AE Liquidation I*, 556 B.R. at 624-25 (rejecting plaintiffs' argument that after-the-fact notice cannot satisfy the WARN Act, and holding that the employer's five day after-

the-fact notice constituted "as much notice as practicable under the circumstances, even if it was

after the fact"); *Butler v. Fluor Corp.*, 511 F. Supp. 3d 688, 719 (D.S.C. 2021) (holding that notices

provided on August 4 and 9-10 was "as soon as practicable" after layoffs occurred on July 31); *see*

*generally Old Electralloy*, 162 B.R. at 126 (notice given the day of the layoff was sufficient).

106.    Here, Yellow sent a warn notice on July 31, 2023, for layoffs of unionized

employees that occurred on July 30—just a day before—and a smaller number of non-union

employees laid off on July 28.  These time periods of one and three days are less than the five days

at issue in *AE Liquidation* and the four to ten days in *Butler*.  Moreover, this timing was as soon

as practicable given Yellow's efforts up until the last moment to save its employees' jobs.  As

explained previously, the IBT withdrew the strike threat on July 23.  Over the next days through

July 25, Yellow and the IBT negotiated the Union's conditional agreement to the One Yellow

Phase 2 operational changes, and Yellow encouraged the IBT to seek federal government

intervention that could sustain the Company.  Only afterwards, on July 26, did it become apparent

that the strike threat's damage was irreversible.  At this point, Yellow needed time to prepare and

send WARN notices to tens of thousands of employees, which required the few days to July 31.

*Compare Butler*, 511 F. Supp. 3d at 719 (holding a lengthier delay was "as soon as practicable"

because of "the presence of thousands of workers at the job site, and the abrupt nature of the

shutdown").  Thus, Yellow "g[a]ve as much notice as is practicable" under the circumstances.

107.    The notices also "give a brief statement of the basis for reducing the notification

period." 29 U.S.C. § 2102(b)(3).  The notices explain that the Company could not provide earlier

notice of the shut down because it qualifies under the "unforeseeable business circumstances,"

"faltering company," and "liquidating fiduciary" exceptions set forth in the WARN Act.  Hawkins

Decl. ¶ 110.  Specifically, the notice to unionized employees explains that the "Company had

hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so." *Id*. "These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated." *Id*. The notices also explain that the closure is permanent, all employees were being terminated, and no bumping system (where a more senior employee displaces a more junior one) or other jobs opportunities will be available. *Id*.

108.    Moreover, Third Circuit precedent holds that the sufficiency of the notice should be considered in light of other communications made to employees. In *Kalwaytis v. Preferred Meal. Sys., Inc.*, Preferred Meal Systems sent a WARN notice to employees on June 26, 1992 saying they would be laid off but that it would contract with another company, Culi-Services, to offer employment to those workers. 78 F.3d 117, 119 (3d Cir. 1996). On July 10, Preferred sent another letter stating that Culi-Services would not be offering employment to all workers, and any employment offers would depend on Culi-Services' discretion. *Id*. *Kalwaytis* explained that the WARN Act reflects "[f]lexibility in the notice requirement" and considered the two letters together to conclude "they do meet the statutory requirements of notice." *Id*. at 121-22. Relying on *Kalwaytis*, *AE Liquidation I* later held that "the Third Circuit has allowed that multiple communications to employees, read together, may satisfy the statute." 556 B.R. at 626; *see also id*. at 618 (holding that the "Court may also consider whether multiple communications to employees, read together, satisfy the statute"). *AE Liquidation I* expressly rejected the employees' argument that "piecemeal communications" were insufficient, and then considered together a February 18 email announcing furloughs and a February 24 email converting the furloughs to permanent layoffs in determining that this content was sufficient to satisfy the WARN Act. *Id*. at

41

626 ("the Court finds no genuine issue of material fact that these communications, considered together, contain the information required by the statute").

109.     Yellow sent several written communications to its employees in June and July 2023 explaining the circumstances facing the Company, and that should be considered in conjunction with the July 31 WARN notices.  Hawkins Decl. ¶¶ 69, 71, 75, 76, 78, 96.  For example, a June 8, 2023 letter explained the need to Complete One Yellow, discussed the militant talk of IBT President Sean O'Brien, and stated that "the reality is that, until the IBT leadership stops the posturing and deals with the reality of the current situation, he is leading you down a road to ruin." *Id.* ¶ 69.  A June 21 letter, in explaining why Yellow was deferring payments to Central States, stated that as "a consequence of our inability to proceed with One Yellow, combined with the challenging business conditions confronting the entire [] industry, Yellow has recently been operating at a loss as it continues to serve its customers." *Id.* ¶ 75.  On July 20, Yellow sent another letter explaining it had offered a wage increase to "clear[] a path to advance One Yellow.  All stakeholders – lenders, shareholders, employees, and customers need to see progress." *Id.* ¶ 96.  These repeated communications further detailed why Yellow eventually failed and why WARN Act notice could not be provided earlier:  the Company was continually attempting to negotiate with the IBT to allow the essential One Yellow initiative, and the IBT's refusal to bargain in good faith could end the Company.  Sadly, that is exactly what happened.  No reasonable employee can claim that they did not know why Yellow conducted a mass layoff or why it could not have given notice sooner.

## COMPLIANCE WITH BANKRUPTCY RULE 3007(e)

110.     The Debtors respectfully submit that this Objection complies with the requirements for omnibus objections set forth by Bankruptcy Rule 3007(e).  Namely, the Debtors have created

a form of notice that shall be served upon each claimant affected by this Objection. Such notices' exhibits prominently identify the claimant's: (a) name; (b) address; (c) applicable claim number; and (d) proposed treatment pursuant to the Objection.

