## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### THE FUNDS' MOTION *IN LIMINE* TO EXCLUDE
### THE AMENDED EXPERT REPORT AND TESTIMONY OF ROBERT T. CAMPBELL

The Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan ("Central PA Teamsters"), the International Brotherhood of Teamsters Union No. Local 710 Pension Fund ("Teamsters Local 710"), the New England Teamsters Pension Fund ("NETTI"), and the Teamsters Joint Council No. 83 of Virginia Pension Fund ("Virginia Teamsters"; together, the "Funds"), by and through their undersigned counsel, respectfully submit this motion *in limine* (the "Motion") pursuant to Rule 702 of the Federal Rules of Evidence ("Rule 702"), made applicable to these proceedings by Rule 9017 of the Federal Rules of Bankruptcy Procedure, to exclude the expert report of Robert T. Campbell and any testimony related thereto.

### PRELIMINARY STATEMENT

1.      The Debtors' objections to the Funds' withdrawal liability claims rest entirely on the expert opinion of an actuary, Robert T. Campbell, who, prior to this case, does not remember ever performing a withdrawal liability calculation.  Campbell does not have the expertise to offer the Court any opinion that is relevant or reliable.   His opinions should therefore be excluded.

---

[1]      A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is:  11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

2.      First, Campbell's career has been almost entirely focused on single-employer pension plans (which do not assess withdrawal liability, as only one employer contributes to the plan), and he testified at deposition that he could not recall if he *ever* performed a withdrawal liability calculation for a multi-employer pension plan ("MEPP").  Experience in the "pension field," however extensive, that almost never intersected with MEPPs or withdrawal liability does not qualify Campbell to criticize the withdrawal liability calculations the Funds' actuaries performed here.  As Campbell is not qualified to opine on the matters he purports to address, his testimony should be disregarded.

3.      Second, Campbell admits that the primary opinion he offers—that the Funds' actuaries were required to use a particular assumption in calculating the unfunded vested benefits ("UVBs") of each Fund—is a legal conclusion.  Far from being a considered actuarial opinion, this position arises solely from Campbell's interpretation of ERISA, and not from experience or practice.  This legal opinion has zero probative value and is inadmissible.  Campbell has also provided deposition testimony in which he disclaims certain other opinions offered in his written report—those opinions, too, must be excluded.

4.      Third, Campbell opines that one Fund's calculations should be adjusted to reflect underlying data from the Debtors' records, which purportedly conflict with those of the Fund.  But the Debtors' records supporting this opinion do not satisfy Rule 702's reliability requirement.  The Debtors' records are facially and admittedly incomplete:  they do not account for different categories of employees, which results in an inaccurate assessment of the contributions those employees made (and, by necessary implication, an inaccurate calculation of the annual withdrawal liability payments owed to that Fund).  Adjustments to the Fund's calculations using

incomplete information are *per se* unreliable and must be disregarded; they certainly are insufficient to disturb the *prima facie* presumption of validity the Fund's claims enjoy.

5.      Fourth, Campbell's report does not appear to be the product of his own analysis. Campbell did not author his report alone. When originally submitted to the Funds, the expert report had two authors: Campbell, and John L. Spencer. Both were engaged by the Debtors as consulting experts working at Hilco Valuation Services, LLC ("Hilco"). In addition to the joint report the two submitted with respect to the Funds (the "Original Report"), they also submitted joint expert reports with respect to the withdrawal liability claims of Central States and the other MEPP claimants that received Special Financial Assistance (SFA). The Funds took the depositions of both Campbell and Spencer in connection with the Original Report; each testified that the other was essential to the final product. But nearly two months following those depositions, and days before the deadline for dispositive motions on the Funds' claims, the Debtors provided an amended report that removed Spencer's name but did not change any of the substantive opinions expressed in the Original Report. Now signed only by Campbell, this report (the "Amended Report") purports to be the expert opinion of Campbell alone. Setting aside the significant issue of waste of estate resources, the late removal of an author raises serious concerns about the integrity of the process by which this report was prepared and the opinions formed—if never necessary for the opinions, why was Spencer originally an author? Or if he was necessary, why were no substantive opinions removed from the Amended Report?

6.      Further concerning is Spencer's admission, during his deposition, that he and Campbell discussed their work in objecting to the Funds' claims with counsel to MFN Partners, a significant equity holder of the Debtors, before the Original Report was served on the Funds. This, too, calls into question the reliability of the opinions Campbell offers.

7.      The Court should exercise its gatekeeper function with respect to expert testimony and not admit the opinions offered in the Amended Report in connection with these proceedings. Campbell has no relevant experience, provides legal opinions, and premises his criticisms on unreliable data.  The opinions set forth in the Amended Report, and testimony by Campbell on the topics set forth therein, should be excluded from consideration in connection with the Debtors' objections to the Funds' claims.

## RELEVANT BACKGROUND

### A.      The Debtors Retain Spencer and Campbell

8.      On November 6, 2023, the Debtors executed an engagement letter with Hilco for the services of Spencer and Campbell as consulting experts in connection with these cases.  *See Declaration of Disinterestedness of Hilco Valuation Services, LLC* [Dkt. No. 1142], Exhibit 1 (the "Hilco Engagement Letter").  The letter was addressed to both Spencer and Campbell.  Spencer's billing rate is $1,325/hour; Campbell's is $950/hour.  *See* Hilco Engagement Letter at 1.

