# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, *et al.*, [1] | ) | Case No. 23-11069 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## <u>FUNDS' REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF ROBERT T. CAMPBELL</u>

Mark D. Collins
Cory D. Kandestin
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

Dennis F. Dunne
(admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

Andrew M. Leblanc
(admitted *pro hac vice*)
Erin E. Dexter
(admitted *pro hac vice*)
Melanie Westover Yanez
(admitted *pro hac vice*)
Riah Kim
(admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

*Counsel for the Funds*

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is:  11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

The Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan ("Central PA Teamsters"), the International Brotherhood of Teamsters Union Local No. 710 Pension Fund ("Teamsters Local 710"), the New England Teamsters Pension Fund ("NETTI"), and the Teamsters Joint Council No. 83 of Virginia Pension Fund ("Virginia Teamsters"; together, the "Funds"), by and through their undersigned counsel, respectfully submits this reply (the "Reply") in support of their Motion *in Limine* to Exclude the Expert Report and Testimony of Robert T. Campbell [Dkt. No. 4837] (the "Motion")[2] and in response to the Debtors' Opposition to the Motion [Dkt. No. 5043] (the "Opposition").

## PRELIMINARY STATEMENT

1.    The Funds seek to exclude Campbell's report and testimony on three principal grounds:  (i) Campbell's experience does not qualify him to opine on whether the Funds' actuaries selected appropriate discount rates to calculate the Debtors' withdrawal liability, (ii) Campbell's primary opinion—that those discount rates must be the same or 'similar' to the rates the Funds use for minimum funding purposes—is an entirely legal opinion (as are others), and (iii) Campbell's report contains serious flaws, either in methodology or process, that call the report's reliability into question.  Instead of addressing these points head-on, the Debtors characterize the Funds' criticisms as overblown.  But the concerns articulated are sincere.  The Debtors' expert calls the professional judgment of fellow actuaries into question without sufficient relevant experience to do so, and employs questionable methods in the process.  His testimony should be excluded.

2.    The first basis on which the Funds seek to exclude Campbell's testimony concerns experience.  As is apparent from all briefing to date, the central dispute between the Debtors and the Funds concerns actuarial decision-making:  each Fund actuary, in his professional judgment

---

[2]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

1

and discretion, selected a discount rate to use in his withdrawal liability calculation. Campbell opines that all of the actuaries' professional judgments are wrong, though he cannot recall making such a judgment himself. The Debtors attempt to defend Campbell's qualifications by suggesting that even though he lacks specific expertise in selecting these assumptions, his ability to perform actuarial calculations may nevertheless be helpful to the Court. But the critical issue here is not the math. It is the actuarial decision-making process in selecting the assumptions that are inputs to the math. That Campbell can perform complicated actuarial mathematics (which the Funds readily admit) does not mean that he is qualified to opine on the appropriateness of actuarial decision-making in this highly specialized circumstance. Neither does the fact that Campbell worked generally in the pension space for 41 years. Campbell may be qualified to opine on some actuarial matters, and may be able to calculate withdrawal liability, but he does not have experience that qualifies him to opine on the narrow issue of how MEPP actuaries select assumptions for withdrawal liability.

3. The Funds' second basis for exclusion is the legal nature of certain of Campbell's opinions. Attempting to evade this argument, the Debtors again suggest that Campbell's generalized experience may nevertheless be helpful to the Court. But the Debtors do not dispute that certain of Campbell's opinions are grounded only in his reading of ERISA, and not in his personal experience in the actuarial field. Moreover, the Debtors have now argued that opinions regarding the discount rate offered by an expert for NETTI and Central PA Teamsters, Ms. Tammy Dixon, should also be excluded as a legal opinion—seemingly an admission that Campbell's opinion on the discount rate is a legal one. Unlike Campbell, however, Dixon offers opinions drawn from her specific experience selecting actuarial assumptions in connection with withdrawal liability calculations. Campbell finds the Funds' actuaries' chosen discount rates to be

unreasonable only because he believes them to violate ERISA—no other reason.  It is a legal opinion, and should be disregarded.