111.    As a result, each claimant can readily identify its claim and proposed treatment and respond accordingly. The proposed form of order further identifies each claimant by category of claims subject to objection. This Objection complies with Bankruptcy Rule 3007(e) and Local Rule 3007-1. To the extent that the Objection not be found to comply in all respects with Local Rule 3007-1, the Debtors respectfully request that any such requirement be waived.

## <u>RESPONSES TO THE OBJECTION</u>

112.    <u>Filing and Service of Responses</u>: To contest the Objection, a Claimant must file and serve a written response to the Objection (a "<u>Response</u>") so that it is actually received by the Clerk of the Bankruptcy Court and the parties in the following paragraph no later than **March 26, 2024 at 4:00 p.m. (ET)** (the "<u>Response Deadline</u>"). Claimants should locate their names and claims in this Objection, and carefully review the Proposed Order and the exhibits attached thereto. A Response must address each ground upon which the Debtors object to a particular claim. A hearing (the "<u>Hearing</u>") to consider the Debtors' Objection shall be held on **April 11, 2024, at 10:00 a.m. (ET)**, before the Honorable Craig T. Goldblatt, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, 3rd Floor, Courtroom No. 7.

113.    Every Response must also be served upon the following persons at the following addresses:

DE:4862-4403-2685.1 96859.001

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com
              pkeane@pszjlaw.com
              ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              david.seligman@kirkland.com
              michael.slade@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        allyson.smith@kirkland.com

114.    Content of Responses: Every Response to the Objection must contain, at a minimum, the following:

(a)    a caption setting forth the name of the Court, the above-referenced case number and the title of the Objection to which the Response is directed; the name of the Claimant and description of the basis for the amount of the Claim;

(b)    a concise statement setting forth the reasons why a particular Claim should not be disallowed for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which the claimant will rely in opposing the Objection at the Hearing;

44

(c)       all documentation or other evidence of the Claim in question, to the extent not already included with the Claimant's proof of claim, upon which the claimant will rely in opposing the Objection at the Hearing;

(d)       the name, address telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the Claimant; and

(e)       the name, address, telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) to whom the Debtors should serve any reply to the Response.

115.    <u>Timely Response Required; Hearing; Replies</u>: If a Response is properly and timely filed and served in accordance with the above procedures, the Debtors will endeavor to reach a consensual resolution with the applicable Claimant.  If no consensual resolution is reached, the Court will conduct the Hearing with respect to the Objection and the Response on **April 11, 2024 at 10:00 a.m. (ET)**, or such other date and time as the parties filing Responses may be notified. Only those Responses made in writing and timely filed and received will be considered by the Court at any such hearing.

116.    <u>Adjournment of Hearing</u>: The Debtors reserve the right to adjourn the Hearing on any Claim included in this Objection.  In the event that the Debtors adjourn the Hearing, they will state that the Hearing on that particular Claim referenced in this Objection, and/or Response, has been adjourned on the agenda for the Hearing on this Objection, which agenda will be served on the person designated by the Claimant in each Response.

117.     If a Claimant whose Claim is subject to the Objection, and who is served with the Objection, fails to file and serve a timely Response in compliance with the foregoing procedures, the Debtors will present to the Court an appropriate order <u>without further notice to the Claimant</u>.

118.     <u>Separate Contested Matter</u>: Each of the Disputed Claims and the Debtors' objections thereto, as asserted in this Objection, constitutes a separate contested matter as contemplated by Bankruptcy Rule 9014.  The Debtors request that any order entered by the Court with respect to an objection asserted herein shall be deemed a separate order with respect to each such Amended Claim and/or Duplicate Claim.

## **<u>RESERVATION OF RIGHTS</u>**

119.     By filing this Objection, the Debtors object to all No Liability Employee WARN Claims because the No Liability Employee WARN Claims present the same legal and factual issues.  However, many of the WARN-related proofs of claim combine WARN-related assertions with additional, unrelated assertions, some of which might be legitimate and others which, in the Debtors' view, are not.  To object to the WARN-related assertions together with these unrelated bases for objection would be inefficient and distract from the WARN issues at hand.  The Debtors therefore intend to file additional substantive and non-substantive objections to the additional, non-WARN related portions of the WARN-related proofs of claims, to the extent that the Debtors deem it necessary and appropriate to do so.  As such the Debtors expressly reserve the right to amend, modify, or supplement this Objection and to file additional objections to any proofs of claim filed in these Chapter 11 Cases including, without limitation, objections as to the liability, amount or priority of any Claims, including the No Liability Employee WARN Claims identified on Schedule 1 to the Proposed Order, and, to the extent necessary, seek relief from Local Rule 3007-1 in order to do so.

DE:4862-4403-2685.1 96859.001

**NOTICE**

120.    The Debtors shall provide notice of this Objection on the following parties, or their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the Committee and Akin Gump Strauss Hauer & Feld LLP as counsel to the Committee; (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) each of the claimants identified on Schedule 1; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

121.    No prior request for the relief sought in this Objection has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as is appropriate under the circumstances.

DE:4862-4403-2685.1 96859.001

Dated:  March 12, 2024
Wilmington, Delaware

*/s/ Peter J. Keane*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                tcairns@pszjlaw.com
                pkeane@pszjlaw.com
                ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                david.seligman@kirkland.com
                michael.slade@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

DE:4862-4403-2685.1 96859.001