9.      Spencer is a Senior Managing Director at Hilco, and claims to have over 30 years of experience working on pension-related issues.  *See* Original Report, Appendix 1-2 (CV of John L. Spencer III).  Campbell is a Director at Hilco, and also claims to have over 30 years of pension-related experience.  *See* Amended Report, Appendix 1 (CV of Robert T. Campbell).  The vast majority of Campbell's experience is with pension plans that do not assess withdrawal liability: single-employer pension plans.  *See* Sept. 9, 2024 Campbell Dep. Tr. 31:14-16 ("I think if you look at my entire 41 years, yes, I'd say more that has been devoted to single-employer pension— pension plans."); *id.* at 32:12-14 (clarifying that recent experience with MEPPs "doesn't make up for all the many years of, you know, where the focus was mainly on single-employer plans[.]").  In all of Campbell's prior work with pension funds, Campbell has never opined on actuarial assumptions for purposes of valuing the unfunded vested benefits of a MEPP.  *See generally* Sept.

9, 2024 Campbell Dep. Tr. 46-51. Campbell cannot recall performing withdrawal liability calculations during his career. *See id.* at 71:13-22 ("Q. Have you ever performed a withdrawal liability calculation for a multi-employer pension fund? A. . . . I mean, I think I did 20-plus years ago. But more recently when I've done calculations for withdrawal liability it was to replicate the work that was done by the plan's actuary [.]").

10.      As far as the Funds are aware, Spencer and Campbell have jointly submitted three expert reports in these cases: one regarding Central States' proofs of claim, a second regarding the proofs of claim of the other SFA funds, and (in its original form) a third regarding the proofs of claim of the non-SFA funds (the Original Report). Campbell also submitted, alone, a rebuttal report regarding one of the non-SFA funds. When Campbell was asked why Spencer did not submit that rebuttal report together with Campbell, Campbell testified that the issues in that report were "entirely actuarial in nature" so "we thought it would be most appropriate for the report to be signed by just me." Sept. 10, 2024 Campbell Dep. Tr. 328:12-16. In that same deposition, Campbell confirmed Spencer was necessary for the Original Report. *See* Sept. 9, 2024 Campbell Dep. Tr. 19:21 – 20:8.

11.      From records submitted to the Court to date, through July 31, 2024, Campbell billed approximately 191 hours of work at $950/hour related to expert work on the Non-SFA Funds, and Spencer billed approximately 152 hours of work at $1,325/hour related to the same. *See* Hilco Fee Applications [Dkt. Nos. 3763, 3982, 4208]. Those figures largely reflect only the preparation of the Original Report (dated July 29, 2024), as they do not include any work on the Non-SFA Funds' claims from August through the present.

### B.    The Original Joint Report

12.      On July 29, 2024, the Debtors submitted the joint expert report of John L. Spencer III and Robert T. Campbell, titled "Expert Report: Non-SFA Pension Funds" (the Original Report)

in support of the *Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Dkt. No. 2595] (the "Objection").

13.     Both Campbell and Spencer offered deposition testimony in support of their joint report. Each testified that the other's work was crucial to the completion of the report. *See, e.g.*, Sept. 9, 2024 Campbell Dep. Tr. 19:21 – 20:8 ("Q. Mr. Campbell, your name is not the only name on this report. Right? A. Right. Q. Why is that? A. We, my colleague and I, John Spencer, are working together on this project. Or at least these seven pension funds and ten or 11 other, other ones. And we have combined our expertise, my [actuarial] expertise with John's pension expertise that kind of spans kind of more of the regulatory area as well. So that's sort of, you know, a combination of our skill sets and bringing our expertise."); *id.* at 20:16 – 21:3 ("Q. You mentioned that you and Mr. Spencer worked together in creating this report. Are there particular sections of this report that were your sections and particular sections that were Mr. Spencer's sections? A. I mean, we both participated in drafting all of the sections."); *see also* Sept. 11, 2024 Spencer Dep. Tr. 133:2-17 ("Q. Could Mr. Campbell have prepared the expert report without you? MR. ESSER: Objection to form. Calls for speculation. You can answer. A. I don't think that it would be reasonable or appropriate for anybody to compile such a – a report like ours by themselves. I think anybody who is doing something like that, putting together a report like ours that's so labor-intensive, detailed, and important should have, you know, at least one additional set of eyes on every part of it. And, I mean, so I don't think -- I don't think that should have happened, and that's not what happened here."); *id.* at 25:6-12 ("Q. Are there any portions of this report that you consider to be more your opinion than Mr. Campbell's opinion? A. I'm not sure what you mean by more my opinion or Mr. Campbell's opinion. This report represents our, Hilco's and - - so my opinions and Mr. Campbell's opinions.").

C.    **The Amended Campbell Report**

14.    On November 5, 2024, nearly two months after the depositions of each Spencer and Campbell, the Debtors submitted an "amended" report.  Spencer's name and signature were removed from the cover page, Spencer's background and CV were struck from the relevant sections, and all plural terms ("we," "our") were modified to singular ("I," "my").  *See* Redline Comparison of Amended Report.  No reason was given for this change.

D.    **Campbell's Proposed Opinions and Testimony**

15.    The Amended Report finds that (1) "[t]here were material errors and inconsistencies in the calculation of the Debtors' withdrawal liability in most of the Non-SFA Funds' proofs of claims" and (2) "[w]hen properly calculated, the Debtors' withdrawal liability to the Non-SFA Funds is substantially reduced or eliminated."  Amended Report at 2.  The Amended Report provides three "opinions" that purport to support these findings.

i.    *Opinion #1:  The Minimum Funding Rate (or Something "Similar") is the Only Reasonable Rate for Valuing UVBs*

16.    The Amended Report contends that the Funds' proofs of claim are "[m]aterially [o]verstated" primarily due to the Funds' use of "[e]xtraordinarily [l]ow" interest rates to value their unfunded vested benefits.  Amended Report at 12.  The correct interest rate to use for valuing the present value of the Funds' future benefit payments, according to Campbell, is the rate that funds use to determine their minimum funding requirements (variously referred to as the "minimum funding rate" or the "funding valuation rate") or something "similar" to it.[2]