4.   The Funds finally raise several indicia of the unreliability of Campbell's opinions, which the Debtors would sidestep entirely.  But though the Debtors may receive the Funds' thorough catalogue of concerns as a "hodgepodge,"[3] each concern individually warrants (at the very least) close scrutiny, and together they suggest serious deficiencies in methodology and process:

- Campbell used facially incomplete records to calculate the Annual Payments for Virginia Teamsters—records that do not reflect what contributions were made on behalf of what category of employee.  While the Debtors were able to unearth employee-level records for a small fraction of the relevant time period, Campbell declined to use them.

- Campbell's opinion that certain Funds should have elected a "fresh start" is entirely speculative, and is inconsistent with deposition testimony in which he suggested it could in fact be reasonable to do the opposite—to decline to take a "fresh start."

- Campbell originally had a co-author of his opinions.  Now he does not.  The Debtors shed no light on the reason for Spencer's original inclusion in and subsequent exclusion from the report that is now only Campbell's.

- Campbell and Spencer discussed their work with MFN Partners before delivering their Original Report.  No meaningful explanation for this conversation is given.

5.   The Debtors suggest that rather than excluding Campbell's testimony, the Court should afford it lesser weight.  The Funds agree that, at minimum, this would be appropriate.  But the Funds continue to contend that Campbell's testimony is not admissible—it is grounded in insufficient experience for the specific matter at issue, is an improper legal opinion, or is unreliable. This testimony cannot satisfy the requirements of Rule 702, and should be excluded.

---

[3]    Opposition ¶ 4.

## **ARGUMENT**

### I.    **CAMPBELL IS NOT QUALIFIED TO GIVE THE OPINION HE OFFERS ON THE DISCOUNT RATE**

6.    The Debtors claim Campbell is qualified because no one challenges his math, and because he has worked at a renowned firm for most of his career where he occasionally audited MEPP actuaries' calculations.  Neither suffices to establish the necessary qualifications.

7.    That Campbell's calculations are correct is not enough when it is the inputs for those calculations that are at issue.  The Debtors attempt to play a trump card by noting that none of the Non-SFA Funds dispute Campbell's math.  *See* Opposition ¶ 2 (claiming "no MEPP in this case has . . . claimed that he did the math wrong"); ¶ 14 (stating that "not one single MEPP . . . disagree[s] with his math"); ¶ 19 (same).  But the math is not the relevant actuarial expertise needed here.  It is the actuarial expertise required to select the assumptions necessary to perform a withdrawal liability calculation—a complex and nuanced process that occurs before determining, and is independent of, the outcome of the calculation.

8.    Multi-employer pension plan actuaries are regularly required to make carefully considered decisions about plan assumptions, including discount rates, and to place their professional credibility on the line when they do so.  *See* 29 U.S.C. § 1393(a)(1); 26 U.S.C. § 431(c)(3).  The Funds' actuaries each made those decisions and put their signatures behind them. *See Funds' Motion for Summary Judgment* [Dkt. No. 4835] ¶ 46.   Campbell, by contrast, cannot definitively recall ever engaging in this process.  *See Declaration of Erin E. Dexter in Support of the Funds' Motion in Limine* [Dkt. No. 4838] ("Dexter Decl."), Ex. B (Sept. 9, 2024 Campbell Dep. Tr.) at 32:21-33:5 ("Q. Did you ever perform a withdrawal liability calculation for that multi-employer pension fund?  A. I don't recall, but I believe I did. I mean, I think I would have had to have. I just don't -- I don't recall it. Q. So do you recall how you valued the unfunded vested

benefits of that multi-employer pension plan?  A. No, I don't."); *id*. at 71:13-20 ("Q. Have you ever performed a withdrawal liability calculation for a multi-employer pension fund?  A. . . . I mean, I think I did 20-plus years ago.  But more recently when I've done calculations for withdrawal liability it was to replicate the work that was done by the plan's actuary [.]").