---

[2]    In the Original Report, Campbell initially stated that he "would expect the interest rates used for purposes of calculating withdrawal liability to be the *same* as the interest rates used for determining each Fund's minimum required contributions."  Original Report at 14 (emphasis added).  At his deposition, however, Campbell walked away from his opinion that the interest rates should be the *same*; Campbell instead claimed they just need to be "similar, if not the same."  Sept. 9, 2024 Campbell Dep. Tr. 239:18-240:1 ("nobody is saying [the interest rates] are required to be the same").  The Amended Report follows suit, and now states that Campbell expects the

17.    This opinion is based not on experience calculating withdrawal liability for multi-employer pension funds or actuarial standards of practice, but on legal interpretation:  Campbell grounds this conclusion exclusively in the language of two provisions of ERISA.  *See* Amended Report at 12-13.  Section 1393(a)(1), which governs actuarial assumptions for determining UVBs (an exercise that requires comparing the present value of future benefit payments to the current value of the plan's assets), provides that UVBs must be based on "[a]ctuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan."  29 U.S.C. § 1393(a)(1).  Section 431(c)(3), on the other hand, provides that a plan's minimum funding requirements (which involves assessing the plan's rate of return on investments) shall be based on "[a]ctuarial assumptions and methods, each of which is reasonable (taking into account the experience of the plan and reasonable expectations), and which, in combination, offer the actuary's best estimate of anticipated experience under the plan."  26 U.S.C. § 431(c)(3).

18.    According to Campbell, because the language of these two ERISA provisions is "nearly identical," the only reasonable rate to use to value UVBs is a rate equal or similar to the minimum funding rate.  This is based only on his reading of the statutes—nothing more.  *See* Sept. 9, 2024 Campbell Dep. Tr. 94:12-24 ("Well, we would expect them to be the same or very similar in terms of the rate that was selected . . . This is our - - yes, our reading of the plain language of these two statutes, that's what we would expect.").  To the extent that any Actuarial Standards of Practice ("ASOP") (*i.e.*, professional guidelines for certified actuaries) require anything different,

---

interest rate for withdrawal liability to be "the same, *or very similar to*," the minimum funding rate.  *See* Amended Report at 13 (emphasis added).

Campbell believes that "the actuary must follow the applicable law"—here, ERISA. And Campbell's opinion that there is a conflict between the law and the ASOPs is, again, based entirely on his reading of ERISA. *See* Sept. 9, 2024 Campbell Dep. Tr. 98:19-99:5 ("Q. So do you think that the sections of ERISA quoted here require something different than what the Actuarial Standard of Practice 27 require?  MS. CHAN: Object to form, and to the extent it calls for a legal conclusion.  A. We think that the statutes as written here conflict with the - - in many cases, many of the funds' cases, the rates selected by the actuaries to measure withdrawal liability. Whatever the justification was, whether it was, you know, ASOP 27 or settlement basis or whatever.").

19.     Campbell admits that actuarial practice conflicts with his position, as a majority of practicing actuaries today use "something other than the funding valuation rate" to calculate withdrawal liability. *Id*. at 99:14-23.  But in Campbell's view, all actuaries who do not select the funding valuation rate (*i.e.*, the minimum funding rate) are acting unreasonably, and belong in "actuary jail." *Id*. at 100:7-15 ("Q. So it's your expert opinion that a majority of actuaries in the multi-employer pension space are using unreasonable assumptions?  MS. CHAN: Object to form. A. That sounds kind of harsh, but it - - yes, that common - - common practice is to use something other than what the statute calls for. And in opinion those - - the selection of those assumptions is and was unreasonable."); Sept. 10, 2024 Campbell Dep. Tr. 387:11-19 ("Q. So it's your expert opinion that a majority of multi-employer plans are currently using actuaries that are not in compliance with professional standards?  MS. CHAN: Object to form.  A. They are - - the actuaries are - - I mean, that's a - - there's a lot of - - a lot of actuaries that would go to actuary jail if this - - if this got - - if it was enforced.").

      ii.       *Opinion #2:  Certain of the Funds' "Proofs of Claims Reflected Incorrect Historical Contribution Data"*

20.     Campbell claims that for NETTI and Virginia Teamsters, "inaccurate contribution rates and contribution base units were applied in the calculation of the Debtors' withdrawal liability in the Funds' proofs of claim."  Amended Report at 15.  Due to alleged discrepancies between the Debtors' records and the contribution data as asserted in the Funds' proofs of claims, Campbell recalculates the Debtors' schedule of annual payments (the "Annual Payments") to these three Funds using the Debtors' data.  *See id*. at 16-20.  But with respect to Virginia Teamsters, the Debtors' own data is admittedly incomplete, unreconciled, and unreliable.  Further, the adjustment Campbell proposes to make to the NETTI Annual Payments is again grounded in a legal opinion, rather than an actuarial determination.

21.     *Virginia Teamsters*.  The Debtors' records forming the basis for Campbell's adjustments to Virginia Teamsters' withdrawal liability calculations are incomplete.  One of the records in question is an Excel spreadsheet titled "Joint Council 83 – Virginia Pension pay and units.xlsx" that sets forth the Debtors' contribution history to Virginia Teamsters, including the total annual dollar amount of contributions Yellow made to the Fund between 2014 and 2023 (the "Annual Remittances"), as well as contribution rates and purported contribution base units ("CBUs") for that same period.[3]  This spreadsheet states that its data is derived from "Wire & ACH"—the Annual Remittances sent to the Fund, rather than actual contribution unit records.[4]

---

[3]    Campbell confirmed that this spreadsheet was prepared by the Debtors, and that he used the information contained therein in forming his opinion.  Sept. 9, 2024 Campbell Dep. Tr. 212:10-22 ("Q. Is this a document you prepared? A. It's not something we prepared, no.  Q. Do you know who prepared this? […] A. […] I don't know who prepared it, but I suspect it was somebody at Yellow.  Q. But this is what you used to determine the contribution base units for the fund for each year. Correct? A. That's correct. And I think this will line up with what you see in the report.").