9.    Campbell's actuarial experience, while extensive, centered primarily around single employer plans that do not assess withdrawal liability.  Campbell does not have experience making the actuarial decisions that he criticizes here.  *See* Dexter Decl., Ex. B (Sept. 9, 2024 Campbell Dep. Tr.) at 31:14-16 ("I think if you look at my entire 41 years, yes, I'd say more that has been devoted to single-employer pension -- pension plans."); *id.* at 32:12-14 (clarifying that recent experience with MEPPs "doesn't make up for all the many years of, you know, where the focus was mainly on single-employer plans[.]").  The Debtors claim that Campbell has acquired relevant experience through the occasional "audit[s]" or "second opinions" of MEPP actuaries' decisions. Opposition ¶ 2.  But simply checking the math of others or auditing records does not equate to making, under professional certification, those highly scrutinized decisions in the first instance. Campbell cannot recall being responsible for selecting actuarial assumptions for purposes of withdrawal liability himself, nor being in a position where he had to certify and stand behind those assumptions as part of his professional work.  He lacks the experience necessary to render an opinion here.

10.    For this reason, the Debtors' attempt to distinguish the cases in the Funds' Motion are of no moment.  For example, the Debtors attempt to reframe the holding of *Allscripts Healthcare, LLC v. Andor Health, LLC*, No. CV 21-704-MAK, 2022 WL 3021560 (D. Del. July 29, 2022) by noting that there, the court found that qualifications in cyber-hacking rendered an expert sufficiently qualified to testify generally about the impact of cyber-hacking on Microsoft Azure

tenants and subscriptions. *See* Opposition ¶ 16. But the Debtors disregard that the court also excluded certain testimony that the expert had no specific experience to give—namely, what Azure "tenants" are, the "relationship between tenants and subscriptions, [and] ownership of tenants." *Allscripts*, 2022 WL 3021560, at *24. In other words, while the *Allscripts* expert could testify about matters in which he in fact had general expertise, he could not testify regarding the specific functions of Microsoft Azure tenants and subscriptions—matters where the expert had no specific expertise. The same result should obtain here. The Debtors do not dispute that Campbell has no specific expertise in the selection of actuarial assumptions for the purpose of calculating withdrawal liability. He should not be permitted to offer his opinion regarding the selection of actuarial assumptions for the purpose of calculating withdrawal liability.

11. The Debtors similarly misunderstand other cases cited by the Funds, claiming that those cases involved experts with "zero experience … or training" in the subject matter of their testimony. *See* Opposition ¶ 16, n.4. But in each of those cases, the court recognized that the expert had general experience and training, but that expertise was not sufficiently specialized to the narrow issues at hand. *See Curry v. Royal Oak Enterprises, LLC*, No. CIV.A. 11-5527, 2013 WL 3196390 (E.D. Pa. Jun. 25, 2013) (excluding an expert with a background in chemistry, the testing of consumer products, consumer safety studies, fire investigations, and warning labels for cosmetic products, as this experience was inadequate to support testimony regarding warning labels for charcoal smokers); *Jones v. Synthes USA Sales, LLC*, No. CIV.A. 08-2060 JAP, 2010 WL 3311840 (D.N.J. Aug. 19, 2010) (an expert generally qualified in metallurgical engineering could not testify on the strength of metals used in surgical procedures as he had no specific experience in the medical field); *Advanced Med. Optics, Inc. v. Alcon, Inc.*, No. CIV.A. 03-1095-KAJ, 2005 WL 782809 (D. Del. Apr. 7, 2005) (an eye surgeon with general knowledge of a

cataract surgical machine and who approved all purchases for his department could not testify regarding sales and market trends of that machine); *see also Calhoun v. Yamaha Motor Corp., USA*, 350 F.3d 316, 321 (3d Cir. 2003) (a human factors engineer and psychologist, though familiar generally with product warnings, could not testify specifically about a child's tendency to squeeze a jet ski throttle as a stress response).