[4]    A separate spreadsheet reflecting monthly remittance dollar figures, only provided in connection with the Amended Report and not available to Virginia Teamsters at Campbell's deposition, confirms that its source, too, is "Wire & ACH" data.  *See* Amended Report at 20 n.57 (citing "Virginia JC 83 Years 2013 thru 2023.xlsx.").

Campbell confirmed that the Debtors do not have records of CBUs.  Instead, the Debtors "backed into the contribution base units by dividing the [Annual Remittance] by the rate."  Sept. 9, 2024 Campbell Dep. Tr. 214:19-23.  Campbell also confirmed that only a *single* contribution rate was used to "back[] in" to the CBUs for each year—the Debtors "assume[d] that everyone – every contribution to the fund [wa]s based on the same rate."  *Id.* at 213:10-13.

22.    But the Debtors made contributions to Virginia Teamsters at *two* different rates, as Campbell acknowledges.  *See* Amended Report at 19-20 (discussing a $97.40/week contribution rate for regular employees and a $10/week rate for "casual" employees).  Yet Campbell declines to factor in both contribution rates when "backing in" to the CBUs.  He attempts to justify this exclusion by "estimat[ing] that the contributions made for casual employees represented only about 2-3%" of the total.  *Id.*  But this "estimate," too, is based on shockingly incomplete data— the Debtors only have records reflecting the division between regular and casual employees for *one year* of the relevant ten-year period (2013-2022).  *See id.* at 20 n.56 ("The Debtors' records contained information regarding casual employees for Virginia Teamsters for the months January 2022 through July 2023 only.").  Despite these demonstrable omissions, Campbell relies exclusively on "the information in the Debtors' records" in recommending adjustments to the Annual Payments owed to Virginia Teamsters.  *See id.* at 18.[5]

23.    *NETTI*.  Campbell also relied on his own legal opinion when proposing amendments to the NETTI annual payment schedule.  Campbell claims that the Annual Payments must be calculated using contribution history from 2013-2022, notwithstanding NETTI's plan

---

[5]    Campbell suggests that alleged weakness in the Fund's internal controls justifies his choice.  But the referenced auditor's letter in fact refers to internal control over financial reporting as relates to the publication of financial statements, and expressly declines to express an opinion on the effectiveness of the Fund's internal controls generally.  *See* TJC83_0000049 (communication of internal control matters based on financial statement audit for year ended Dec. 31, 2021); Amended Hilco Report at 18 n.55.  This is certainly an insufficient reason to rely instead on records that lack data for an entire category of employees.

documents requiring otherwise.  Campbell explained during his deposition that ERISA requires the Annual Payments to be calculated using the most recent 10 years of contribution data because "it's our understanding that PBGC approval is not available for any kind of alternative methodology for determining withdrawal liability payments."  Sept. 9, 2024 Campbell Dep. Tr. 146:20-147:1.[6]  When asked what this understanding is based on, Campbell explained that "[i]t's based on my reading . . . of ERISA."  *Id*. at 147:13-14.

> iii.    *Opinion #3:  Central PA Teamsters, Teamsters Local 710, and Virginia Teamsters Must Adopt a "Fresh Start"*

24.    In calculating the UVBs allocable to the Debtors for Central PA Teamsters, Teamsters Local 710, and Virginia Teamsters, Campbell assumes that "each Fund would have taken a 'fresh start' approach to calculating withdrawal liability" because "each Fund would have had no UVBs at some point during the past ten years, if the present value of vested benefits had been determined using the funding valuation rate."  Amended Report at 25.  Specifically, Campbell claims that "Central PA would have had zero UVBs at December 31, 2021, but would have had a UVB greater than zero at December 31, 2022.  Local 710 and Virginia Teamsters would have had zero UVBs at December 31, 2020, and would not have had any UVBs thereafter."  *Id*.  Using this reasoning, Campbell claims that the Debtors owe an Annual Payment of $4,528,090 to Central PA Teamsters for only 1.5 years and owe absolutely no withdrawal liability to Teamsters Local 710 and Virginia Teamsters.  *See id*. at 27.

25.    Campbell confirmed, however, that a "fresh start" is not required under ERISA. Sept. 9, 2024 Campbell Dep. Tr. 166:21-25 ("Q. Does ERISA require employers to adopt a fresh start if given the opportunity to do so?  MS. CHAN: Object to form.  A. That's not my

---

[6]    Campbell stated that this was "our" understanding, meaning that of both himself and Spencer.  *Id*.  To the extent Campbell relied on Spencer in forming this conclusion, that opinion should no longer stand, as Spencer is no longer an author of the Amended Report.

understanding of ERISA; it's just that it's available."). Nor would it be unreasonable for a fund to choose *not* to adopt a fresh start. *Id*. at 168:14-22 ("Q. So is it your opinion that it is unreasonable for a fund not to adopt a fresh start? MS. CHAN: Object to form. A. Yeah, I don't think it's unreasonable."); *id.* at 172:2-10 ("Q. In your opinion, would it be unreasonable for Local 710 not to take a fresh start if it had the opportunity to do so? MS. CHAN: Object to form. A. I think it would be reasonable to -- definitely would be reasonable to adopt a fresh start. I don't know that it would be unreasonable not to. I mean, it's - - you know, it's their decision.").

## **LEGAL STANDARD**

26.     Rule 702 governs the admissibility of qualified expert testimony. Specifically, Rule 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993).