12.    The additional cases the Debtors invoke similarly fall short.  In two, *Waldorf* and *Hammond*, the court found that the experts had substantial practical experience specific to the matter at issue, despite lacking formal training or education in the field.  *See Waldorf v. Shuta*, 142 F.3d 601, 626 (3d Cir. 1998) (finding expert qualified because he had over 20 years of experience working in the relevant field despite lacking formal education and training); *Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 653 (3d Cir. 1982) (finding expert qualified notwithstanding his lack of formal education in the subject matter because he had extensive relevant practical experience).  And in *Holbrook* and *Payton*, the court permitted the experts to speak on matters that are routine elements of those experts' professions.  *See Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 781-82 (3d Cir. 1996) (holding that an internal medicine physician was qualified to opine on mesothelioma despite not being an oncologist because his opinion relied on a pathology report which he routinely analyzes); *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985) (holding two obstetrician-gynecologists could testify as to the effects of drugs on fetuses despite never having been research scientists, because such analysis would have been a standard element of the experts' medical school educations).  Campbell's education or training is not in question here, but his practical experience is.  Campbell himself has admitted that his work with MEPPs constituted

only a small percentage of his work in the past 40 plus years.  Campbell simply is not qualified to testify regarding the selection of actuarial assumptions for withdrawal liability.[4]

13.   The Funds do not dispute Campbell's résumé, nor do the Funds contend that Campbell would not be well-qualified to discuss the actuarial practices with which he did, in fact, engage extensively.  But it is crucial to recognize that his experience, though long-tenured, is not the kind that speaks to the specific issues in this case.  The Court requires testimony from someone who can attest to how actuaries select assumptions for withdrawal liability and the kinds of assumptions they are willing to put their professional credibility behind.  Campbell's cavalier assertion that actuaries who do not select the funding assumption belong in "actuary jail" only underscores his limitations in this respect.  Dexter Decl., Ex. C (Sept. 10, 2024 Campbell Dep. Tr.) at 387:11-19. Campbell lacks the relevant qualifications to opine on the narrow matter in dispute.  His opinion regarding the appropriate actuarial assumptions to select for purposes of withdrawal liability calculations must therefore be excluded.

## II.   CAMPBELL OFFERS LEGAL OPINIONS

14.   Campbell offers two legal opinions:   that the Funds' selected discount rates, and NETTI's calculation of Annual Payments, each violate ERISA.  *See* Motion ¶¶ 36-38; *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("an expert witness is prohibited from rendering a legal opinion").  The Debtors defend Campbell's ability to offer these opinions with two arguments:  (i) that once the Court decides on these issues during the summary

---

[4]    The Debtors cite additional cases which suggest that Campbell's lack of specific expertise goes to the weight of his testimony rather than admissibility.  *See Knight v. Otis Elevator Co.*, 596 F.2d 84, 88 (3d Cir. 1979) (admitting expert testimony in a product liability action despite expert's lack of specific expertise in design defects, as his "inexperience . . . should go to the weight, and not to the admissibility, of his opinion"); *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 226-27 (N.D.N.Y. 1994), *aff'd sub nom. Lappe v. Honda Motor Co. of Japan*, 101 F.3d 682 (2d Cir. 1996) ("a lack of specialization affects the weight of the opinion, not its admissibility").  If the Court determines to admit Campbell's testimony, the Funds agree that Campbell's testimony should be afforded limited weight given Campbell's inexperience with MEPPs and withdrawal liability.

judgment phase, the Funds' objection to Campbell's legal opinions will be a "moot point," and (ii) that if the Court declines to enter summary judgment on these issues, Campbell "should still be able to generally opine on industry standards for performing actuarial valuations for MEPPs, actuarial practices he has observed within the MEPP context (particularly concerning withdrawal liability calculations), and as to various flaws with the Funds' actuaries' assumptions and methodologies in calculating withdrawal liability in this case."  Opposition ¶¶ 19-20; *see also id*. ("[a]t the very least, Mr. Campbell should be allowed to provide testimony at trial rebutting any claims by the Funds' experts that use of the PBGC rates, the Segal Blend, or use of the current liability rates was reasonable.").  These arguments are unpersuasive and seek to re-frame Campbell's opinions as ones he has not given.

15.  First, the Debtors' suggestion that a decision on summary judgment will render Campbell's opinions moot can only be understood as an admission that Campbell's opinions are legal opinions.  The Funds concur—particularly as Campbell admits that his opinion on both topics is based only on his reading of ERISA, rather than any practical experience (as discussed below). Campbell's legal opinions offer no value to the Court.