27.     In applying *Daubert* and determining whether expert testimony is admissible under Rule 702, the Third Circuit requires a court to consider three principal factors: (1) qualification, (2) reliability, and (3) fit. *See Calhoun v. Yamaha Motor Corp., USA*, 350 F.3d 316, 321 (3d Cir. 2003). First, the witness must have adequate knowledge, skills, and training with respect to the relevant subject matter. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). Second, to be considered reliable, the "expert must testify to scientific, technical or other specialized knowledge [that] will assist the trier of fact"; the proffered expert's testimony must be "based on the methods and procedures of science rather than on subjected belief or unsupported speculation." *Id*. at 742 (quoting *Daubert*, 509 U.S. at 590). Third, the expert's testimony must

"fit," meaning "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact" in understanding a fact in issue. *Calhoun*, 350 F.3d at 321.

28.     Under *Daubert* and its progeny, judges are charged to act as "gatekeepers" to exclude unreliable and irrelevant expert testimony. *See Daubert*, 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999). The "burden is placed on the party offering expert testimony to show that it meets each of the standards for admissibility." *Withrow v. Spears*, 967 F. Supp. 2d 982, 992 (D. Del. 2013); *accord, Chemical Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 588 (D. Del. 2004).

## ARGUMENT

29.     Campbell's testimony regarding adjustments to the Funds' withdrawal liability calculations must be excluded because it fails to satisfy all requisite factors: (1) he lacks the relevant qualifications, as his pension-related experience almost exclusively concerns funds that never assess withdrawal liability, (2) certain opinions are inadmissible legal opinions, and (3) his opinions are unreliable because they are based on admittedly incomplete data, unsupported conjecture, unreliable methods, or bias.

## I.      Campbell Lacks the Requisite Specialized Knowledge and Skill to Opine on Withdrawal Liability Calculations

30.     Campbell is not an expert in calculating withdrawal liability. Before this case, he cannot recall ever performing a withdrawal liability calculation. And though a certified actuary, his experience working with MEPPs is extremely limited. As Campbell lacks the experience necessary to opine on the central issue in these claim objections—how withdrawal liability should be calculated—his testimony must be excluded.

31.     Nearly all of Campbell's experience as an actuary is with single-employer pension funds. *See* Sept. 9, 2024 Campbell Dep. Tr. 31:14-16, 32:12-14. As Campbell acknowledges,

MEPPs are very different from single employer pension plans—the most crucial distinctions being that single-employer plans do not assess withdrawal liability, and minimum funding assumptions for single-employer plans are entirely different than for MEPPs. *See id.* at 33:9-34:6.  The vast majority of Campbell's experience advising or opining on pension-related matters did not involve any issues relevant to what he seeks to opine on here.

32.    The minimal MEPP-related experience Campbell does possess does not qualify him to opine on withdrawal liability calculations—particularly as Campbell cannot recall ever performing one. *See id.* at 32:21-33:1 ("Q. Did you ever perform a withdrawal liability calculation for that multi-employer pension fund? A. I don't recall, but I believe I did.  I mean, I think I would have had to have.  I just don't - - I don't recall it."); *id.* at 71:13-22 ("Q. Have you ever performed a withdrawal liability calculation for a multi-employer pension fund?  A. . . .I mean, I think I did 20-plus years ago.  But more recently when I've done calculations for withdrawal liability it was to replicate the work that was done by the plan's actuary [.]").

33.    As courts have consistently held, it is not enough for an expert to have training or generalized knowledge in a related field.  The proffered expert's expertise must relate ***specifically*** to the opinion they are offering. *See Calhoun*, 350 F.3d at 322 (holding certain proffered experts were generally qualified but lacked the qualifications necessary to testify on subjects outside of area of expertise); *see also Allscripts Healthcare, LLC v. Andor Health*, LLC, No. CV 21-704-MAK, 2022 WL 3021560, at *24 (D. Del. July 29, 2022) (excluding portions of expert testimony about Microsoft Azure where expert never consulted on a case involving Azure and never performed investigations regarding Microsoft Azure tenants, despite having general qualifications as a cybersecurity consultant); *Advanced Med. Optics, Inc. v. Alcon*, Inc., No. CIV.A. 03-1095-KAJ, 2005 WL 782809, at *9 (D. Del. Apr. 7, 2005) (finding renowned ophthalmologist was

unqualified to opine on fluidics systems despite having knowledge and experience of such systems from using them in the field of ophthalmological surgery); *Jones v. Synthes USA Sales, LLC*, No. CIV.A. 08-2060 JAP, 2010 WL 3311840, \*7 (D.N.J. Aug. 19, 2010) (finding expert to be unqualified to opine on spinal implant devices where expert was a metallurgical engineer but had no specific knowledge of orthopedic devices); *Curry v. Royal Oak Enterprises, LLC*, No. CIV.A. 11-5527, 2013 WL 3196390, \*1, \*5 (E.D. Pa. Jun 25, 2013) (finding chemist was unqualified to testify on issue of inadequate warning labels due to "minimal experience" with warning labels). Regardless of Campbell's actuarial training and pension-related experience, Campbell is not qualified to opine on whether the Funds' withdrawal liability calculations are correct or appropriate, as he does not have expertise in withdrawal liability calculations.

## II.    Campbell Offers Improper Legal Opinions

34.    Campbell offers two impermissible legal opinions:  that there is only one permissible rate to use when measuring UVBs (the minimum funding rate or something "similar" to it), and that NETTI is prohibited from using CBUs and contribution rates other than from 2013-2022 in determining Annual Payments.  These legal opinions invade the province of the Court and have zero probative value.