16.  Second, the Debtors' contention that Campbell can opine on "industry standards[,]" "actuarial practices[,]" or "flaws with the Funds' actuaries' assumptions and methodologies" suggests that Campbell intends to offer new opinions absent from his report.  Opposition ¶ 20. Campbell has made clear in all of his reports (original and amended) that his opinions on the discount rate and NETTI's Annual Payment calculation rest entirely on his reading of ERISA— he is not offering opinions based on industry standards or actuarial practices.  *See* Opposition, Ex. 1 (Am. Expert Report) at 21 ("[…] the Non-SFA Funds did not follow ERISA […] in calculating and assessing withdrawal liability for the Debtors."); *id*. at 22 ("[…] the Non-SFA Funds […]

ignored the ERISA requirements related to withdrawal liability payments for the Debtors."); *see also* Dexter Decl., Ex. B (Sept. 9, 2024 Campbell Dep. Tr.) at 94:22-23 ("[t]his is our -- yes, our reading of the plain language of these two statutes"); *id.* at 98:25-99:3 ("We think that the statutes as written here conflict with the—in many cases, many of the funds' cases, the rates selected by the actuaries to measure withdrawal liability."); *id.* at 147:2-13 (confirming that his criticism of NETTI's annual payment calculation is "based on my reading, our reading of ERISA").  And Campbell never claimed any basis for either opinion other than inconsistency with what he believes ERISA to say.  *See Declaration of Erin E. Dexter in Support of the Funds' Reply in Support of its Motion in Limine*, Ex. J (Sept. 9, 2024 Campbell Dep. Tr.) at 97:8-16 ("Q. Is it your expert opinion that it is unreasonable for an actuary to use an assumption that is not the minimum funding rate when performing a withdrawal liability calculation? MS. CHAN: Object to form. A. I think it's unreasonable to use an assumption that varies significantly from the funding valuation interest rate, given the statute."); Dexter Decl., Ex. B (Sept. 9, 2024 Campbell Dep. Tr.) at 147:25-148:5 (testifying that NETTI's use of the Segal Blend is "inconsistent with Actuarial Standards of Practice in the sense that the standard of practice says if applicable law conflicts with something that could be derived from the standard of practice, then the applicable law prevails"); *id.* at 147:2-10 ("Q. What does that understanding, that PBGC approval is not available for alternative methodologies for determining withdrawal liability payments, based on?  A. Just from reading, reading the -- reading 4219 itself and looking -- looking for, you know, any kind of -- any kind of provision in the regulations on 4219 that would permit it. And it's just not there.").

17. The Debtors attempt to shoehorn new opinions into their expert's testimony by claiming that Campbell, over the years, has acquired "knowledge of the applicable law and standards of practice governing selection of actuarial assumptions and methods" and "a grasp of

how and when industry standards interplay with the law." Opposition ¶ 21. But Campbell does not ground his opinion in actuarial practice or industry standards, and admits that with respect to the discount rate, common practice is in conflict with his opinion: most plan actuaries today choose to use a discount rate for purposes of withdrawal liability that does not exclusively reflect expected investment returns. *See* Dexter Decl., Ex. B (Sept. 9, 2024 Campbell Dep. Tr.) at 99:14-23 ("Q. Mr. Campbell, have you observed that a majority of multi-employer plans do not use the minimum funding rate for determining withdrawal liability? A. Yeah, I haven't seen survey information, but I -- so I don't know if it's majority. But in my observation, I've – I've seen more -- more funds using something other than the funding valuation rate than actually using the funding valuation rate."). According to Campbell, current actuarial practice is wrong. Dexter Decl., Ex. C (Sept. 10, 2024 Campbell Dep. Tr.) at 387:2-388:6 (claiming that a majority of practicing actuaries today are "not in compliance with the law"). Moreover, there is an inherent contradiction in suggesting that Campbell's expertise allows him to opine on "how and when industry standards interplay with the law" when the recent rash of court decisions expressing skepticism for anything other than the minimum funding rate began only after Campbell had left his active actuarial practice at Willis Towers Watson. *See Funds' Opposition to the Debtors' Motion for Partial Summary Judgment* [Dkt. No. 5042] (explaining that recent cases suggesting the minimum funding rate and withdrawal liability discount rates should be identical or similar rest on the flawed premise that ERISA requires an actuary's "best estimate" to reflect the plan's investment returns).