35.    The Third Circuit expressly prohibits an expert witness from rendering a legal opinion.  *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (holding expert testimony improperly opined on legal duties arising from federal securities laws); *Dow Chem. Canada Inc. v. HRD Corp.*, 656 F. Supp. 2d 427, 435–36 (D. Del. 2009), *aff'd as corrected*, 587 Fed. Appx. 741 (3d Cir. 2014) (striking expert testimony that drew conclusions on patent and contract law); *Rogers v. Wilmington Tr. Co.*, No. 18-CV-00116-CFC, 2020 WL 1310002, at \*1 (D. Del. Jan. 15, 2020) ("Expert testimony concerning custom and practice in an industry is 'proper so long as the expert does not give his opinions as to legal duties that arise under the law.'")

(internal quotation marks and alterations omitted); *see also Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (upholding exclusion of portions of expert report that invaded the province of the trial judge by interpreting portions of the Uniform Commercial Code); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) ("experience is hardly a qualification for construing a document for its legal effect").

36.     *Only One Permissible Rate*.  Campbell admits that his endorsement of the minimum funding rate, to the exclusion of all other actuarial approaches, is not based on his experience. Instead, he believes ERISA requires actuaries to select this assumption—an opinion he formed by reading the statutes.  *See* Sept. 9, 2024 Campbell Dep. Tr. 94:22-23 ("[t]his is our – yes, our reading of the plain language of these two statutes"); *id.* at 98:25-99:3 ("We think that the statutes as written here conflict with the—in many cases, many of the funds' cases, the rates selected by the actuaries to measure withdrawal liability."); *id.* at 146:2-3 ("Q. Are you a lawyer, Mr. Campbell? A.  No; but I can read [ERISA section] 4219.").  This is a legal opinion.  It is not grounded in actuarial practice, actuarial standards, or Campbell's own experience and observations as an actuary.  Campbell's opinion rests entirely on his interpretation of a statute.

37.     Not only does Campbell impermissibly opine on the law, he makes light of a very serious issue.  If Campbell is to be believed, the majority of actuaries today are acting in a way that would risk professional censure.  According to Campbell, any actuary that does not use the minimum funding rate—which, again, is a majority of practicing actuaries—is "not in compliance with the law."  *See* Sept. 10, 2024 Campbell Dep. Tr. 387:2-388:6; *see also* Sept. 9, 2024 Campbell Dep. Tr. at 99:6-23 (agreeing that "a majority of multi-employer plans do not use the minimum funding rate for determining withdrawal liability").  Accordingly, "there's a lot of. . . actuaries that would go to actuary jail[.]"  Sept. 10, 2024 Campbell Dep. Tr. 387:17-18; *see also* Sept. 9, 2024

Campbell Dep. Tr. at 100:7-15 ("Q. So it's your expert opinion that a majority of actuaries in the multi-employer pension space are using unreasonable assumptions? MS. CHAN: Object to form. A. That sounds kind of harsh, but it – yes[.]").  Campbell's glib dismissal suggests that he is not sincere in providing this opinion.  Regardless, as it rests entirely on his interpretation of ERISA, Campbell's opinion that there is only one permissible rate to use must be excluded as an inadmissible legal opinion.

38.     _NETTI's Annual Payments_.  Campbell's adjustments to NETTI's calculation of Annual Payments are also grounded entirely in legal opinion.  While he acknowledged the NETTI plan documents provide for different Annual Payment calculation inputs, Campbell stated he used inputs from 2013-2022 notwithstanding any contrary provision of the NETTI plan because any other inputs would not be legally permissible: "it's our understanding that PBGC approval is not available for any kind of alternative methodology for determining withdrawal liability payments." Sept. 9, 2024 Campbell Dep. Tr. 146:20-147:1.  No other justification was given than Campbell's own "reading . . . of ERISA."  *Id*. at 147:13-14.

39.     If the Debtors wish to make these legal arguments in briefing, they may do so, and the Funds will of course respond.  But placing these legal arguments in the mouth of an expert is impermissible.  Any expert testimony grounded only in the Campbell's reading of ERISA, rather than any relevant experience, should be disregarded.

## III.    Campbell's Opinions Are Not Reliable

40.     The Court should also exclude Campbell's testimony based on incomplete data, conjecture, improper process, or bias.  *See In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 800 (3d Cir. 2017) ("any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible") (quoting *In re Paoli R.R. Yard PCB Litig.* at 745).

41.     First, Campbell's revisions to the calculations of the Debtors' Annual Payments for Virginia Teamsters must be excluded as unreliable because Campbell relied on records that are demonstrably and admittedly incomplete.  Second, Campbell's opinion that Central PA Teamsters, Teamsters Local 710, and Virginia Teamsters should have elected a "fresh start" was disavowed during his deposition.  Third, Spencer's late removal from the report suggests infirmities in process that call the reliability of Campbell's testimony into question.  Finally, there are questions of improper bias stemming from Campbell and Spencer's conversations with certain of the Debtors' equity holders that render the Original Report and the Amended Report unreliable.

### A.     Campbell Relies on Facially Incomplete Records

42.     Campbell relied on records provided by the Debtors to calculate the Annual Payments for Virginia Teamsters.  But the Debtors do not have *any* records reflecting contribution base units, which is a necessary input of the Annual Payments.  Instead, the Debtors attempted to "back in" to the contribution base units by dividing Annual Remittances by a single contribution rate, notwithstanding the fact that the Debtors contributed to Virginia Teamsters at two different contribution rates.  *See* Sept. 9, 2024 Campbell Dep. Tr. 215:13-20 ("Q. Who made the decision to simply rely on the debtors' mathematical calculation of contribution base units? MS. CHAN: Object to form. A. Well, we did that. . . . But it was because that was the only information that - - that we were getting from the debtors."); *id.* at 222:6-17 ("Q. So [the Debtors] didn't produce to you any actual records. . . reflecting the contribution base units that they made contributions based on? MS. CHAN: Object to form. A. That's correct. Q. And, yet, you decided that the debtors' records. . . were more reliable than the records reflecting the actual contribution base units? MS. CHAN: Object to form. A. That was the decision we made, yes.").