18. The opinions Campbell offers—that actuaries are legally required to select the minimum funding rate (or something "similar"), and that NETTI's Annual Payment calculation is inconsistent with ERISA—are pure legal opinions. They are not based on his experience. And to the extent Campbell seeks to testify that actuarial practice and custom support these opinions, the

Court should not allow it, as those opinions never appeared in any of his reports and his deposition testimony in fact contradicts it. *See Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F.Supp.2d 604, 615 (D. Del. 2007) (excluding belated opinions of expert that fell outside the scope of his report and deposition). Campbell's legal opinions should be excluded.

## III.    CAMPBELL'S REPORT IS METHODOLOGICALLY UNRELIABLE

19.   The remaining opinions in Campbell's report must, too, be excluded as they do not satisfy Rule 702's reliability requirement. The Debtors fail to explain why Campbell's reliance on the Debtors' annual remittance records for Virginia Teamsters—which do not reflect CBUs for different categories of employees—is methodologically sound, why Campbell's calculations assuming a "fresh start" are not speculative, and why this Court should trust the integrity of Campbell's report despite unanswered questions regarding process and potential bias.

### A.    Campbell Did Not Rely on Reliable Records Because He Either Did Not Have Them or He Ignored Them

20.  Campbell's adjustments to Virginia Teamsters' Annual Payment calculations are based on facially incomplete records. This should end the inquiry—the data in which the report is grounded is not reliable. The contention that it was appropriate for Campbell to rely on the Debtors' records because he "made every attempt to investigate the accuracy of the Fund's CBU records" and that any discrepancies are just "disputed facts" fails (Opposition ¶¶ 28-29)—Campbell's opinions must be grounded in reliable data and methods, and they are not.

21.  The Debtors' records that Campbell uses for his calculations do not contain ***any data*** regarding the Debtors' employees' CBUs. The records reflect only the total dollars the Debtors remitted to Virginia Teamsters on behalf of all employees of every category, without detail by category. On the other hand, Virginia Teamsters does have records that reflect the various CBUs of casual and regular employees. But Campbell disregarded Virginia Teamsters' records and

instead created entirely new CBU calculations using the Debtors' remittance records alone—even though such records provide no information regarding what contributions were made on behalf of which kind of employee.  This inescapably renders Campbell's methodology unreliable.

22.  The Funds do not fault Campbell here—he was hamstrung by the Debtors' lack of adequate records.  But creating new data by making incorrect assumptions about the Debtors' employee base is improper and cannot satisfy Rule 702.  *See* Dexter Decl., Ex. B (Sept. 9, 2024 Campbell Dep. Tr.) at 212:18-213:13 (Campbell confirming that only a single contribution rate was used to "determine the contribution base units for each year" and the Debtors "assume[d] that everyone -- every contribution to the fund [was] based on the same rate."); *id*. at 207:19-208:12 (explaining that the Debtors determined CBUs by dividing the Debtors' total contributions for a year by the highest contribution rate for that year); *id.* at 225:4-11 ("Q. The calculations that you relied on for your -- for the contribution base units used in your report effectively assume that everyone is a regular employee and each contribution is 97.40 per week, don't they? MS. CHAN: Object to form. A. That is, in effect, what -- what we did, yes.").  And contrary to what the Debtors say, Campbell did indeed cherry-pick what data to reflect—he declined to account, at all, for even the few months of casual employee data he had concrete evidence of.  *See* Opposition, Ex. 1 (Am. Expert Report) at 20 n.56 (stating that "[t]he Debtors' records contained information regarding casual employees for Virginia Teamsters for the months January 2022 through July 2023 only[,]" but declining to incorporate this data into his calculations).