43.     The data in the Debtors' records is admittedly incomplete.  The Debtors *do not have* contribution base unit-level records; all they have is the total dollar amount sent to the Fund on

behalf of all employees.  *See* Sept. 9, 2024 Campbell Dep. Tr. 221:16-20 ("Q. Just to be clear, the debtors did not actually provide you any records of contribution units. Correct? A. Explicitly in terms of, like, organically derived, yes.").  Nor do the Debtors know what portion of their employees during the relevant ten-year period were regular or casual.  Following delivery of the Original Report, the Debtors appear to have unearthed some records reflecting the split between casual and regular employees, but only for the nineteen months prior to the Debtors' cessation of operations (only twelve months of which are relevant for the withdrawal liability calculation).  *See* Amended Report at 20 n.56.[7]

44.     Yet with the full knowledge that the Debtors made contributions at two different rates, and even in possession of *some* data reflecting the split between the employee categories, Campbell elected to rely on records that backed into contribution base units by dividing Annual Remittances by a single contribution rate.  *See* Sept. 9, 2024 Campbell Dep. Tr. 207:19 – 208:12 (explaining that the Debtors determined CBUs by dividing the Debtors' total contributions for a year by the highest contribution rate for that year); *id.* at 225:4-11 ("Q. The calculations that you relied on for your – for the contribution base units used in your report effectively assume that everyone is a regular employee and each contribution is 97.40 per week, don't they?  MS. CHAN: Object to form.  A. That is, in effect, what – what we did, yes."); *id.* at 227:7-10 ("Q. . . . When you were providing your opinion and working on your report, did you explicitly account for casual employees in your calculations?  A. We did not.").

---

[7]     Campbell was aware of the Debtors' limited records of casual employees at this time of his deposition, although Virginia Teamsters was not.  *See* Sept. 9, 2024 Campbell Dep. Tr. 210:13-21 (testifying that he has only seen CBU breakdowns for "for parts of two years for casual employees only").  Despite this revelation in deposition and counsel's representation that the Debtors would produce such records, it was not until the Amended Report was provided (two months later) that Virginia Teamsters received these records.  *See id*. at 210:22 – 211:9; Amended Report at 20 n.56 ("The Debtors' records contained information regarding casual employees for Virginia Teamsters for the months January 2022 through July 2023 only.").

45.     This disregard of different contribution rates significantly undercounts total CBUs. Yet Campbell stands by this methodology, claiming the distinction between casual and regular employees and the different contribution rates for each does not meaningfully impact the Debtors' withdrawal liability.  *See* Amended Report at 19-20.  This, too, is an unreliable assumption, as it extrapolates a conclusion for ten years from one year's worth of data.  *See id.* at 20 n.56.  And Campbell goes even further, alleging that accounting for casual employees would "artificially and inappropriately inflate[]" the Debtors' withdrawal liability, notwithstanding that ERISA explicitly requires the use of *contribution base units*, not annual remittances or any other datapoint, as an input in determining Annual Payments.   Amended Report at 19; *contra* 29 U.S.C. § 1399(c)(1)(C)(i)(I).

46.     Campbell's reliance on the Debtors' incomplete records renders his opinion unreliable.  In particular, his disregard of contributions made on behalf of casual employees at a separate contribution rate is the kind of improper "cherry-picking" that courts regularly find leads to unreliable testimony.  *See In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.,* 858 F.3d at 796-800 (holding expert's analysis was unreliable and inadmissible because the expert improperly cherry-picked data, trendlines, and scientific studies to draw his conclusions); *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 138 (M.D. Pa. 2015) (excluding expert report as unreliable because expert used incomplete data to artificially inflate sales projections and failed to implement complete dataset after being provided with more complete version).  Campbell's adjustments to the Annual Payments owed to the Virginia Teamsters, grounded in incomplete and unreliable data, should be disregarded.

## B.     Campbell Disavowed His Opinion that the Funds Should "Fresh Start"

47.     In the Amended Report, Campbell opines that Central PA Teamsters, Teamsters Local 710, and Virginia Teamsters "would have had no UVBs at some point during the past ten

years, if the present value of vested benefits had been determined using the funding valuation interest rates" and then, at that point of zero UVBs, "assumed each Fund would have taken a 'fresh start' approach to calculating withdrawal liability."  Amended Report at 25.  In his deposition, however, Campbell disavowed this opinion by testifying that (i) taking a fresh start approach is optional and (ii) choosing not to take a fresh start could be reasonable.  *See* Sept. 9, 2024 Campbell Dep. Tr. 166:21 – 168:22 ("Q. Does ERISA require employers to adopt a fresh start if given the opportunity to do so? MS. CHAN: Object to form.  A. That's not my understanding of ERISA; ***it's just that it's available***. . . . Q. Is it your expert opinion that a multi-employer plan should always adopt a fresh start if it has the ability to do so? MS. CHAN: Object to form.  A. Yeah, I don't think - - I don't think it's my opinion that they should always.  I mean, that's a decision that each individual fund would need to make based on their own circumstances and history and how well funded they are.  There's lots of - - lots of variables. Q. So is it your opinion that it is unreasonable for a fund not to adopt a fresh start? MS. CHAN: Object to form.  A. Yeah, ***I don't think it's unreasonable***.") (emphasis added); Sept. 10, 2024 Campbell Dep. Tr. 295:21-296:14 ("Q. Are fresh starts optional? A. The— MS. CHAN: Object to form.  A. ***Yes, a fresh start is an option***. . . . Q. Fresh starts are not required, are they? A. ***They're not required***. Q. And a fresh start isn't required just because the assets of the fund exceed the liabilities on a given date, is it? MS. CHAN: Object to form.  A. It's not required, no. Q. And it's not required even if the assets exceed the liabilities on a given date, is it? MS. CHAN: Object to form.  A. It's not, no.") (emphasis added).