23.  The Debtors claim that the difference between the Debtors' and Virginia Teamsters' records is merely a disputed fact that should go to the weight, not admissibility, of the testimony. That might have been true if the Debtors had any credible basis to dispute Virginia Teamsters' calculations, which reflect the separate employee categories.  But the Debtors only have 12 months

of relevant employee-level data, and *Campbell did not use any of it*.  The admission that Campbell

found, but disregarded, evidence that the Debtors indeed contributed to Virginia Teamsters at

different rates on behalf of different categories of employees supports the Funds' position that

Campbell's methodology in criticizing the Virginia Teamsters' Annual Payment calculation is not

sound.

24.  The remittance records that Campbell relied on do not contain the CBU data needed

to calculate Annual Payments for Virginia Teamsters, and Campbell's method of reverse-

engineering CBUs from those records is fundamentally unreliable because it does not account for

the Debtors' different contribution rates for different categories of employees.  Testimony based

on such unreliable methods cannot be admitted.  *See In re Zoloft (Sertraline Hydrochloride) Prod.*

*Liab. Litig.*, 858 F.3d 787, 800 (3d Cir. 2017) ("any step that renders the analysis unreliable under

the Daubert factors renders the expert's testimony inadmissible") (quoting *In re Paoli R.R. Yard*

*PCB Litig.* at 745); *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 138 (M.D. Pa. 2015) (excluding

expert report as unreliable because expert used incomplete data to artificially inflate sales

projections and failed to implement complete dataset after being provided with more complete

version).

### B.  Campbell's Opinion on the Fresh Start Is Speculative and Inconsistent

25.  The Debtors fail to acknowledge that Campbell's opinion that certain Funds should

have adopted a "fresh start" is entirely speculative.  The Funds never had a zero-UVB year, and

never had occasion to consider adopting a fresh start; hypothesizing about what the Funds might

have done in circumstances that did not occur is not probative testimony.  *See Leonard v. Stemtech*

*Health Scis., Inc.*, 981 F. Supp. 2d 273, 280 (D. Del. 2013) (excluding expert testimony "that on

its face, speculates about what is not known (and might or might not be the case)"); *see also*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993) (explaining that expert

testimony "must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known" and "'knowledge' connotes more than subjective belief or unsupported speculation").[5] Campbell's opinion on the fresh start is purely speculative and is not helpful to this Court.

26.  The Debtors note that notwithstanding the fresh start's optionality, Campbell opines that it would be unreasonable for the Funds not to elect a fresh start, and it is appropriate for the Court to consider this opinion.  Opposition ¶ 31.  Citing selective testimony where Campbell noted that taking a fresh start may have some administrative benefits, the Debtors suggest that Campbell opines that adopting a fresh start is reasonable.  *Id*.  But the Debtors ignore the portion of Campbell's testimony where he agrees that it could also be reasonable for a fund to *decline* to adopt a fresh start.  *See* Dexter Decl., Ex. B (Campbell Sept. 9, 2024 Dep. Tr.) at 172:2-10 ("Q. In your opinion, would it be unreasonable for Local 710 not to take a fresh start if it had the opportunity to do so?  MS. CHAN: Object to form.  A. I think it would be reasonable to -- definitely would be reasonable to adopt a fresh start. I don't know that it would be unreasonable not to. I mean, it's -- you know, it's their decision.").  This is inconsistent testimony at best, and it is unreliable as a result.

### C.    The Opposition Does Not Clarify Why Spencer Was Removed from the Report

27.  The Debtors fail to address why Spencer was removed from the Amended Report. This omission is notable.  The Debtors' records reflect that Spencer spent over 150 hours on the Original Report.  *See* Motion ¶ 11; Hilco Fee Applications [Dkt. Nos. 3763, 3982, 4208].  The Non-SFA Funds and the Debtors' estates expended significant resources in preparing and conducting the deposition of an expert who apparently no longer stands by the opinions about which he testified.  The Debtors, while not disputing the portions of Campbell's and Spencer's

---

[5]     It is no answer that Teamsters Local 710 would be required, under its plan, to adopt a fresh start if it experienced a zero-UVB year.  Teamsters Local 710 never had zero UVBs; this plan provision was not triggered.

testimony where each stated the other was necessary for the final product, now suggest that Spencer simply "assisted" Campbell all along and "there is nothing wrong with that."  Opposition ¶ 37.  But there *is* something wrong with the fact that the Debtors are unable to clarify why they initially presented Spencer as a joint expert whose opinions were inseparable from Campbell's, only to later relegate him to the role of "assistant."