48.    Consequently, Campbell's opinion that these Funds would have elected a fresh start should be excluded as contradictory and speculative.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 (proffered expert's testimony cannot be based on "subjective belief or unsupported speculation") (quoting *Daubert*, 509 U.S. at 590); *Allscripts Healthcare, LLC*, 2022 WL 3021560,

at *43 ("It is well-established an opinion based on speculation or an educated guess is inadmissible.") (internal quotation marks omitted); *Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp. 2d 273, 280 (D. Del. 2013) (excluding expert testimony "that on its face, speculates about what is not known (and might or might not be the case)"); *see also Cot'n Wash., Inc. v. Henkel Corp.*, 56 F. Supp. 3d 626, 650 (D. Del. 2014) (excluding expert testimony where expert offered contradictory statements).[8]

### C.    Spencer's Removal Suggests an Unreliable Methodology

49.    The removal of one author from a jointly-submitted expert report, over three months after the report's initial delivery and following depositions of both experts, calls into question the reliability of the opinions given by the remaining author.

50.    One of two things must be true.  Either Spencer was necessary for the formation of these opinions, as the Debtors' fee applications attest, and his removal raises concerns as to whether Campbell's own opinions are now compromised (for it is inappropriate for one expert to rely on the opinions of another, non-testifying expert as the basis for his own opinion).  *See, e.g.*, *Pernix Ir. Pain DAC v. Alvogen Malta Operations Ltd.*, 316 F. Supp. 3d 816, 827 (D. Del. 2018) ("[T]he use of testimony from another expert who did not testify in this trial constitutes admission of inadmissible hearsay.").  Or Spencer was never necessary for these opinions.  In that case, his original inclusion as an author of the report was an error (and the purpose of the hundreds of hours he billed to this issue is now unclear), raising concerns that Campbell's testimony is not the

---

[8]    On page 28 of the Amended Report, Campbell also proffers an opinion on the "true value" of the lump sum withdrawal liability payments by relying on another expert's determination of the appropriate discount rate to apply to lump sum withdrawal liability payments.  In his deposition, however, Campbell walked away from this opinion entirely and admitted he had no opinion on the present value of the Debtors' Annual Payments.  *See* Sept. 9, 2024 Campbell Dep. Tr. at 187:5-15 ("Q. So what rate to use to discount the annual payments to present value is beyond the scope of your expert report? A. Which is why we used the rates that were developed by another expert for the debtors on this case. Q. So you don't have an opinion on the present value of the future payment obligations the funds owe to the debtors?  MS. CHAN: Object to form.  A. I do not.").  This opinion, too, should be excluded.

"product of reliable . . . methods."  Fed. R. Evid. 702; *Butts v. Weisz*, 410 F. App'x 470, 472 (3d Cir. 2010) ("Rule 702 requires that expert testimony. . . be 'the product of reliable principles and methods.'"); *Wood v. Showers*, 822 F. App'x 122, 125 (3d Cir. 2020) (finding that the expert report's methodology "lack[ed] so many indicia of reliability" as to render it inadmissible under Rule 702).  Either way, Spencer's sudden, eleventh-hour removal casts serious doubts on the Amended Report's reliability and whether it holds any probative weight.

### D.    Campbell's and Spencer's Communications with MFN Partners Raise Questions of Bias

51.    Finally, during Spencer's deposition, Spencer admitted that he and Campbell had a call with counsel to MFN Partners ("MFN")—holders of certain equity interests in the Debtors—about withdrawal liability calculations relating to the Non-SFA Funds.  *See* Spencer Dep. Tr. 137:8-139:3.  It is no secret that MFN has a strong interest in reducing or eliminating unsecured claims in these cases, including those of the Funds, in an effort to drive returns to equity.  Due to objections by Debtors' counsel on common interest privilege grounds, it is unclear precisely what Campbell and Spencer discussed with MFN's counsel.[9]  However, that Campbell and Spencer discussed the Funds' withdrawal liability calculations with MFN's representatives at all raises serious questions as to the Amended Report's credibility.  Unlike the Debtors, MFN is not an estate fiduciary.  That the Debtors' experts discussed their work on objections to the Funds' claims with MFN suggests the distinct possibility that instead of striving to arrive at the correct, supportable calculation of each Fund's claim, the Debtors' experts were instead attempting to reduce the claims for the benefit of MFN.

*          *          *

---

[9]    The Funds reserve all rights regarding whether this privilege, to the extent it ever existed, has been waived.

52. Campbell's opinions fail to meet Rule 702's admissibility standard. Campbell lacks the experience necessary to opine on withdrawal liability calculations, certain conclusions are impermissible legal opinions or based on faulty data or conjecture, and there are significant indicia of failures in process and bias. Campbell's opinions must therefore be excluded.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Funds respectfully request that the entirety of the Amended Report, and any testimony by Campbell on the opinions set forth therein, be excluded.

Dated: November 11, 2024
    Wilmington, Delaware

*/s/ Cory D. Kandestin*
Mark D. Collins (No. 2981)
Cory D. Kandestin (No. 5025)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: collins@rlf.com
    kandestin@rlf.com

-and-
Dennis F. Dunne (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
-and-
Andrew M. Leblanc (admitted *pro hac vice*)
Erin E. Dexter (admitted *pro hac vice*)
Melanie Westover Yanez (admitted *pro hac vice*)
Riah Kim (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100,
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
*Counsel for the Funds*