28.   Elsewhere in the Opposition, the Debtors cite a report by Mr. Kevin Campe, expert for the Philadelphia Teamsters, for the uncontested point that Campbell can ably perform actuarial calculations.  But the Debtors neglect to mention that a distinct decision was made for Campbell to submit a rebuttal report to Campe's alone, without Spencer, because the issues in that rebuttal report were "entirely actuarial in nature."  Dexter Decl., Ex. C (Sept. 10, 2024 Campbell Dep. Tr.) at 328:11-16.  Yet Spencer was initially included here as a co-author with Campbell.  The Debtors do not explain why the same decision was not made with respect to the report at issue here, or why they later elected to reverse course.

29. The Debtors' silence on this point leaves crucial questions unanswered.  Without knowing whether the final opinions presented in the Amended Report are fully Campbell's or if they have been influenced by an author who has now withdrawn his name, it is impossible to assess the integrity of the report.

### D.    The Opposition Does Not Shed Light on Campbell and Spencer's Conversations with MFN Partners

30. For similar reasons, there is a legitimate concern about bias stemming from the discussions between Campbell, Spencer, and MFN Partners regarding the Debtors' withdrawal liability to the Non-SFA Funds.  The Debtors' sole response on this point is that the conversation was apparently not very detailed.  But no explanation was given regarding what was discussed or

what motivated the discussion when the topic arose during Spencer's deposition,[6] and the Debtors again decline to provide an explanation now.  This ongoing lack of transparency only heightens the concern that these conversations could have influenced the opinions rendered by Campbell.

*          *          *

31.  Campbell's opinions fail to meet Rule 702's admissibility standard, and the Debtors have not established otherwise.  Campbell's opinions must therefore be excluded.

## <u>CONCLUSION</u>

For the foregoing reasons, the Funds respectfully request the Court to grant the Funds' Motion and exclude the expert report and testimony of Mr. Robert T. Campbell.

[*Remainder of the page is intentionally left blank.*]

---

[6]   The Debtors' counsel instructed Spencer not to divulge details of his and Campbell's conversations with MFN Partners on grounds of the Debtors' and MFN Partners' purported "common interest in managing this estate." Dexter Decl., Ex. D (Sept. 11, 2024 Spencer Dep. Tr.) at 139:8-10.

Dated:      December 4, 2024          */s/ Cory D. Kandestin*
            Wilmington, Delaware       Mark D. Collins (No. 2981)
                                       Cory D. Kandestin (No. 5025)
                                       **RICHARDS, LAYTON & FINGER, P.A.**
                                       One Rodney Square
                                       920 North King Street
                                       Wilmington, Delaware 19801
                                       Telephone: (302) 651-7700
                                       Facsimile:  (302) 651-7701
                                       Email:  collins@rlf.com
                                               kandestin@rlf.com

                                       -and-
                                       Dennis F. Dunne (admitted *pro hac vice*)
                                       **MILBANK LLP**
                                       55 Hudson Yards
                                       New York, New York 10001
                                       Telephone: (212) 530-5000
                                       Facsimile:  (212) 530-5219

                                       -and-

                                       Andrew M. Leblanc (admitted *pro hac vice*)
                                       Erin E. Dexter (admitted *pro hac vice*)
                                       Melanie Westover Yanez (admitted *pro hac vice*)
                                       Riah Kim (admitted *pro hac vice*)
                                       **MILBANK LLP**
                                       1850 K St. NW, Suite 1100,
                                       Washington, DC 20006
                                       Telephone: (202) 835-7500
                                       Facsimile:  (202) 263-7586
                                       *Counsel for the Funds*